**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (AZ Bar No. 15838)
Brunn (Beau) W. Roysden III (AZ Bar No. 28698)
Drew C. Ensign (AZ Bar No. 25463)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-5025
Joseph.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov

*Attorneys for Plaintiff State of Arizona*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA,<br><br>   Plaintiff,<br><br>  v.<br><br>JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as acting inspector general of the Department of Treasury; and U.S. DEPARTMENT OF THE TREASURY;<br><br>   Defendants. | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.     This is a constitutional challenge to a provision in the American Rescue Plan Act of 2021 (the "Act"). Specifically, a component of Section 9901 of the Act (hereinafter, the "Tax Mandate") forbids States from using COVID-19 relief funds to "directly or indirectly offset a reduction in … net tax revenue" resulting from state laws or regulations that reduce tax burdens—whether by cutting rates or by giving rebates, deductions, credits, "or otherwise." This Tax Mandate is plainly unconstitutional, either because: (1) it is too ambiguous to satisfy the constitutional requirements for Congress placing conditions on the States under the Spending Clause or (2) it represents an unprecedented and unconstitutional intrusion on the separate sovereignty of the States through federal usurpation of one half of the State's fiscal ledgers—control of their revenues.

2.     The actual effect of the Tax Mandate remarkably appears to depend on who is asked. The principal proponent of the provision, Senator Manchin—who insisted upon its inclusion as a condition for his support and provided the decisive vote without which the Act would not have passed—intended (and believed) that the Tax Mandate enacts a blanket prohibition forbidding States from cutting taxes in any manner whatsoever through 2024. The New York Times, for example, reports that Senator Manchin "argue[s] that states should not be cutting taxes at a time when they need more money to combat the virus. He urged states to postpone their plans to cut taxes."[1] That result appears to follow from the fungibility of money and the Tax Mandate's broad ban on using funds "directly *or indirectly* [to] offset" tax cuts.[2]

[1]   Alan Rappeport, *A Last-Minute Add to Stimulus Bill Could Restrict State Tax Cuts*, N.Y. Times (March 12, 2021), https://www.nytimes.com/2021/03/12/us/politics/biden-stimulus-state-tax-cuts.html.

[2]   American Rescue Plan Act of 2021, Pub. L. No. 117-2 (2021), *available at* https://www.congress.gov/bill/117th-congress/house-bill/1319/text (emphasis added).

3.      By contrast, the U.S. Department of Treasury ("Department"), a Defendant here, disagrees. The Department appears to believe that the Tax Mandate only prevents the States from using the funds provided by the Act specifically to fund tax cuts, but does not prevent the States from otherwise cutting taxes as long as they do not explicitly designate moneys appropriated by the Act as the funding source. Under that view, the Tax Mandate seemingly regulates speech more than taxation: *i.e.*, "Just don't *say* you are using these moneys to cut taxes." A Department spokesman told the Associated Press on or before March 18 that the "[S]tates are free to make policy decisions to cut taxes – they just cannot use the pandemic relief funds to pay for those tax cuts."[3] The Treasury Department eventually told the States the same essential message directly in a March 23, 2021 letter, which stated "the limitation in the Act is not implicated" if "States lower certain taxes but do not use the funds under the Act to offset those cuts."

4.      These divergent views—which exist even amongst Congressional Democrats who passed the Act and the Administration of the President that signed the Act into law, to say nothing about non-aligned parties—underscore the palpable ambiguity in the Tax Mandate. The fact that those politically allied to enact the Act *cannot even agree with each other* as to what the Tax Mandate means provides powerful evidence that it is subject to multiple potential interpretations. Indeed, the language of the Tax Mandate is patently ambiguous, and even borderline incoherent.

5.      This ambiguity alone renders the Tax Mandate unconstitutional. "[I]f Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'" *South Dakota v. Dole*, 483 U.S. 203, 207 (1987) (quoting *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981) (identifying this

---

[3]  *See* Laura Davison, *Treasury Clears States to Cut Taxes -- But Not With Stimulus*, Bloomberg (March 18, 2021), https://www.bloomberg.com/news/articles/2021-03-18/u-s-states-approved-to-cut-taxes-but-not-with-federal-money.

requirement as one amongst multiple constitutional requirements). The inability of even the Act's supporters to agree about what the Tax Mandate actually means is sufficient to demonstrate that the provision cannot satisfy this *Dole/Pennhurst* requirement.

6. Conversely if the Act actually prohibits the States from engaging in any form of tax relief—an interpretation that the Tax Mandate's text is susceptible to and what Senator Manchin seemingly intended, without whose vote the Act would never have become law—it is an unconstitutional intrusion upon the sovereignty of the States. Indeed, it would violate constitutional constraints on Congress's Spending Clause power for three reasons.

7. *First*, the Tax Mandate is unrelated to the federal interest in the national program advanced in the Act. The ostensible purpose of the Act is to assist states in responding to the economic impact of the COVID-19 pandemic. But in prohibiting states from making any tax reduction, no matter the justification for the change, possibly years after the impact of the pandemic has dissipated, Congress goes too far in attaching conditions insufficiently related to the asserted federal interest. *See Dole*, 483 U.S. at 208.

