**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (No. 15838)
Brunn (Beau) W. Roysden III (No. 28698)
Drew C. Ensign (No. 25463)
Robert J. Makar (No. 33579)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joe.Kanefield@azag.gov
Beau.Roysden@azag.gov
Drew.Ensign@azag.gov
Robert.Makar@azag.gov
*Attorneys for Plaintiff State of Arizona*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| STATE OF ARIZONA, | No. 2:21-cv-00514-DJH |
| Plaintiff, | **MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | |
| JANET YELLEN, in her official capacity as Secretary of the Treasury et al.; | |
| Defendants. | |

1

**TABLE OF CONTENTS**

2   INTRODUCTION ................................................................................................ 1

3   FACTUAL BACKGROUND ............................................................................... 3

4   LEGAL STANDARD ........................................................................................... 7

5   ARGUMENT ......................................................................................................... 7

6   I.   Plaintiffs are Likely to Prevail on the Merits of Their Claims ................. 7

7          A.   The Tax Mandate Is Unconstitutionally Ambiguous ...................... 8

8          B.   If The Tax Mandate Unambiguously Prohibits Tax Cuts Broadly, It Is
9                Unconstitutional ............................................................................ 12

10                1.   The Tax Mandate Violates the Relatedness Requirement ..................... 12

11                2.   Congress's Attempt To Undermine The Federal Character Of Our
                      Constitutional System Violates *Dole* ........................................ 13

12                3.   The Tax Mandate Violates The Supreme Court's Anti-
13                     Commandeering Test ................................................................... 14

14   II.   The Remaining Requirements For Injunctive Relief Are Satisfied Here ............. 17

15   CONCLUSION .................................................................................................... 17

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**CASES**

*Abbott v. Perez,*
138 S. Ct. 2305 (2018) ................................................... 17

*Alaska v. U.S. Dep't of Transp.,*
868 F.2d 441 (D.C. Cir. 1989) ..................................... 17

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
548 U.S. 291 (2006) ............................................... *passim*

*Bond v. United States,*
564 U.S. 211 (2011) ..................................................... 13

*Charles C. Steward Mach. Co. v. Davis,*
301 U.S. 548 (1937) ..................................................... 14

*City of Philadelphia v. Sessions,*
280 F. Supp. 3d 579 (E.D. Pa. 2017) ............................ 13

*Coyle v. Smith,*
221 U.S. 559 (1911) ..................................................... 14

*Doe #1 v. Trump,*
984 F.3d 848 (9th Cir. 2020) ....................................... 17

*Mayweathers v. Newland,*
314 F.3d 1062 (9th Cir. 2002) ..................................... 12

*McCulloch v. Maryland,*
4 Wheat. 316 (1819) ..................................................... 14

*Murphy v. NCAA,*
138 S. Ct. 1461 (2018) ........................................... 14, 15

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) ............................................... *passim*

*New State Ice Co. v. Liebmann,*
285 U.S. 262 (1932) ..................................................... 16

*New York v. United States,*
505 U.S. 144 (1992) ............................................... *passim*

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) ................................................... 7, 8, 9

*Printz v. United States,*
521 U.S. 898 (1997) ..................................................... 15

*South Dakota v. Dole,*
483 U.S. 203 (1987) ........................................... 2, 7, 8, 14

*Univ. of Tex. v. Camenisch*,
   451 U.S. 390 (1981) ....................................................................................... 7

*Winter v. NRDC*,
   555 U.S. 7 (2008) ........................................................................................... 7

**STATUTES**

42 U.S.C. § 6000 *et seq.* (1976 ed. and Supp.III) ............................................... 9

American Rescue Plan Act of 2021,
   Pub. L. No. 117-2, 135 Stat. 4 .................................................... 1, 4, 5, 10

**INTRODUCTION**

The State of Arizona ("State") respectfully requests a preliminary injunction against one of the most aggressive encroachments upon state sovereignty ever enacted by Congress in the history of the Republic. The challenged provision effectively seeks to replace the system of separate sovereigns that is fundamental to the Constitution, in which both the federal and state governments have independent taxing power, with one in which Congress alone sets taxing policy. Congress's actions are patently unconstitutional: either because (1) the provision at issue is too ambiguous to impose valid conditions on the States or (2) Congress has flouted bedrock principles of federalism enshrined in the Constitution. Either way, the State is entitled to the injunction it now seeks.