8. *Second*, the Tax Mandate asks the states to sell out key aspects of their sovereignty, and thus induces the states to engage in unconstitutional activities. *Id.* at 210. A fundamental part of the structure of the U.S. Constitution is its establishment of *separate* federal and state sovereigns: "The federal system rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond v. United States*, 564 U.S. 211, 220-21 (2011) (citation omitted). "For this reason, 'the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.' Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer." *See National Fed'n of Indep. Bus. v. Sebelius ("NFIB"),* 567 U.S. 519, 582 (2012)

4

(opinion of Roberts, C.J.) (quoting *New York v. United States*, 505 U.S. 144, 162 (1992) (citation omitted)).

9.     Under the broad/Machin reading, the Tax Mandate does precisely this: it attempts to eviscerate the federal structure of the Constitution by collapsing a system of dual sovereigns, each with their own taxing authority, into a system where Congress— and *Congress alone*—has authority to set tax policy. For 2021-24, if voters wish to elect officials to lower their tax burdens, their votes for state elected officials are effectively worthless: only Congress would have the power to lower their taxes, either by reducing federal taxes or amending the Act to restore to the States power to set their own tax policies. Because the Tax Mandate attempts to "vest[] power in one central government, … individual liberty would suffer" if it is not enjoined. *NFIB,* 567 U.S. 519, 582

10.     *Third*, Congress cannot use its power under the Spending Clause to "coerce" the states into adopting a preferred policy. *See id.* at 582. "[E]conomic dragooning that leaves the States with no real option but to acquiesce" crosses the line from permissible persuasion to impermissible coercion and effectively amounts to unconstitutional commandeering of state sovereignty. *Id.*

11.     The Tax Mandate crosses this line. It offers an enormous amount of money to the States—for Arizona, a total amount that is about 40% of its general fund budget— at a time when that budget is strained by the ravages of a once-in-a-century pandemic. Indeed, addressing the financial straits of the States is Congress's explicit motivation for this third wave of stimulus aid. In this context, the Act presents the States with effective offers-they-can't-refuse.

12.     Arizona needs clarity on the legality and meaning of this provision. Policymakers in the state have real and present interest in tax policy which could potentially decrease net tax revenue against some baselines. Those policymakers need to know how their decisions could interact with their use of funds under the Act.

13.     Whether the Act is too ambiguous to carry out its patron's desired intent or actually unambiguously provides for a result that is patently unconstitutional—the result is the same: the Tax Mandate cannot stand. Its violations of the Constitution are patent, and Arizona is entitled to relief preventing Defendants from employing the Act to prohibit it from providing tax relief for their citizens with funds not derived from the Act.

**PARTIES**

14.     Plaintiff State of Arizona is a sovereign state of the United States of America. The Attorney General is the chief legal officer of the State of Arizona and has the authority to represent the State in federal court.

15.     Defendant Janet L. Yellen is the Secretary of the Treasury and is named in her official capacity.

16.     Defendant Richard K. Delmar is the Acting Inspector General of the Department of the Treasury and is named in his official capacity. On information and belief, the Inspector General is responsible for monitoring and oversight of existing coronavirus relief funds to the States, and is generally responsible for informing the Secretary of the Treasury about programs administered by the Department and advising on the necessity for corrective action.

17.     Defendant the Department of the Treasury is an agency of the United States.

**JURISDICTION AND VENUE**

18.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1346, and §§ 2201-02.

19.     Venue is proper within this federal District pursuant to 28 U.S.C. § 1391(e) because (1) Plaintiff Arizona resides in this District and no real property is involved and (2) a "substantial part of the events and omissions giving rise to the claim occurred" in this District—*i.e.*, the injury to the state's sovereign interests and the state's management of its fiscal affairs.

20.     Arizona has standing to challenge the Tax Mandate and to seek declaratory and injunctive relief. The Tax Mandate injures the State in several ways. Two stand out. *First*, the Tax Mandate directly threatens Arizona's sovereign interests, including its ability to "exercise … sovereign power over individuals and entities within the relevant jurisdiction—[which] involves the power to create and enforce a legal code, both civil and criminal." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982). By diminishing the State's power to tax its residents as it sees fit, the Tax Mandate necessarily and gravely injures Arizona's sovereign interests.

21.     *Second*, the Tax Mandate harms Arizona's interest in "securing observance of the terms under which it participates in the federal system." *Id.* at 607-08 (1982). The Tax Mandate specifically attacks those terms and affects the State's sovereign power within the system.

22.     In addition, the Tax Mandate is harming Arizona's ability to govern itself effectively right now. Because the Tax Mandate fails to speak clearly as to the scope of its prohibition, Arizona policy makers are unable to engage in informed decision-making on whether to accept the funds offered by the Act and how to structure their conduct afterwards. Furthermore, by unconstitutionally limiting the ability of Arizona officials to manage a full one-half of the fiscal ledger, and by subjecting the state to the risk that it may be made to return funding to the federal government, Arizona and its residents are directly harmed.