On March 11, 2021, President Biden signed the American Rescue Plan Act of 2021 ("ARPA," or the "Act") into law. One component of the ARPA appropriates aid money to the states. Under this provision, Section 9901 of the Act, Arizona is set to receive about $4.7 billion. But at the same time, Congress attempted to use those moneys to impose constraints the sovereign taxing power of states that are entirely unprecedented. Specifically, the Act—assuming it is clear enough to be effective—prohibits states from reducing net tax revenues in any manner for the entire 2021-24 period. To the State's knowledge, Congress has never previously enacted anything remotely equivalent. And for good reason: this unprecedented attempt to trample the sovereignty of states is patently unconstitutional.

The provision at issue in Section 9901 (hereinafter, the "Tax Mandate"), prohibits the States from using ARPA moneys "to either directly or indirectly offset" any reduction in net tax revenue as a result of a tax policy change. See American Rescue Plan Act of 2021, Pub. L. No. 117-2, § 9901, 135 Stat. 4, 223-228 (adding § 602(c)(2)(A) to the Social Security Act (42 U.S.C. § 801 et seq.)). Any state that violates this provision will be required to repay the funds to the Treasury. *Id.*

The essential problem is that money is fungible, so any reduction of any tax whatsoever could be deemed to make "indirect" use of ARPA funds to offset the reduction. That notably appears to have been the intent of the chief proponent of the Tax Mandate, Senator Manchin, who made clear that (in his view) "states should not be cutting taxes at [this] time." Makar Decl. Ex. M.

While this may have been the intent behind the Tax Mandate, its language is palpably ambiguous. Its text gives no clarity on what amounts to an indirect offset or a reduction in net tax revenue, or what baseline should be used to determine when a reduction has taken place. Even supporters of the law cannot agree on what it does: the Secretary of the Treasury has contended—seemingly in contradiction with the provision's architect, Senator Manchin—that the Tax Mandate is only meant to prohibit states from using aid money to fund tax cuts.

Indeed, Secretary Yellen's own testimony to Congress powerfully demonstrates the hopeless ambiguities inherent in the Tax Mandate, stating that the Tax Mandate creates "a host of thorny questions," and that "given the fungibility of money, it's a hard question to answer" what the effect of the Tax Mandate will be. *See* Makar Decl. Ex. Y. Moreover, in a letter to Secretary Yellen, 21 state attorneys general asked her to answer whether specific examples would violate the Tax Mandate, but she declined—or was unable—to do so. *See* Makar Decl. Exs. R, T.

This ambiguity makes the Tax Mandate unconstitutional and unenforceable. Although the Spending Clause gives Congress considerable authority to spend for "'the general welfare,'" that authority is not unlimited. *See South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987). Among other requirements, "when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). With the Tax Mandate, Congress has failed to speak with a sufficiently clear voice for states to voluntarily or knowingly understand the scope of the purported condition.

2

Alternatively, if the Tax Mandate is the unambiguous prohibition on cutting taxes of any sort, then its constitutional violations are even more patent. In particular, the Tax Mandate is unconstitutional because (1) it is wholly unrelated to the purpose of the state aid provision—particularly where Congress itself provided extensive tax relief in the Act but forbids the States from providing any of their own, (2) attempts to collapse the federal system of dual sovereigns with independent taxing authority, and (3) commandeers state tax policy. The Supreme Court has explained that "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992). This limitation is fundamental to the federal system and serves to protect individual liberty and ensure political accountability. *See Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*, 567 U.S. 519, 577-78 (2012). The Tax Mandate, by exploiting an economic crisis to attempt to take command of state tax policy, runs roughshod over these limitations.

Because the Tax Mandate is unclear and unlawful, and the threat of recoupment hangs over Arizona's ability to make informed decision-making about tax policy, the Court should enjoin the provision's enforcement as it applies to Arizona.

## FACTUAL BACKGROUND

The COVID-19 pandemic has produced an enormous economic recession. For a variety of reasons, including state and federal policies, deliberate caution among individuals and businesses to avoid infectious disease, and the effects of the disease itself on individuals and the public health system, national output and employment has fallen dramatically from the highs of 2020. *See*, *e.g.*, Makar Decl. Ex. A. Countless businesses have been forced to close, and millions of individuals have lost their jobs. In the final accounting, 2020 experienced the worst economic decline since World War II. *See, e.g.*, Makar Decl. Ex. B.