## THE ACT AND ITS TAX MANDATE

23.     The Act was passed by the House and Senate by votes of 219-212 and 50-49, respectively. *See* H.R. 1319, American Rescue Plan Act of 2021, *Actions*, *available at* https://www.congress.gov/bill/117th-congress/house-bill/1319/actions.

24.     On March 11, 2021, President Biden signed the American Rescue Plan Act into law. *See* American Rescue Plan Act of 2021, Pub. L. No. 117-2 (2021), *available at* https://www.congress.gov/bill/117th-congress/house-bill/1319/text.

25.     The Act includes $195.3 billion in aid to make payments to each of the 50 states and the District of Columbia. *See id.* § 9901 (adding § 602(b)(3)(A) to the Social Security Act ("SSA")). Of that $195.3 billion, $25.5 billion is allocated equally among the states and the District of Columbia. The remainder, minus a fixed sum to be allocated to District of Columbia, is to be allocated in an amount proportional to the average estimated number of seasonally adjusted unemployed individuals in each state during the period of the three months ending in December 2020. *Id.* (adding § 602(b)(3)(B) to the SSA).

26.     Under this formula, Arizona is expected to receive approximately $4.7 billion. *See* Jared Walczak, *State Aid in American Rescue Plan Act is 116 Times States' Revenue Losses*, TAX FOUNDATION (Mar. 3, 2021), https://taxfoundation.org/state-and-local-aid-american-rescue-plan/

27.     These funds are to remain available until December 31, 2024. *See* American Rescue Plan Act, American Rescue Plan Act of 2021, Pub. L. No. 117-2 § 9901 (2021).

28.     The Act provides several permissible uses of the funds, including to "respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality" and to "make necessary investments in water, sewer, or broadband infrastructure." *Id.* (adding § 602(c)(1) to the SSA).

29.     The Act also provides that "No State or territory may use funds made available under this section for deposit into any pension fund." *Id.* (adding § 602(c)(2)(B) to the SSA).

30.     The Tax Mandate, in the same section of the Act, provides: "A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase." *Id.* (adding § 602(c)(2)(A) to the SSA).

31.     If a state violates the Tax Mandate, the Act provides that such state "shall be required to repay to the Secretary" the lesser of either the applicable reduction in tax revenue or the total amount of funds received by the state. *Id.* (adding § 602(e) to the SSA).

32.     The Act provides no process for a State to dispute or contest an alleged violation of the Tax Mandate.

33.     The Act gives the Secretary authority "to issue such regulations as may be necessary or appropriate to carry out this section." *Id.* (adding § 602(f) to the SSA).

34.     The Tax Mandate does not explain or define the terms "indirectly offset," "reduction in net tax revenue," or provide any additional clarity regarding which tax policies could lead to recoupment by the Secretary.

## FACTUAL ALLEGATIONS

35.     The coronavirus pandemic drastically damaged the national economy, leading to all states experiencing some sort of slowdown and impairing their ability to support needed programs and stimulus for their local economies.

9

36.     Meanwhile, demand for certain state services has increased, such as Medicaid and unemployment insurance.

37.     After Arizona was forced by COVID-19 to shut down portions of the state's economy, revenue the second quarter of calendar year 2020 (*i.e.*, the end of Fiscal Year 2020) came in well below projections. The State then forecast a budget deficit of between $600M to $1.1B for Fiscal Year 2021 (July 1, 2020 to June 30, 2021). However, due to shifts in consumer behavior, revenue for Fiscal Year 2021 has come in $1B over the projection and the State now has an estimated surplus in terms of state revenues specifically.

38.     In order to improve Arizona's economy and stimulate demand, and to assist struggling businesses and individuals trying to make ends meet, state policymakers in Arizona may desire to reduce their tax rates. Arizona's Governor specifically proposed an income tax cut before the Act was enacted, which its Legislature is presently considering. The Arizona Legislature is not a full-time body but is currently in session.   It must finalize a budget before it adjourns for the year and before the State's new fiscal year begins on July 1, 2021.

39.     The Tax Mandate threatens these plans and is casting uncertainty over tax policy in the States, creating the concern that any policy changes in state taxation could lead to recoupment if the States accept funds under the Act.

40.     The amount of moneys allocated to the States is quite large relative to state budgets: Arizona has an annual budget of around $12.4 billion from its general fund, and the total moneys from the State Recovery Fund are anticipated to be $4.7 billion—about 40 percent of one year's general fund budget.

41.     This large sum of money effectively presents each of the States, including Arizona, with an "offer it cannot refuse." In particular, the States are in no position to

turn down the federal government's offer given their financial situations, which have been significantly strained by the Covid-19 pandemic.

42.     Notably, there is no indication that Congress ever contemplated that any State would refuse funds under the Act, and instead every indication that Congress simply assumed—almost certainly correctly—that the inherent coercion of the Act would induce all of the States to accept the Tax Mandate with all of its attending infringement on their sovereign authority.

43.     The Tax Mandate, under its broad reading, also would dramatically undermine democratic accountability. Take, for example, candidates for state legislatures that categorically oppose all tax cuts. That unpopular position might easily cost them votes. But the Tax Mandate lets them duck accountability and claim that their opposition to tax cuts is based on their illegality under federal law. Similarly, candidates that favor tax cuts may not be able to run effectively on that platform as voters may correctly recognize that electing such candidates is unlikely to delivery any actual state tax relief, since the Tax Mandate may simply invalidate them or make them too costly to enact.