Arizona also experienced an economic decline, and the state's budget fared accordingly. Arizona's tax revenue for FY 2020, for example, came in over $800 million below the estimate from last year's budget. *Compare* Makar Decl. Ex. C *with id.* Ex. D.

Similarly, the trust fund covering Arizona's unemployment dropped over 90% in 2020. *Id.* Ex E.

The economic and financial situation confronting Arizona and the rest of the country led Congress to pass the Act. Among many other provisions, the Act provides for a $195.3 billion aid program, payable directly to the States. *See* ARPA § 9901 (adding § 602(b)(3)(A) to the SSA). According to the sponsors of the Act, the purpose of this aid provision was to enable States to address the negative economic impact of the COVID-19 emergency. *See* Makar Decl. Ex. F. The Act also enacts substantial federal tax relief. Makar Decl. Exs. G, Z.

Arizona expects to receive approximately $4.9 billion under the Act, calculated based on a formula that considers a State's unemployed population from October through December of 2020. ARPA § 9901 (adding § 602(b)(3) to the SSA); *see also* Makar Decl. Ex. G. This figure represents approximately 9% of Arizona's total budget for fiscal year 2022. *See id.* Ex. H.

This program of state aid was a part of the original ARPA bill as passed by the House. The Senate, however, quietly added a provision imposing a limit on states which accept funding under the Act. That provision, the Tax Mandate, states:

> "A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase."

ARPA § 9901 (adding § 602(c)(2)(A) to the SSA). Nothing in the statute or the Congressional legislative history lends additional clarity to the meaning of this limitation.

In addition to the Tax Mandate, the ARPA provides other limitations on the use of the grant money. First, the Act lays out only four permissible uses of the grants:

> "(A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts…;

> "(B) to respond to workers performing essential work during the COVID–19

public health emergency by providing premium pay to eligible workers of the State…;

"(C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State…; or

"(D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* (adding § 602(c)(1) to the SSA). The statute also provides that "[n]o state or territory may use funds made available under this section for deposit into any pension fund." *Id.* (adding § 602(c)(2)(B) to the SSA). These conditions or limitations are not at issue here.

The Act further provides that a state that violates the Tax Mandate can be compelled to repay the lesser of the amount of the tax reduction or the total amount of funds received. *Id.* (adding § 602(e) to the SSA). The Act does not provide the states with any specific process to challenge recoupments.

In the wake of the passage of the Act, numerous commentators began to take note of the Tax Mandate and to question its precise scope. *See, e.g.*, Makar Decl. Exs. I-J. Several commentators have observed in recent weeks that the statute appears to be meaningfully ambiguous, creating doubts as to the legality of potential state tax changes for states accepting funds under the Act. *See, e.g.*, *id.* Ex. K; Ex. L ("As Daniel Hemel, a law professor at the University of Chicago and an expert on tax law, told me, 'money is fungible, so I'm not quite sure what it means for the funds to indirectly offset a reduction in net tax revenue resulting from a tax cut.'").

Congress's intent behind the Tax Mandate remarkably appears to depend on who is asked. The principal proponent of the provision, Senator Manchin—who insisted upon its inclusion as a condition for his support and provided the decisive vote without which the Act would not have passed—intended (and believed) that the Tax Mandate enacted a blanket prohibition forbidding the States from cutting taxes in any manner whatsoever through 2024. The New York Times, for example, reports that Senator Manchin "argue[d] that states should not be cutting taxes at a time when they need more money to

combat the virus. He urged states to postpone their plans to cut taxes." *Id.* Ex. M. That result appears to follow from the fungibility of money and the Tax Mandate's broad ban on using funds "directly *or indirectly* [to] offset" tax cuts. By contrast, the Department of Treasury, a Defendant here, disagrees. The Department appears to believe that the Tax Mandate only prevents the States from using the funds provided by the Act specifically to fund tax cuts but does not prevent the States from otherwise cutting taxes as long as they do not specifically designate moneys appropriated by the Act as the funding source. A Department spokesman told the Associated Press that the "[S]tates are free to make policy decisions to cut taxes – they just cannot use the pandemic relief funds to pay for those tax cuts." *See id.* Ex. N.