44.     Similarly, the Tax Mandate may undermine democratic accountability by empowering current governors in ways that violate separation of powers and/or democratic principles. For example, current governors appear to be permitted to accept funds under the Act, and thereby bind their successors elected in 2021, 2022, or 2023, to the Tax Mandate. Similarly, current governors may undermine the authority of their legislatures over fiscal manners by accepting funds under the Act.

45.     The Tax Mandate also drastically injures the sovereignty of the States. For example, pre-Tax Mandate the States—like all sovereign governments with independent fiscal authority—could engage in macroeconomic stimulus in two broad ways: (1) spending additional moneys or (2) cutting taxes. But the Tax Mandate effectively strips the States of half of that power, and reflects Congress's apparent judgment that the

only appropriate stimulus measures for the States is spending more money. That judgment is particularly bizarre as Congress itself enacted a variety of stimulative tax-cutting measures in the Act. But Congress apparently wishes to reserve purely to the federal government the power to engage in macroeconomic stimulus through tax cuts and strip the States of that sovereign authority. Under the Act and its Tax Mandate, Congress has effectively told the States: "Tax cuts for me, but not for thee." But the Constitution does not permit Congress to place the States in such a demeaned and subservient position.

46.     Because of the potential injuries that the Tax Mandate would cause Arizona, the Arizona Attorney General sent a letter to Secretary Yellen along with 20 other state attorneys general on March 16, 2021. A copy of that letter is attached as Exhibit A.

47.     That letter posed many specific examples and asked the Secretary to explain whether the Tax Mandate would prohibit specific actions. *See* Exhibit A at 3-4.

48.     Secretary Yellen wrote the state attorneys general a letter in response on March 23, 2021. A copy of that letter is attached as Exhibit B.

49.     Secretary Yellen's letter appears to tell the state attorneys general what she told the press five days prior: she is essentially disavowing the broad interpretation of Senator Manchin and other Senators. Instead, Secretary Yellen argued that the Tax Mandate "simply provides that funding received under the Act may not be used to offset a reduction in net tax revenue resulting from certain changes in state law." Ex. B at 1. "If States lower certain taxes but do not use funds under the Act to offset those cuts—for example, by replacing the lost revenue through other means—the limitation in the Act is not implicated." *Id.* The letter also promises "further guidance" but provides little additional information about that guidance. *Id.* at 1-2. The letter does not address the specific examples that the state attorneys general requested clarification upon. *Id.*

12

50.     This dispute over the extent of the limitations in the Tax Mandate presents a present, justiciable, controversy. The response from the Department of the Treasury fails to provide Arizona policy makers with sufficient information and assurances to inform their decisions. Judicial resolution is required—and quickly—for Arizona to make informed decisions on tax policy as it recovers from the economic impacts of COVID-19.

**CLAIMS FOR RELIEF**

**COUNT I**

**Violation of the Spending Clause – Ambiguous Condition**

51.     The allegations in the preceding paragraphs are reincorporated herein.

52.     Article I of the U.S. Constitution enumerates the powers of Congress.

53.     Article I, § 8, cl. 1 empowers Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States."

54.     While Congress may provide conditional grants to the states under the Spending Clause, those conditions are subject to several limitations, including that "if Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously.'" *Dole*, 483 U.S. at 207 (quoting *Pennhurst*, 451 U.S. at 17).

55.     The Tax Mandate runs afoul of these requirements and thereby attaches unconstitutional strings to the state aid in the Act.

56.     In particular, the Tax Mandate is ambiguous and fails to give the State clear notice of what it means to "indirectly offset a reduction in the net tax revenue" of the state.

57.     The disagreement as to what the Tax Mandate means between its chief proponent and Defendants underscores the ambiguity inherent in its text.

58.     The Department's inability or unwillingness to address the specific examples provided by the State's letter expeditiously supplies further evidence that the text of the Tax Mandate does not provide readily ascertainable answers.

59.     The Tax Mandate creates very complicated issues as to what the proper baseline against which potential tax-cut measures are to be judged. Moreover, it appears to rely on unidentified balanced-budget or similar budgeting requirements (without which it is unclear why tax-revenue reductions would need to be "funded" with specific moneys at all).

60.     Because the Tax Mandate is ambiguous, it is an unconstitutional attempt to place conditions upon the States.

61.     No other enumerated power in the constitution entitles Congress to impose this condition.

## COUNT II

**Violation of The State's Sovereignty Under The Spending Clause, Tenth Amendment, Anti-Commandeering Principle, And Structure Of The Constitution**

62.     The allegations in the preceding paragraphs are reincorporated herein.

63.     The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

64.     As the Supreme Court has explained, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v*, 505 U.S. at 162. This prohibition against commandeering state governments serves important values, such as safeguarding individual liberty and promoting political accountability. *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1477 (2018).