Arizona policymakers are currently contemplating several policy changes which could arguably affect tax revenue. For example, Governor Doug Ducey in January of 2021 called for $600 million in permanent income tax cuts. *Id.* Ex. O. Some Arizona legislators are considering changes to the tax code which would respond to a recent proposition in Arizona raising tax rates. *Id.* Ex. P. In another forthcoming policy change that may be considered a reduction in tax rates, Arizona is currently in the process of phasing out a vehicle registration fee. *Id.* Ex. Q. Under the language of the Tax Mandate and the understanding advanced by Senator Manchin, any reduction in net tax revenue resulting from these policies might be "indirectly offset" by the billions Arizona is to receive under the Act, notwithstanding their lack of any relationship to the aid in that law.

To help answer some of these uncertainties, on March 16, 2021, Arizona's attorney general, joined by 20 other state attorneys general, wrote a letter to the Secretary of the Treasury asking for clarification on the scope of the Tax Mandate and providing specific examples for the Treasury to provide guidance as to whether the Tax Mandate would apply. *Id.* Ex. R. On March 17, 2020, the State of Ohio filed suit in the Southern District of Ohio challenging the Constitutionality of the Tax Mandate on similar grounds to those raised in this suit. *Id.* Ex. S. Secretary Yellen subsequently sent the state attorneys general a short response, declining to address any of the specific examples. *Id.*

Ex. T. The letter appeared to suggest that the States could cut taxes as long as they do not specifically claim that ARPA funds are the basis of the offsetting funds: "Nothing in the Act prevents States from enacting a broad variety of tax cuts." *Id.* But at the same time, Secretary Yellen stated "the limitations of the Act [would] not [be] implicated" if States cut taxes and "*replac[e] the lost revenue through other means*," *id.* (emphasis added)— which suggests that Treasury might insist that States replace the lost revenue with new revenue, and thus not enact any *net* change in taxation.

Because Congress lacks constitutional authority to impose such an ambiguous and potentially broad condition on this federal aid, Arizona now seeks a preliminary injunction of the Tax Mandate's enforcement against it.

## LEGAL STANDARD

The State seeks a preliminary injunction for the purpose of "preserv[ing] the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). As the moving party, a plaintiff can obtain a preliminary injunction by showing that (1) it "is likely to succeed on the merits," (2) it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.    Plaintiffs are Likely to Prevail on the Merits of Their Claims

Congress's authority under the spending clause is broad, but not limitless. *Dole*, 483 U.S. at 207-08. In particular, the Supreme Court has articulated four limitations on the exercise of that power. First, "the exercise of the spending power must be in pursuit of 'the general welfare,'" as opposed to the pursuit of any local interest. *Id.* at 207. Second, any condition imposed on states for the receipt of funds must be "'unambiguous[] ..., enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id.* (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Third, conditions on federal grants must be related to

the federal interest in the national program. *Id.* Fourth, "other constitutional provisions may provide an independent bar to the conditional grant of federal funds." *Id.* at 208.

In addition to these Spending Clause limitations, Congress may not employ any of its powers to coerce the State into adopting a federal regulatory program as its own. *See NFIB*, 567 U.S. at 578 (opinion of Roberts, C.J.) (citing *New York*, 505 U.S. at 178). "Congress may use its spending power to create incentives" for the States to enact certain policies, but where "'pressure turns into compulsion,'" this crosses the line into unconstitutional commandeering. *Id.* at 577-78.[1]

Because the Tax Mandate independently violates *several* of these constitutional requirements, any one of which is sufficient to invalidate it, Arizona is likely to prevail on its challenge to the provision's constitutionality.

### A.    The Tax Mandate Is Unconstitutionally Ambiguous

Because conditional grants under the Spending Clause are "in the nature of a contract[,]" their constitutional legitimacy rests on whether a State can both "voluntarily and knowingly" accept the terms. *See Pennhurst*, 451 U.S. at 17. The condition in question must be viewed "from the perspective of a state official who is engaged in the process of deciding whether" to accept the funds. *Arlington Central*, 548 U.S. at 296. Unlike a traditional statutory interpretation case, the question under the *Pennhurst* inquiry is not what the "best" reading of the statutory language is. Instead the court only need determine whether the statute allows state officials to "clearly understand" the obligations that go with the funds, and whether the condition furnishes "clear notice" regarding the potential liability the State would face. *Id.* Absent such unambiguous clarity, Congress's

---

[1]    Whether "coercion" violates the spending clause because state acceptance of the condition is not voluntary, or whether it is "commandeering," is a distinction without a difference for present purposes. *See, e.g.*, *NFIB*, 567 U.S. at 677 (joint dissent). ("Congress effectively engages in this impermissible compulsion [commandeering] when state participation in a federal spending program is coerced, so that the States' choice whether to enact or administer a federal regulatory program is rendered illusory."). As long as the states have been coerced into accepting the condition, it is unconstitutional regardless of how it is classified. *Id.*

attempt to impose a condition upon the States through its Spending Clause power is unconstitutional. *Id.*