14

65.     If the Tax Mandate is not ambiguous, it prohibits the States from cutting taxes in essentially any manner. That result necessarily follows from the fungibility of money and the prohibition on relief funds to "directly *or indirectly* offset a reduction in … net tax revenue." So construed, the Tax Mandate is unconstitutional in at least three independent ways.

66.     *First*, the Tax Mandate is unrelated to the asserted federal interest in the national program advanced in the Act. *See Dole*, 483 U.S. at 208. Congress can readily achieve its aims here without this severe intrusion upon state sovereignty. The Tax Mandate thus wildly exceeds any permissible nexus between the funds provided under the Act and conditions imposed upon the States.

67.     *Second*, the Tax Mandate violates the Constitution by transgressing upon the fundamental federal character of the Constitution and represents an unconstitutional attempt by Congress to usurp the sovereign taxing powers of the States. Congress cannot employ its power under the Spending Clause to fundamentally subvert the federal nature of the Constitution. As the Supreme Court has explained, if such an attempt were to succeed, "individual liberty would suffer" in a manner that the Constitution prohibits. *New York*, 505 U.S. at 162.

68.     *Third*, the size and nature of the aid in the Act combine with the conditions created by the pandemic to effectively coerce Plaintiffs and commandeer their taxing authority.

69.     In the current challenging fiscal environment, Arizona has "no real choice," but to accept the $4.7 billion available through the American Rescue Plan Act. *NFIB*, 567 U.S. at 687. But accepting that money requires that the State sacrifice its sovereign power to set its own tax policy, since virtually any revenue-reducing measure would violate the Tax Mandate.

70. By coercing and commandeering the State's tax policy, the federal government has violated the Constitution, including the Tenth Amendment and the structural protections inherent in the Constitution. *See also Bond*, 564 U.S. at 226 ("Whether the Tenth Amendment is regarded as simply a truism or whether it has independent force of its own, the result here is the same." (cleaned up)).

## PRAYER FOR RELIEF

**Plaintiffs respectfully request that this Court enter judgment:**

A. Declaring that the Tax Mandate is ambiguous and thus violates the Constitution;

B. Declaring that the Tax Mandate is in excess of Congress's powers enumerated in Article I and is thus unenforceable;

C. Declaring that the Tax Mandate violates the Tenth Amendment to the Constitution of the United States and/or the structural protections of the same and is thus unenforceable;

D. Enjoining the Defendants, and any other agency or employee of the United States, from recouping funds based on a violation of the Tax Mandate;

E. Enjoining the Defendants, and any other agency or employee of the United States, from otherwise enforcing the Tax Mandate against Plaintiffs;

F. Awarding Plaintiffs' reasonable costs and expenses of this action, including attorneys' fees; and

G. Awarding all other further relief to which Plaintiffs might be entitled.


**MARK BRNOVICH**
**ATTORNEY GENERAL**


By: /s/ Drew C. Ensign
    Joseph A. Kanefield (No. 15838)
    Brunn W. Roysden III (No. 28698)
    Drew C. Ensign (No. 25463)

*Attorneys for Plaintiff State of Arizona*

# Exhibit A

  

Office of the Attorney General
State of Georgia

Office of the Attorney General
State of Arizona

Office of the Attorney General
State of West Virginia

March 16, 2021

**VIA EMAIL & U.S. MAIL**

The Honorable Janet L. Yellen
Secretary
Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220
(202) 622-1100
correspondence@treasury.gov

  Re: **Treasury Action to Prevent Unconstitutional Restriction on State's
    Fiscal Policy through American Rescue Plan Act of 2021**

Dear Secretary Yellen:

   The undersigned State Attorneys General request that the Department of the Treasury take immediate action to confirm that certain provisions of the American Rescue Plan Act (the "Act") do not attempt to strip States of their core sovereign authority to enact and implement basic tax policy. Those provisions, found in section 9901 of the Act,[1] forbid States from using COVID-19 relief funds to "directly or indirectly offset a reduction in … net tax revenue" resulting from state laws or regulations that reduce tax burdens—whether by cutting rates or by giving rebates, deductions, credits, "or otherwise[.]"[2] This language could be read to deny States the ability to cut taxes in any manner whatsoever—even if they would have provided such tax relief with or without the prospect of COVID-19 relief funds. Absent a more sensible interpretation from your department, this provision would amount to an unprecedented and unconstitutional intrusion on the separate sovereignty of the States through federal usurpation of essentially *one half* of the State's fiscal ledgers (*i.e.*, the revenue half). Indeed, such federal usurpation of state tax policy would represent the greatest attempted invasion of state sovereignty by Congress in the history of our Republic.

---

[1] https://www.congress.gov/117/bills/hr1319/BILLS-117hr1319enr.pdf.

[2] *Id.* at pp. 1319-223.