Two Supreme Court cases, *Pennhurst* and *Arlington Central*, have carefully considered the question when a conditional grant is ambiguous. Both cases determined that the states could not be constitutionally bound by unclear statutory language. In *Pennhurst*, the Supreme Court addressed the Developmentally Disabled Assistance and Bill of Rights Act of 1975. *Pennhurst*, 451 U.S. at 5 (citing 42 U.S.C. § 6000 *et seq.* (1976 ed. and Supp.III)). That law was a federal-state grant program providing federal funding to participating states in exchange for those states complying with the conditions in the Act. *Id.* at 11. The case concerned whether the law's bill of rights portion created judicially enforceable rights for the developmentally disabled. *Id.* at 5-6. Applying the principle that Congress must speak "with a clear voice" to enable states "to exercise their choice knowingly" under the Spending Clause, and that Congress would not have intended to impose the expansive obligations represented by the bill of rights on states without clearly articulating such an obligation, the Court rejected the enforceability of the bill of rights against the states. *Id.* at 17-19. In particular, the Court found it persuasive that other parts of the statute clearly articulated the obligations of the states, while the bill of rights portion used more ambiguous language. *Id.*

In *Arlington Central*, the Supreme Court addressed a provision in the Individuals with Disabilities Education Act (IDEA) which provides that a court in an IDEA case "'may award reasonable attorneys' fees as part of the costs.'" *Arlington Central*, 548 U.S. at 293-94 (citation omitted). The question presented there was whether IDEA permitted prevailing parents to recover expert fees as a part of "costs." *Id.* The Court carefully considered the various possible understandings of the term "costs" and concluded that the statute did not impose an obligation to pay expert fees in a sufficiently unambiguous manner. In so doing, the Court rejected legislative history evidence suggesting intent on the part of Congress that "costs" should encompass these fees. In response to this argument, the Court stated: "In a Spending Clause case, the key is not what a majority of

the Members of both Houses intend but what the States are clearly told regarding the conditions that go along with the acceptance of those funds." *Id.* at 304.

The Tax Mandate is less clear than either of the conditions at issue in *Pennhurst* or *Arlington Central*. While the Supreme Court stated in *Arlington Central* that a court evaluating ambiguity should "begin with the text," *id.* at 296, the text in the Tax Mandate adds little clarity to key ambiguities. Consider a few of the questions its language leaves unresolved: First, the Tax Mandate does not explain the limits (if any) on when ARPA funds "indirectly offset" a reduction in net tax revenue. For example, if a state uses the federal funds from the Act to the supplement the pay of its essential government employees, as expressly permitted by the ARPA, thereby reducing its own budgetary obligations to pay such workers, and then proceeds with a pre-existing plan to cut income taxes, has any tax reduction been indirectly offset? Does it matter if the money comes out of a different fund than where the ARPA grant is directly utilized? Second, the Tax Mandate does not explain what the baseline is for when a "reduction" in in the "net tax revenue" has taken place. For example, if the State revenues were projected to increase in 2022 by $500 million, and the state instituted an income tax reduction reducing this revenue increase to be only $450 million, would that be a "reduction in net tax revenue?" Third, can an indirect offset be diminished or eliminated over time? If a state uses funds from the Act in 2021, is it bound until 2024 from any policy change which reduces net tax revenue? The text is largely silent on these questions.

The ambiguities in the Tax Mandate are even starker when compared with the clear pronouncements elsewhere in the ARPA. For example, the prohibition on the use of ARPA funds to fund pensions is far clearer than the Tax Mandate: "No State or territory may use funds made available under this section for deposit into any pension fund." ARPA § 9901 (adding § 602(c)(2)(B) to the SSA). As in *Pennhurst*, this Section shows that Congress knows how to create an unambiguous prohibition on the use of ARPA funds. For whatever reason, however, Congress elected to use a confusing and expansive construction for the Tax Mandate, rendering it fatally ambiguous.