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 2

Section 9901 of the American Rescue Plan Act, which amends sections 602 and 603 of the Social Security Act, explains what States may and may not use COVID-19 recovery funds for. Most pertinent here, subsection 602(c)(2)(A) (the "Tax Cut Prohibition") prohibits the States from "us[ing] the funds provided under this section … to either *directly or indirectly* offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase."[3] States must certify that they will use any COVID-19 relief funds provided under the Act "in compliance with subsection (c) of this section[,]" and if a State fails to comply, the Act requires the State to repay the funds in "an amount equal to the amount of funds used in violation of such subsection[.]"[4]

The import of the Act's prohibition against "offsetting" reductions in state tax revenue is unclear, but potentially breathtaking. This provision might have been intended merely to prohibit States from *expressly* taking COVID-19 relief funds and rolling them directly into a tax cut of a similar amount. But its prohibition on "indirectly" offsetting reductions in tax revenue, combined with the list of prohibited kinds of tax reductions (rate cuts, rebates, deductions, credits, or "otherwise"), could also be read to prohibit tax cuts or relief of any stripe, even if wholly unrelated to and independent of the availability of relief funds. After all, money is fungible, and States must balance their budgets. So, in a sense, *any* tax relief enacted by a state legislature after the State has received relief funds could be viewed as "using" those funds as an "offset" that allows the State to provide that tax relief.

Several real and hypothetical examples of state tax policy sharpen this troubling point:

- Arizona voters at the 2020 election voted for a large tax increase related to education that has nothing to do with COVID-19 and the Arizona Legislature may seek to provide an alternative tax structure for small businesses—again having nothing to do with COVID-19 or the federal funds.

- Arizona is phasing out law-enforcement fees on vehicle registration renewals.

---

[3] "Covered period" is defined in Section 602(g)(1) as the period that begins on March 3, 2021, and "ends on the last day of the fiscal year of such State … in which all funds received by the State … from a payment made under this section or a transfer made under section 603(c)(4) have been expended or returned to, or recovered by, the Secretary."

[4] It further provides that "in the case of a violation of subsection (c)(2)(A), the amount the State … shall be required to repay shall be the lesser of—(1) the amount of the applicable reduction to net tax revenue attributable to such violation; and (2) the amount of funds received by such State … pursuant to a payment made under this section or a transfer made under section 603(c)(4)."

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 3

- During the current legislative session and prior to the passage of the Act, Georgia's House of Representatives passed a bill, now under consideration by its Senate, that would extend a tax credit for families who adopt a child out of foster care.

- Also during the current legislative session and prior to the passage of the Act, Georgia's House of Representatives passed a bill that raises the standard deduction, which would provide Georgians with an estimated $140 million in state income tax relief that largely benefits those of lower to middle incomes.

- The West Virginia Legislature is considering a bill to extend the Neighborhood Investment Tax Credit (a charitable program) and increase the annual tax credit cap from $3 million to $5 million.  These changes are projected to reduce West Virginia tax revenue by roughly $2 million per year in future years.

- Another bill in West Virginia would expand a limited aircraft repair and maintenance sales tax exemption to all such activities.  This change will result in a small reduction in sales tax collections.

- Alabama legislators are currently considering legislation that would allow tax exemptions for organizations that provide care for the sick and terminally ill, offer services for children who are victims of sexual or physical abuse, furnish new homes for victims of natural disasters, and respond to emergencies and provide life-saving, rescue, and first-aid services; tax deductions that would benefit people with special needs and enable citizens to purchase storm shelters to protect their families from tornadoes; and tax credits for hospitals and universities engaged in research and development beneficial to society.

- The Indiana General Assembly is considering a tax credit for donations to public school foundations as well as a tax credit for donations to qualified foster care organizations.  It is also considering various sales tax exemptions for purchases such as public safety equipment.

- Kansas is considering decoupling part of its income tax code from the federal tax code, to end a state-level income tax increase caused by pass-through changes from prior federal tax law revisions.

- Kansas is considering giving property or income tax deferrals or credits to small businesses impacted by closure orders during the COVID-19 pandemic.

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 4

- Under bipartisan legislation proposed in Kentucky, homeowners in a proposed tax increment financing district meant to revitalize a predominantly minority area of Louisville hurt by decades of disinvestment would pay property taxes for the next three decades based on their property's assessed value this year. And a housing developer would be able to defer 80% of its annual property taxes, up to $7.64 million, to offset construction costs.

- Montana's Legislature is considering a very slight income tax cut for most income earners.

- Montana's Legislature is also considering increasing its current education tax credit for families.

- In Oklahoma, a bill has passed the House that would, among other things, restore the refundability of the state's Earned Income Tax Credit.

- Suppose a property decreases in value resulting in a decrease of legally assessed value, and the state keeps the assessed tax *rate* consistent—which results in a decrease in assessed *tax amount*.

- Similarly, suppose a property increases in value, but the State decreases the assessed rate such that the amount of tax assessed remains unchanged.

- Assume that projected state revenue is set to increase 10%, and a state legislature adopts measures such that the state's revenue collection "only" increases 8%.

Not one of these common changes to state tax policy has any real or direct connection to the State's potential receipt of COVID-19 relief funds, yet each of them could be deemed a tax "rebate," "deduction," "credit," or "otherwise" that could result in a "reduction in the net tax revenue" of the State. Thus, each of these otherwise lawful enactments could be construed as violations of the Act's prohibition on "offsetting" tax cuts.