The ambiguities in the language of the Tax Mandate have all-but been admitted by Secretary Yellen. She has conceded that the Tax Mandate raises "a host of thorny questions." Makar Decl., Ex. Y. But unambiguous language should raise no "thorny questions—let alone a full-blown "host of" them—since the answers are supposed to be clear from the text itself. Similarly, Secretary Yellen's answer to the question of what the effect of the Tax Mandate is—*i.e.*, "given the fungibility of money, it's a hard question to answer"—further underscores the palpable ambiguity here. Moreover, in a letter to Secretary Yellen, 21 state attorneys general asked her to answer whether specific examples would violate the Tax Mandate, but she declined to do so. *Id.* Exs. R, T.

The ambiguity of the Tax Mandate is also apparent from the inability of even its supporters to agree upon its meaning. Senator Manchin—who insisted upon the provision and without whose support the Act would have never been passed—thought it instituted a broad prohibition against all state tax relief. *Id.* Ex. U. Indeed, Senator Manchin was likely to seeking to prohibit tax reform in his home state of West Virginia, which only a broad reading of the Tax Mandate would effectuate. *Id.* Exs. U, V. But Secretary Yellen—*i.e.*, Secretary of the Treasury to President Biden, without whose signature the Act also would never have become law—does not read the Act nearly so broadly. If the proponents of the Tax Mandate—who have strong political incentives to put the Tax Mandate in the best possible light—cannot even agree on what the Tax Mandate actually mandates, how are the States supposed to "knowingly and voluntarily" accept the conditions it imposes?

The ambiguity of the Tax Mandate is also perhaps unsurprising given how it came to be included in the Act. Specifically, the Act never went through committee hearings or was the product of meaningful debate on the floor of either House. *Id.* Exs. W, X. Instead, it was surreptitiously inserted as a "perfecting amendment" at the eleventh-hour by Senator Schumer at the behest of Senator Manchin. In that posture—where almost no Senators and quite possibly no Representatives at all reviewed the provision's text pre-passage—the potential ambiguities unsurprisingly went unaddressed.

1   Again, unlike a traditional statutory interpretation dispute, the Court in this case
2   does not have to come up with the correct or best interpretation of the language in the
3   Tax Mandate. The Tax Mandate is unconstitutional because, "from the perspective of a
4   state official," there are open questions which make the obligation impossible to
5   knowingly agree to. *See Arlington Central*, 548 U.S. at 296.[2]

6   **B.    If The Tax Mandate Unambiguously Prohibits Tax Cuts Broadly, It Is Unconstitutional**

7   If this Court concludes that the Tax Mandate is not unconstitutionally ambiguous,
8   it must consider whether it satisfies the remaining constitutional requirements articulated
9   in *Dole* and *NFIB*. The best reading of the plain language in the statute suggests that, as
10  stated by Senator Manchin, the Tax Mandate is intended to prohibit any change in tax
11  policy whatsoever that reduces tax revenue. Such a broad and sweeping reading of the
12  Tax Mandate would violate the Constitution in three independent ways, however.

13  **1.    The Tax Mandate Violates the Relatedness Requirement**

14
15  While the relatedness requirement is generally a "low-threshold" test, *see*
16  *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002), there must still be "some
17  relationship" between the condition imposed and "the purpose of the federal spending."
18  *See New York*, 505 U.S. at 167. The Tax Mandate fails this requirement for two reasons.

19  *First*, the Tax Mandate is far too sweeping. The ostensible purpose of the Act is to
20  assist states in responding to the economic impact of the COVID-19 pandemic. But in
21  prohibiting states from making any tax reduction, no matter the justification or causal
22  relationship to the aid funds, possibly years after the impact of the pandemic has
23  dissipated, even this low threshold test is stretched beyond its breaking point. Rather, the
24  only possible purpose for such a limitation would be an ideological commitment to
25  higher taxes—as expressed by Senator Manchin—and this cannot be said to relate to the
26  federal spending in question, which is focused on recovery from the economic impact of

27  ───────────────
28  [2]   While the Department of the Treasury may someday answer the questions posed here or similar questions in a rulemaking or a guidance document, this does nothing to help the states determine how to make tax policy here and now. Nor could guidance from the Treasury Department transmute *ambiguous* statutory text into unambiguous language.

COVID-19. *See City of Philadelphia v. Sessions*, 280 F. Supp. 3d 579, 640-43 (E.D. Pa. 2017) (concluding that the interest of "enhancing <u>local</u> criminal justice," which motivated the Byrne JAG grant statute, was not sufficiently related to national interest in immigration enforcement).