Put aside the gross federal overreach inherent in trying to take state tax policy hostage in this way. If this expansive view of this provision were adopted, it would represent an unprecedented and unconstitutional infringement on the separate sovereignty of the States. When Congress attaches conditions to a States' receipt and use of federal funds, those conditions must (1) be placed "'unambiguously[,]'" (2) relate to "'the federal interest'" for which the spending program was established, (3) not violate other constitutional provisions, and (4) not contain a financial inducement "so coercive as to pass the point at which 'pressure turns into compulsion.'" *See generally South Dakota v.*

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 5

*Dole*, 483 U.S. 203, 207-208, 211 (1987); *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012).  Spending conditions imposed on States that do not meet these requirements are not "necessary and proper" for exercising Congress' spending power and also infringe on powers "reserved to" the States. U.S. Const. Art. I, Section 8, Clause 18; U.S. Const. Amd. X.  The Act's Tax Cut Prohibition violates these requirements.

First, if the Tax Cut Prohibition were interpreted to place any limits on how States could enact tax relief not directly connected to the relief funds provided by the Act, it would impose a hopelessly ambiguous condition on federal funding.  The examples listed above make the point: how is a State to know, when accepting the relief funds, whether any of these kinds of commonplace and sensible tax relief measures are "indirectly" offset by COVID-19 relief funds? Is it enough that the funds help balance a state budget that *also* contains tax relief measures? What if the presence of relief funds in 2021's budget effectively frees up funds to offer tax relief in 2022? Absent a clear and narrowing construction by Treasury regulation, States cannot possibly know the bargain they are striking in accepting the relief funds.  Yet the "legitimacy of Congress' power to legislate under the spending power … rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

Second, for similar reasons, a maximalist construction of the Tax Cut Prohibition would result in federal conditions that do not relate to the federal interest for which the spending program was established: relief from the economic harms caused by COVID-19.  It is one thing to require that coronavirus-stimulus-related money be spent on coronavirus-related stimulus.  It is quite another, and beyond Congress's Spending Power, to forbid States from providing tax relief *of any kind*, *for any reason*, merely to ensure that federal funds are spent for their intended purpose.

Third, a broad construction of the Tax Cut Prohibition would violate separation of powers and fundamental democratic principles, and would effectively commandeer half of the State's fiscal ledgers, compelling States to adopt the one-way revenue ratchet of the current Congress for the next three years.  For example, if citizens wish to lower their overall tax burden in the next two election cycles, they cannot elect a candidate for state office that could actually carry out such a policy.  Similarly, elected officials who wish to spend more public funds would now have a ready excuse for why state surpluses cannot be used to cut taxes: Congress forbids that, so we "have" to spend it instead.  Such a system would eliminate the democratic accountability that federalism serves to protect.  *See*, *e.g.*, *New York v. United States*, 505 U.S. 144, 169 (1992) ("Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate[.]").  The upshot is that, for purposes of setting tax policy, there would now be a single sovereign in the United States: Congress.

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 6

But fundamental to our Constitution is separate federal and state sovereigns, who can each set their own taxing policies based on their own independent legislatures.

In addition, a governor could—by mere stroke of a pen—accept the stimulus funds and thereby bind both (1) the legislature of that state and (2) his or her successor as governor from cutting any tax or tax assessment. Congress has no such power to intrude upon the democratic structures of the States, whose republican forms of government are guaranteed by Article IV. Notably, the 117th Congress cannot even bind the 118th Congress from enacting legislation contrary to its legislation. Yet a broad construction of the Tax Cut Prohibition would let the governors of the States in 2021 prohibit future state governors and legislatures from enacting revenue-reducing measures in 2024.

Fourth, the expansive view of the Tax Cut Prohibition is unconstitutionally coercive. No one could dispute that Congress cannot force States to pursue certain tax policies at the state level. *Cf. Sebelius*, 567 U.S. at 577 (plurality) ("'[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.' Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer." (quoting *New York*, 505 U.S. at162)). Congress may not micromanage a State's fiscal policies in violation of anti-commandeering principles nor coerce a State into forfeiting one of its core constitutional functions in exchange for a large check from the federal government. Such "economic dragooning" of the States cannot withstand constitutional scrutiny. *Id*. at 582.

Yet the Act arguably compels that result. The COVID-19 pandemic has wreaked economic havoc across much of the Nation, leaving many citizens in need of short-term financial support, and Congress determined that some of that support would flow through the States. Although some States have weathered the crisis better than others, it is difficult to envision many, if any, turning down this support for their citizens. For example, Arizona has an annual budget of around $12.4 billion from its general fund, and the moneys from the State Recovery Fund are anticipated to be $4.8 billion—40 percent of one year's general fund budget. As another example, West Virginia's share represents over 25% of one year's budget. Many States put to the Hobson's choice of taking this financial support or maintaining their sovereign independence to set their own tax policy will be hard pressed to decline the federal funds.