*Second*, the Tax Mandate not only lacks a rational relationship to the purpose of the State aid—it affirmatively violates the Act's express (and actual) purposes. Notably, the Act expends a truly enormous amount of money as stimulus through *tax relief*. *See* Makar Decl., Exs. G, Z. Congress's thus made its own determination through the Act that substantial tax relief (as well as spending) is appropriate to stimulate the U.S. economy. Barring the States from engaging in any form of stimulus through tax relief of their own is irrational when judged by Congress's own actions. In essence, Congress's message to the States is "Tax cuts for me, but not for thee." But this flagrant hypocrisy does not satisfy *Dole*'s relatedness requirement.

The lack of a rational relationship is starkly demonstrated by Congress's decision to engage in fiscal stimulus by exempting the first $10,200 in unemployment benefits from federal income tax. *Id.* But if the States act to conform their own tax laws to provide the *very same* exemption, that would presumably violate the Tax Mandate.

### 2. Congress's Attempt To Undermine The Federal Character Of Our Constitutional System Violates *Dole*

A fundamental part of the structure of the U.S. Constitution is its establishment of *separate* federal and state sovereigns: "The federal system rests on what might at first seem a counterintuitive insight, that 'freedom is enhanced by the creation of two governments, not one.'" *Bond v. United States*, 564 U.S. 211, 220-21 (2011) (citation omitted). "For this reason, 'the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.' Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer." *See NFIB,* 567 U.S. at 577 (quoting *New York*, 505 U.S. at 162).

*Dole* further provides that Congress's Spending Clause "power may not be used to induce the States to engage in activities that would themselves be unconstitutional." 483 U.S. at 210. But the Tax Mandate (backed by the Act's grants) attempts to do just that: offer the States enormous sums in return for vitiating the system of dual sovereignty—including dual taxing sovereigns—that is inherent in the Constitution. Indeed, one of the most important aspects of state sovereignty retained within the union is the power to tax. *See McCulloch v. Maryland*, 4 Wheat. 316, 429 (1819).

Under the broad reading of the Tax Mandate, a state's decision to take funds in 2021 could potentially undermine this core aspect of state sovereignty for years down the road, in areas far afield from the state's actual use of the funds in question. The breadth of this provision takes it well beyond an ordinary conditional grant affecting some limited aspect of state taxing authority; here, Congress is inducing the states to sell the "essence of their statehood." *See Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 597 (1937). The attempt to buy this essential aspect of state sovereignty is unconstitutional.

### 3.     The Tax Mandate Violates The Supreme Court's Anti-Commandeering Test

Congress's enumerated powers do not include the power to issue orders to, or "commandeer," state governments. *See Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018). The Supreme Court has repeatedly stated that Congress lacks "the ability to require the States to govern according to Congress's instructions." *New York*, 505 U.S. at 162 (citing *Coyle v. Smith*, 221 U.S. 559, 565 (1911)). Accordingly, while Congress can condition the spending of certain funds, and can use its Spending Clause power to persuade the states to a certain degree, Congress cannot use its power under the Spending Clause to "coerce" the states into adopting a preferred policy. *See NFIB,* 567 U.S. at 583-85 (opinion of Roberts, C.J.). "[E]conomic dragooning that leaves the States with no real option but to acquiesce" crosses the line from permissible persuasion to impermissible coercion and effectively amounts to commandeering. *Id.* at 582.

14

The ARPA provides Arizona with $4.9 billion in a time of unparalleled economic contraction. This is nearly 10% of Arizona's projected FY2022 budget. *See* Makar Decl. Ex. T. In the current economic situation, Arizona cannot turn down this "'financial inducement.'" *NFIB*, 567 U.S. at 580. In *NFIB*, the Court addressed Medicaid spending which "account[ed] for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs." *Id.* at 581. The amount of funds at stake in this case is similar to that at issue in *NFIB*, leaving the states with "no real option" but to take the funds, and the conditions with them. *Id.* at 582. As the Joint Dissent in *NFIB* explained (largely in agreement with the Chief Justice): "Even if a State believes that the federal program is ineffective and inefficient, withdrawal would likely force the State to impose a huge tax increase on its residents, and this new state tax would come on top of the federal taxes already paid by residents to support subsidies to participating States." *Id.* at 680 (joint dissent). In the situation presented by the COVID-19 economic crisis, it is coercion to impose ancillary policy conditions to such vast funding.