Given the foregoing, we ask that you confirm that the American Rescue Plan Act does not prohibit States from generally providing tax relief through the kinds of measures listed and discussed above and other, similar measures, but at most precludes *express* use of the funds provided under the Act for direct tax cuts rather than for the purposes specified by the Act. In the absence of such an assurance by March 23, we will take appropriate additional action to ensure that our States have the clarity and assurance

Letter to Secretary Janet L. Yellen
March 16, 2021
Page 7

necessary to provide for our citizens' welfare through enacting and implementing sensible tax policies, including tax relief.  We look forward to hearing from you promptly.  Please direct your response to joe.kanefield@azag.gov, and we will forward.[5]

Sincerely,

| | | |
|---|---|---|
| Mark Brnovich<br>Attorney General of Arizona | Christopher M. Carr<br>Attorney General of Georgia | Patrick Morrisey<br>Attorney General of West Virginia |
| Steve Marshall<br>Attorney General of Alabama | Leslie Rutledge<br>Attorney General of Arkansas | Ashley Moody<br>Attorney General of Florida |
| Lawrence G. Wasden<br>Attorney General of Idaho | Theodore E. Rokita<br>Attorney General of Indiana | Derek Schmidt<br>Attorney General of Kansas |
| Daniel Cameron<br>Attorney General of Kentucky | Jeff Landry<br>Attorney General of Louisiana | Lynn Fitch<br>Attorney General of Mississippi |
| Eric S. Schmitt<br>Attorney General of Missouri | Austin Knudsen<br>Attorney General of Montana | Douglas J. Peterson<br>Attorney General of Nebraska |
| Mike Hunter<br>Attorney General of Oklahoma | Alan Wilson<br>Attorney General of South Carolina | Jason R. Ravnsborg<br>Attorney General of South Dakota |
| Ken Paxton<br>Attorney General of Texas | Sean D. Reyes<br>Attorney General of Utah | Bridget Hill<br>Attorney General of Wyoming |

---

[5] Please note this letter is not intended to be and is not in any way a waiver of any legal rights, claims, defenses, or immunities possessed by the States regarding this matter.

# Exhibit B



## DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C.

SECRETARY OF THE TREASURY

March 23, 2021

The Honorable Mark Brnovich
Attorney General
State of Arizona
2005 N Central Avenue
Phoenix, AZ  85004

Dear Attorney General Brnovich:

I write in reply to your March 16, 2021 letter regarding Treasury's implementation of section 9901 of the American Rescue Plan Act (the "Act"), which provides funds to States, territories, Tribal governments, and localities to help them manage the economic consequences of COVID-19.

In the Act, Congress has provided funding to help States manage the public health and economic consequences of COVID-19 and it has given States considerable flexibility to use that money to address the diverse needs of their communities.  At the same time, Congress placed limitations to ensure that the money is used to achieve those purposes – including provisions stating that this funding may not be used to offset a reduction in net tax revenue resulting from certain changes in state law.

It is well established that Congress may place such reasonable conditions on how States may use federal funding.  Congress includes those sorts of reasonable funding conditions in legislation routinely, including with respect to funding for Medicaid, education, and highways.  Here, the Act provides a broad outlay of federal funds, and accordingly includes restrictions to ensure that those funds are properly applied.  Earlier COVID-19 relief measures providing state funding also included restrictions that barred States from spending those funds on certain ineligible expenditures.

Nothing in the Act prevents States from enacting a broad variety of tax cuts.  That is, the Act does not "deny States the ability to cut taxes in any manner whatsoever."  It simply provides that funding received under the Act may not be used to offset a reduction in net tax revenue resulting from certain changes in state law.  If States lower certain taxes but do not use funds under the Act to offset those cuts—for example, by replacing the lost revenue through other means—the limitation in the Act is not implicated.

It is also important to note that States choosing to use the federal funds to offset a reduction in net tax revenue do not thereby forfeit their entire allocation of funds appropriated under this

statute.  The limitation affects States' ability to retain only those federal funds used to offset a reduction in net tax revenue resulting from certain changes in state law.

Treasury is crafting further guidance—including guidance to address more specifically the issues raised by your letter and the procedures Treasury will use for any future recoupment—that will provide additional information about how this provision will be administered.  We will provide this guidance before a State must submit a certification under § 602(d)(1).  We also expect to engage in an ongoing dialogue throughout the program.

These funds will provide transformative relief to States, territories, and Tribal governments, and our communities should be able to use the funds to recover from the economic fallout due to the pandemic, which is what Congress intended.  I hope to work with your State, as well as others across the country, to ensure these funds can be used in ways that align with the goals of the statute without undue restrictions.

Sincerely,

Janet L. Yellen

cc:	The Honorable Christopher M. Carr
	The Honorable Patrick Morrisey
	The Honorable Steve Marshall
	The Honorable Leslie Rutledge
	The Honorable Ashley Moody
	The Honorable Lawrence G. Wasden
	The Honorable Theodore E. Rokita
	The Honorable Derek Schmidt
	The Honorable Daniel Cameron
	The Honorable Jeff Landry
	The Honorable Lynn Fitch
	The Honorable Eric S. Schmitt
	The Honorable Austin Knudsen
	The Honorable Douglas J. Peterson
	The Honorable Mike Hunter
	The Honorable Alan Wilson
	The Honorable Jason R. Ravnsborg
	The Honorable Ken Paxton
	The Honorable Sean D. Reyes
	The Honorable Bridget Hill