The threat of the Tax Mandate to the constitutional balance of power is evident in its irreconcilability with the justifications of anticommandeering doctrine, which serves two purposes. First, anticommandeering enshrines the "structural protections of liberty" inherent in the federal system. *See Printz v. United States*, 521 U.S. 898, 921 (1997). By dividing power among multiple sovereigns, the Constitution reduces the risk of tyranny. *See New York*, 505 U.S. at 187. Second, the anticommandeering doctrine protects lines of political accountability. By preventing the federal government from ordering the state governments into adopting federal policy, anticommandeering ensures that accountability resides directly in the source of a particular policy, rather than allowing federal policy to be concealed through a state government intermediary. *See Murphy*, 138 S. Ct. at 1477; *New York*, 505 U.S. at 169.

The Tax Mandate, however, runs contrary to these purposes. First, it undermines structural protections of liberty. The state's independence in broad tax policy is an important value. Congress is, of course, perfectly within its rights to disfavor tax cuts as a

matter of federal policy. However, if Congress could use coercive grants to buy the state's compliance with federal tax policy, the nation would be limited to a single sovereign governing overarching tax policy in both the federal and state governments. In addition to threatening liberty, this would undermine the states' role as "laboratories of democracy." *Cf. New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) ("It is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

Second, the Tax Mandate undermines political accountability. With the Tax Mandate, the federal government takes the power to lower taxes away from state governments—but not the responsibility for their tax rates. It will be state and local legislators who are stuck with the tax rates the federal government has imposed on them through 2024. Those officials will "bear the brunt of public disapproval" while Congress "remain[s] insulated from the electoral ramifications of their decision." *New York*, 505 U.S. at 169. Congress cannot blur responsibility in this fashion, even by using the expedience of the Spending Clause.

The Tax Mandate also undermines democratic accountability at the state level as well. Take, for example, candidates for state legislatures that categorically oppose all tax cuts. That unpopular position might easily cost them votes. But the Tax Mandate lets them duck accountability and claim that their opposition to tax cuts is based on their illegality under federal law. Similarly, candidates that favor tax cuts may not be able to run effectively on that platform as voters may correctly recognize that electing such candidates is unlikely to delivery any actual state tax relief, since the Tax Mandate may simply invalidate them or make them too costly to enact.

Given its scope, its purpose, and the vast amount of funding being used to buy these key elements of state sovereignty, the Tax Mandate is unconstitutionally coercive and should be enjoined.

## II.    The Remaining Requirements For Injunctive Relief Are Satisfied Here

The violations of Arizona's sovereignty cause clear irreparable injury. All states "have an interest, as sovereigns, in exercising 'the power to create and enforce a legal code.'" *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989). And "the inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018).

As to the third and fourth *Winter* factors, "'the balance of the equities and public interest factors merge'" because "the Government is a party." *Doe #1 v. Trump*, 984 F.3d 848, 861-62 (9th Cir. 2020) (cleaned up). Enjoining the Tax Mandate will not harm anyone. Arizona is challenging no other provisions in the ARPA. Federal grants can still be paid, and the State can still spend those grants on the permissible uses articulated in the statute. All that will be prevented is the Treasury's ability to recoup funds from the state of Arizona for tax policy changes undertaken during the enjoined period. This will enable Arizona to continue with its existing policy program, consistent with Arizona's sovereign authority to set state taxes.

Furthermore, for the same reasons, an injunction is in the public interest. The Arizona public is entitled to have their policy makers not be constrained by an unconstitutional condition. As the Tax Mandate unconstitutionally inhibits elected policy makers from undertaking policy which, in their judgement, is in the best interests of their constituents, enjoining it is similarly in the public interest.

## CONCLUSION

The State's motion for a preliminary injunction should be granted.

RESPECTFULLY SUBMITTED this 5th day of April, 2021.

**MARK BRNOVICH**
**ATTORNEY GENERAL**

By

    Joseph A. Kanefield (No. 15838)
    Brunn W. Roysden III (No. 28698)
    Drew C. Ensign (No. 25463)
    Robert J. Makar (No. 33579)
       *Assistant Attorneys General*

*Attorneys for Plaintiff Arizona*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of April, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for parties that are registered CM/ECF users will be served by the CM/ECF system pursuant to the notice of electronic filing.  In addition, I have emailed a copy of the foregoing to Stephen Ehrlich and Charles Roberts at the U.S. Department of Justice, who are assigned to this case, and dispatched to them hard copies of the same via overnight Federal Express.

 s/ Drew C. Ensign
*Attorney for the State of Arizona*