Exhibit E

https://www.azfamily.com/news/investigations/3_on_your_side/originals/trust-fund-that-covers-arizona-employment-plunged-90-this-year/article_15254750-3bfb-11eb-b4b1-a7d2c0202009.html

3 ON YOUR SIDE

# Trust fund that covers Arizona employment plunged 90% this year

CARES Act money could provide influx of cash

SUSAN CAMPBELL
POSTED DEC 14, 2020

**PHOENIX (3 On Your Side)** - Gov. Doug Ducey plans to use CARES Act money to support Arizona's unemployment trust fund if it runs out of money in the coming months, 3 On Your Side has learned.

During an interview in September, Department of Economic Services Director Michael Wisehart predicted the state's unemployment trust fund could be exhausted in November 2020. At the time, he said Arizona would be forced to borrow from the federal government to make unemployment payments.

[↗] **Interactive dashboard: Unemployment in Arizona**

"You have to pay that money back through taxes on employers going forward," Wisehart said.

Things have changed since that September interview. The trust fund has hemorrhaged money, but not as quickly as expected.

According to a review of state data, Arizona began 2020 with its unemployment trust fund sitting at about $1.1 billion. By December 2020, the fund that provides a lifeline to unemployed Arizonans had plummeted to less than $100 million, a 90% drop in less than one year.

# Trust fund balance drops by 90% in 2020

Source: Brett Bezio, Arizona Department of Economic Security

It's really hard to predict things right now because we've got two things going on at once. On one hand, we're very optimistic about the vaccine and it rolling out and us getting back to something that's more normal. On the other hand, the pandemic is out of control.

Dave Wells, Grand Canyon Institute



"That's the whole purpose of having an unemployment insurance trust fund, is having it there when people need it. And we've needed it this year really badly," said Dave Wells, the research director for the nonpartisan think tank Grand Canyon Institute.

Wells predicts the trust fund could reach zero sometime in March, but he expects it to rebound quickly into positive territory.

"Employers pay a tax to fund it, and the first tax is due at the end of the first quarter and mostly paid in April," Wells explained. "In that scenario, I see the trust fund still having about $70 million by the end of next year, a year from now.

The maximum weekly unemployment benefit in Arizona is $240 per week, the second-lowest in the country. According to Wells, the rate of payments for state unemployment insurance will slow down as people get jobs or exhaust their 26 weeks of benefits. But he is quick to point out there is no crystal ball in such uncertain times.

"It's really hard to predict things right now because we've got two things going on at once," Wells said. "On one hand, we're very optimistic about the vaccine and it rolling out and us getting back to something that's more normal. On the other hand, the pandemic is out of control."

It is not unprecedented for the state's unemployment trust fund to dip into the red. During the Great Recession, the fund hit zero, and the state borrowed money from the U.S. Department of Labor to pay for benefits. Ben Petersen, a spokesman for Ducey, said the state has other options during the pandemic.

"Arizona is planning to use some of its federal CARES Act funds to replenish the unemployment trust fund should additional funds be needed," Petersen wrote in an email. "This will ensure that Arizonans in need will continue to receive unemployment benefits and avoid a costly burden on businesses and job creators."

Since the start of the pandemic, Arizona has paid out more than $12.4 billion in unemployment benefits to more than 2 million people, according to DES spokesman Brett Bezio. The payments include state unemployment insurance claims and federal Pandemic Unemployment Assistance (PUA) claims.

# UI and PUA benefits paid in Arizona

## Total number of recipients: 2,063,833

Doing the math, that averages out to less than $6,050 per person. It's not that straightforward, though, because some people will have received more than others, depending on how long they were unemployed.

Source: Arizona Department of Economic Security



# More stories about unemployment in Arizona

📄 **New ID verification rules delay unemployment for some Arizonans**

📄 **Hundreds of thousands of Arizonans could lose unemployment lifeline in weeks**

📄 **Unemployment recipients will have to verify identity with new system through DES**

📄 **3.5M Arizona unemployment claims flagged for fraud while real claims fall through cracks**

📄 **AZ inundated with 3.4 million fraudulent unemployment claims**

📄 **Criminals using dead Arizonans' information to file fraudulent unemployment claims**

📄 **Ducey claims Arizona economy is 'booming' as unemployed lose federal relief**

📄 **Arizona unemployment fraud victims wait more than a month for response from DES**

📄 **Unemployment benefits showing up in random mailboxes in Arizona**

📄 **Thousands of Arizonans receive bills for unemployment overpayments**

---

*Copyright 2020 KPHO/KTVK (KPHO Broadcasting Corporation). All rights reserved.*



Where Arizona stands 1 year into the coronavirus pandemic

Susan Campbell

Exhibit F

ABOUT  NEWSROOM  SERVICES  STUDENTS  CONTACT  Search

ⓘ  Click here for COVID information and resources for New Yorkers.



Charles E.
**SCHUMER**
UNITED STATES SENATOR FOR NEW YORK



Leave a
**COMMENT**



Help For
**NEW YORKERS**

Newsroom   Press Releases

03.08.21

# AFTER TIRELESS ADVOCACY, SCHUMER SECURES $23.8 BILLION IN DIRECT AID FOR NEW YORK'S STATE & LOCAL GOVERNMENTS IN FIRST MAJOR VICTORY AS MAJORITY LEADER, SCHUMER DELIVERS BILLIONS FOR NY'S TAXPAYERS AND MUNICIPALITIES; BILL DELIVERS $35 BILLION TO NYS AGENCIES, INCLUDING $12.6 BILLION TO NYS FOR FISCAL RELIEF & SENATOR SECURES ADDITIONAL $10.8 BILLION DIRECT TO LOCALITIES

*State & Local Aid Has Been Top Schumer Priority Since Beginning Of Pandemic; Schumer Delivers Direct Federal Assistance To Every Community Of Every Size, Keeping Local Economies Afloat, Frontline Workers on the Job & Main Streets Alive*

*State & Local Fiscal Relief Funds Provides a Whopping $12.56B To NYS, $6.14B To Metro Cities, $3.9B For Counties, $825M For Small Cities, Towns, And Villages, & $358M For NYS Broadband Program*

*Schumer To NY Municipalities and Taxpayers: Help Is On The Way!*

Delivering on his promise of robust relief for New York State and localities, U.S. Senate Majority Leader Charles E. Schumer declared that "help is on the way" and detailed the contents of the $23.8 billion in state and local fiscal aid, including $12.56 billion for New York State's government and more than $10.8 billion for counties, cities, towns, and villages, he secured for New York in the American Rescue Plan he led to passage in the Senate. Upon President Biden's signature, the American Rescue Plan will provide a vital and substantial injection of funding for cash-strapped localities that can be used to pay for essential services, retain vital frontline workers, and offset lost revenues and increased costs from the COVID-19 emergency.

Funds can also be used for relief to small businesses, hard-hit industries, and infrastructure investments to help rebuild local economies. Schumer says the state and local funding will keep local economies afloat and essential services running for communities, including the roll out of vaccines. It is estimated that New York State's agencies and authorities will receive over $30 billion from the American Rescue Plan, on top of the funds from the state and local fiscal relief fund.

"After fighting this pandemic on the frontlines, New York's counties and municipalities were loud and clear: they needed help and they needed it now to keep frontline workers on the job and prevent brutal service cuts. And today, to all towns, villages, cities, and counties throughout New York I say: help is on the way," **said Senator Schumer.** "As Majority Leader, I was proud to make state and local funding my top priority as municipalities throughout New York and The *American Rescue Plan* will deliver the much deserved relief for New York's local governments – to the tune of $23.8 billion – to get New York's municipalities the resources and funding they need to prevent layoff, to keep essential services running, and to keep our Main Streets alive and able to rebound when we emerge from the pandemic."

The senator explained that the nation's economic recovery depends on the survival of state and local governments, which have been forced to make substantial layoff across the nation as they struggle with revenue shortfalls caused by the COVID downturn. New York State lost billions of dollars in revenue compared to pre-pandemic years and counties and other municipalities across the state have already had to cut thousands of jobs due to massive budget shortfalls.

Concerned about the layoffs of public health care workers, firefighters, sanitation workers, teachers, and other vital public servants across New York, Schumer has fought since the beginning of the pandemic to deliver financial resources to help all counties, cities, towns, and villages recover. In addition to securing $150+ billion for New York in previous COVID relief bill negotiations, Schumer visited the Southern Tier and Western New York and pushed the previous administration to provide robust state and local aid that would benefit all Americans. After months of effort, the senator also successfully called for FEMA to provide 100% cost sharing to New York state, delivering billions more for the state to cover costs related to the pandemic.

The state and local allocation for New York in the Schumer-driven *American Rescue Plan* will help local governments avoid further layoffs and local tax and fee increases that would place a heavier burden on families and small businesses in crisis.

**The full breakdown of the $23.8 billion going to New York State and localities can be found here.**

**$23.8 Billion for New York** – Total amount of funding provided to New York State through the state and local fiscal relief fund, to keep first responders, frontline health workers, and other providers of vital services safely on the job as states and local governments roll out vaccines and fight to rebuild Main Street economies. Funding can be used for assistance to households, small businesses, nonprofits, aid to impacted industries such as tourism, travel, and hospitality, investments in water, sewer, and broadband infrastructure, and to provide premium pay to frontline workers. Local governments of every size, including all counties, cities, towns, and villages, receive dedicated federal aid awards. A new $10 billion capital projects program also support state broadband deployment efforts. Funds are allocated in New York as follows:

- **$12.569 Billion** for New York State Government
- **$6.141 Billion** for New York Metro Cities
- **$3.907 Billion** for New York's Counties
- **$825 Million** for New York's Small Cities, Towns, and Villages
- **$358 Million** for a New York State Broadband Investment Program

**Eligible uses for the state and local funds as detailed in the American Rescue Plan, appear below. This information is subject to change:**

Funds may be used by state and local governments for:

- Costs associated with responding to the COVID-19 public health emergency or its negative economic impacts, including but not limited to, assistance to households, small businesses, and nonprofits or aid to impacted industries such as tourism, travel, and hospitality.
- To support workers performing essential work during the COVID-19 public health emergency by providing premium pay to eligible workers or by providing grants to eligible employers that have eligible workers who perform essential work.
- To cover revenue losses caused by the COVID-19 public health emergency.
- To make necessary investments in water, sewer, or broadband infrastructure.

"We acknowledge the leadership of Senator Schumer and the members of New York's Congressional Delegation who supported our local governments throughout this pandemic. Without our Senator Schumer, this package would not have included the federal assistance to counties and local governments. He has always been there for New Yorkers, and his resolve has only been strengthened during this this pandemic," **said NYSAC Executive Director Stephen Acquario.**

"Local governments have been on the frontline since the beginning of the pandemic providing critical public health services and ensuring the well-being of our most vulnerable citizens. For more than a year, we have continued this important work despite the immense challenges and fiscal uncertainty we have faced due to COVID-19 and the subsequent economic fallout. We thank Senator Schumer for his continued advocacy, this support helps to ensure local governments throughout the nation, and the people they employ, can continue the important and life-saving work they do every day," **said New York Association of Counties President and Dutchess County Executive Marc Molinaro.**

"I am profoundly thankful to Leader Schumer and his team for their tireless efforts to deliver COVID relief to state and local governments," **said Erie County Executive Mark Poloncarz.** "Erie County has been on the frontline of the pandemic since day one, and this critical funding will allow us to continue fighting the virus and vaccinating our residents while maintaining essential services and promoting the economic recovery."

"We cannot have an adequate and full economic recovery without direct aid to counties and localities that have been on the frontlines of the pandemic response. Senate Majority Leader Schumer understood that and he fought for this historic funding included in the relief package passed on Saturday. Albany County will be receiving over $55.1 million in aid, while the combined total for our cities, towns and villages will come out to be more than $170 million, and I was proud to advocate for it over the last year. I urge the House to take up this bill and get it passed quickly so it can be signed by President Biden and provide families and businesses with the lifeline they desperately need," **said Albany County Executive Daniel P. McCoy.**

**Albany Mayor Kathy Sheehan said,** "The American Rescue Plan is going to help us keep our residents safe, frontline employees delivering essential services, businesses open, and cities thriving. A huge thank you to U.S. Senate Majority Leader Chuck Schumer for being a tireless advocate for this legislation and leading the charge to secure its passage in the US Senate. Our entire country needs this."

"We appreciate the tireless efforts of Senator Schumer, Senator Gillibrand, and Congressman Tonko to secure financial assistance for local communities, including the City of Troy," **said Troy Mayor Patrick Madden.** "The Covid-19 pandemic has taken a significant financial toll on our community, impacting essential operations and services while reducing much-needed revenues. We eagerly await final passage of the American Rescue Plan, and applaud President Biden and our federal representatives for their commitment to rebuild our economy through this direct emergency assistance program."

"Senator schumer has been working for most of this past year to deliver local pandemic relief to municipalities like Schenectady. He visited City Hall this summer to redouble his commitment and true to his word, in his first bill as Majority Leader he has delivered. This funding will be enormously helpful to us in dealing with the revenue we lost in the pandemic and boosting our economic development moving forward," **said Schenectady Mayor Gary McCarthy.**

"Buffalo has weathered immense challenges due to the COVID-19 pandemic," **said Buffalo Mayor Bryon W. Brown.** "I predicted the need for federal aid early on. Direct local funding in this relief bill will ensure our recovery and I am confident Buffalo will emerge stronger and more resilient than ever. I applaud President Biden, Leader Schumer, Speaker Pelosi, Senator Gillibrand, and Congressman Higgins for their leadership during this difficult time."

**Rochester Mayor Lovely Warren said,** "Our City, and all local governments across the country, have been hit hard with both revenue shortfalls and expenses related to the pandemic. Just like so many households, Rochester's finances have been stressed and I'm grateful for Senator Schumer's leadership in delivering assistance for our city and all the other localities across the nation that needed a boost. Working with his congressional colleagues and President Biden, Chuck Schumer did what he does best -- fighting for all of us here in New York. Thank you Senator Schumer for ensuring our city has the resources to keep fighting for our neighbors across every one of Rochester's neighborhoods."

"I commend Senator Schumer's leadership and determination. The American Rescue Plan will give Syracuse and communities across the nation the opportunity to not only recover from the pandemic but to come back stronger and more competitive," **said Syracuse Mayor Ben Walsh.** "It brings relief to people all over Syracuse who are suffering and helps hundreds of city workers hurt by the fiscal impact of COVID-19. The aid coming to Syracuse will help us offset what we've lost and prepare for the effects of the pandemic that will surely linger for years."

**Monroe County Executive Adam Bello said,** "The American Rescue Plan will deliver immediate and critical help to the families, workers, businesses and state and local governments that have felt the brunt of the economic downturn from the ongoing COVID-19 pandemic. I thank Sen Schumer for listening to the American people about what they need to make it through this trying time, and for his leadership and determination that has delivered a plan that will provide real, tangible results for the people of Monroe County and New York State. Funding provided by this plan will help vaccination distribution, hire additional vaccinators, give struggling businesses the chance to survive, further address the needs of our schools and lift the weight of fear and worry from families facing eviction, foreclosure and food insecurity."

**Onondaga County Executive McMahon said,** "Local Counties have been on the frontline since day one whether combating the COVID-19 pandemic, and no one has understood that better than Senator Schumer. Thanks to his tireless efforts, Onondaga County will be able to receive desperately needed funding to not only make up for lost revenue but help us recover stronger than ever. McMahon continued, "As we ramp up vaccinations, work to reopen schools and rebuild our economy, I know Onondaga County can rely on Senator Schumer to be the advocate we need in Washington."

"Municipalities throughout New York State and the country have been negatively impacted by the Coronavirus pandemic. Because of strong advocates like Senator Schumer, the American Rescue Plan Act of 2021 provides municipalities with necessary resources to provide services and enhance the quality of our residents. I commend the Senator for his tireless efforts and thank him for his continued support," **said Utica Mayor Robert M. Palmieri**

"When Westchester was facing our darkest days at the onset of this pandemic, Leader Schumer instantly understood the massive hole that would be left in our - and other local governments' - budgets. With that in mind, he went to work. Our Senate and House delegation understood that the hole created in our budgets would result in less funding for vital functions – like public health, safety and transportation – that County government provides. This funding is a lifeline that will allow us to keep these vital public functions operating while easing the tax burden on already stressed residents. I sincerely thank Leader Schumer, Senator Gillibrand, Congressmen Bowman, Jones & Maloney and President Joe Biden for their efforts on the *American Rescue Plan*," **said Westchester County Executive George Latimer.**

The City of Newburgh has been extremely hard hit by the COVID-19 pandemic," **said City of Newburgh Mayor Torrance Harvey.** "The direct funding for the City of Newburgh that the *American Rescue Plan* provides will help us continue our efforts to defeat the virus and build back our City's economy. I thank Senator Schumer for his steadfast leadership in making sure that the City of Newburgh and its residents have the tools needed to continue on despite the challenges that have come along with this crisis."

"The American Rescue Plan is a huge win for every single American. This act restores faith that our government has our backs and can be a force for good when we are most in need. On behalf of the 180,000 residents of Ulster County, I want to thank Majority Leader Chuck Schumer. None of this would be possible without his leadership, vision, and relentless efforts," **said Ulster County Executive Pat Ryan.**

"After a long and turbulent year, aid is finally here for Yonkers families, thanks to President Biden's and Senator Schumer's unwavering leadership. They recognized the needs of cities like Yonkers, where the pandemic hit the hardest, devastating the economic and social progress achieved in recent years. Yonkers now has a clear path set for ourselves, our schools, businesses and local community organizations to begin the road to recovery so we can continue to move forward," **said City of Yonkers Mayor Mike Spano.**

"The City of Kingston and our dedicated staff have worked around the clock to respond to this pandemic on the frontlines, while as a city we dealt with revenue loss and economic hardship" **said City of Kingston Mayor Steve Noble.** "We thank Senator Schumer for his leadership in passing the American Rescue Plan, which will provide much-needed direct aid to the City of Kingston, and other cities across this nation, at a time when it is needed most so we can continue serving Kingston residents. "

**Rockland County Executive Ed Day said,** "Just like many of our residents, Rockland County's finances have been hard hit by the added expenses and revenue shortfalls related to the pandemic. While we took steps early on to limit the fiscal impacts of COVID-19, we in County government have been the boots on the ground during this crisis and we have done whatever was necessary to keep delivering the services that people count on, this funding will make that job just a little bit easier. I thank Senator Schumer and our entire congressional delegation for delivering direct assistance to localities which will make all the difference as we work to fully recover from the pandemic."

"The American Rescue Plan includes critically needed funding for vaccinations, testing, schools and small businesses right here in Broome County," **said Jason Garnar, Broome County Executive.** "For months I have advocated for this funding for local governments so we can support our employees who have been fighting COVID-19 since day one," said

County Executive. "For months I have advocated for this funding for local governments so we can support our employees who have been fighting COVID-19 since day one," said Broome County Executive Jason Garnar. "A big thank you to Senator Schumer for helping make sure local governments in Broome County will get the funding we need to support our workers, fight COVID, and rebuild our economy."

"Funding for State and Local Governments is a big win for municipalities across the state and nation," said Richard C. David, Major of the City of Binghamton. "As President of the New York Conference of Mayors (NYCOM), I'm proud to have played a role working with Mayors throughout New York in advocating for this much needed direct relief. I'd like to thank Senator Schumer for his relentless leadership and for working with municipalities, listening to us and fighting for us. The funding for state and local governments will allow municipalities to continue to support critical police, fire, EMS, and other essential services as we recover from the pandemic and rebuild our local economies."

###

Print  Email  👍 Like 0  🐦 Tweet

Previous Article                                              Next Article

ABOUT          NEWSROOM          SERVICES          STUDENTS          CONTACT          OFFICES

# Exhibit G



March 3, 2021

# State Aid in American Rescue Plan Act Is 116 Times States' Revenue Losses

 Jared Walczak

> **Note:** The state and local revenue allocation table was updated on March 9th to reflect Senate amendments modifying the state aid formula.

Preliminary data suggest that states closed out calendar year 2020 with only $1.7 billion less revenue than they generated in 2019 (a decline of less than 0.2 percent), not counting federal assistance, while municipal governments actually experienced substantial revenue growth due to rising property values. Yet the American Rescue Plan Act (ARPA) sets aside $350 billion in additional state and local aid. Increasingly, federal proposals to provide a cash infusion for state and local governments has become a solution in search of a problem.

Forty-three states and the District of Columbia have now published revenue data for all 12 months of 2020; in those states, revenues are *up $3.2 billion* in aggregate compared to the previous calendar year, thanks to robust gains in financial markets and federal assistance that has kept businesses afloat and provided benefits to individuals. Some of those are, indeed, *taxable* benefits, in the case of enhanced and expanded unemployment compensation benefits. For the remaining seven states, it is necessary to project revenues through the end of the calendar year based either on U.S. Census Bureau data through the three quarters, or, in Nevada and New Mexico, state data running through October and November respectively.

These adjustments yield an aggregate $1.7 billion decline in state revenues. Under the American Rescue Plan Act, states would receive $195.3 billion in aid, divided according to each state's share of national unemployed workers. Under Senate amendments, a further adjustment is made to ensure that each state receives, at minimum, the amount it was allocated for purposes of the Coronavirus Relief Fund under the CARES Act. While some conservative lawmakers have criticized this allocation model (which benefits states with steeper job losses) on the grounds that different state policies and approaches may yield some of this variation and that the federal government should be neutral to these decisions, we have argued previously that using the change in unemployment is a more efficient targeting method than allocating aid per capita. Far less defensible, however, is the notion that aid to states should be 116 times the decline in state revenues—especially since the federal government has already provided over $200 billion in fungible aid to subnational governments.

Local governments, meanwhile, would receive $130.2 billion, split evenly between cities and counties, with aid to cities based on the existing formula for Community Development Block Grants (CDBGs) and county aid based on population. The CDBG formula takes into account population, poverty, and the age and density of housing, as it was designed for grants administered by the U.S. Department of Housing and Human Services (HUD) to promote affordable housing and expand economic opportunities for low-income households. Data for municipal revenues are only available for the first three quarters of calendar year 2020, but local revenues actually *rose* by $29.8 billion over that period compared to the same period in 2019, and there is every reason to believe that this trajectory has continued. Local governments have more revenue than they did a year ago, but the American Rescue Plan Act would still provide them with $130.2 billion.

The remaining $24.5 billion in the state and local aid packages would provide another $20 billion in assistance to tribal governments and a further $4.5 billion to U.S. territories. Unlike



| 🖨 | Print this page |
| 📧 | Subscribe |
| ♥ | Support our work |

billion in assistance to tribal governments and a further $4.5 billion to U.S. territories. Unlike the CARES Act, which allocated aid to the District of Columbia using the same formula used for territories, the American Rescue Plan Act would not only treat D.C. as a state for purposes of aid but would provide the District with an additional $755 million payment to account for what it would have received under the CARES Act under a state designation. The District of Columbia recently announced a $526 million surplus.

### Aid Distribution Amounts and Formulas

| Level of Government | Amount | Distribution Formula |
|---|---|---|
| State Governments | $195.3 billion | Share of National Unemployment with CARES Act Minimum Payment |
| Local Governments | $130.2 billion | Population (Counties) and CDBG Criteria (Cities) |
| Territories | $4.5 billion | Base Allocation plus Population |
| Tribal Governments | $20.0 billion | Treasury Determination |

Source: American Rescue Plan Act.

The following table shows each state's estimated revenue gains or losses in 2020, alongside the state and local aid that would be allocated to each under the American Rescue Plan Act. Federal aid as a percentage of loss is for the state component only (state aid as a percentage of state revenue loss, where states have lost revenue). Aid per capita incorporates aid to both states and localities. The American Rescue Plan Act provides $1,066 in state and local aid per capita nationwide, and the $195.3 billion earmarked for state governments is almost 116 times the states' aggregate revenue losses. For state revenue data, we largely rely on monthly tax collections data collected by Marc Joffe at the Reason Foundation, updated where appropriate and projected through the end of the year for the seven states with data limitations.

### State Revenues and State and Local Aid Under the Proposed American Rescue Plan Act
*Change in State Revenue in Calendar Year 2020 vs. 2019, with Proposed Federal Aid Allocations*

| State | Revenue Change | American Relief Act Aid Allocations | | | Federal Aid Calculations | |
|---|---|---|---|---|---|---|
| | | State Aid | Local Aid | Total Aid | % of Loss | Per Capita |
| Alabama | $563,716,794 | $2,088,109,980 | $1,890,457,564 | $3,978,567,544 | – | $811 |
| Alaska | -$423,777,385 | $1,250,000,000 | $257,269,324 | $1,507,269,324 | 295% | $2,060 |
| Arizona | $359,373,486 | $4,727,380,641 | $2,545,326,640 | $7,272,707,281 | – | $999 |
| Arkansas | -$19,800,000 | $1,625,508,134 | $1,198,939,470 | $2,824,447,604 | 8210% | $936 |
| California | $6,167,098,000 | $25,672,242,592 | $14,943,211,818 | $40,615,454,409 | – | $1,028 |
| Colorado | $853,587,000 | $3,894,086,649 | $1,879,159,818 | $5,773,246,467 | – | $1,003 |
| Connecticut | -$242,259,847 | $2,607,685,594 | $1,640,619,508 | $4,248,305,102 | 1076% | $1,192 |
| Delaware | -$263,695,643 | $1,250,000,000 | $305,135,704 | $1,555,135,704 | 474% | $1,597 |
| District of Columbia | -$434,620,000 | $1,712,325,487 | $493,410,164 | $2,205,735,651 | 508% | $2,075 |
| Florida | -$2,634,900,000 | $10,077,563,954 | $6,047,585,455 | $16,125,149,409 | 382% | $751 |
| Georgia | $598,533,000 | $4,584,350,259 | $3,565,534,086 | $8,149,884,345 | – | $768 |
| Hawaii | -$1,151,388,697 | $1,607,573,544 | $481,024,078 | $2,088,597,622 | 140% | $1,475 |
| Idaho | $484,103,896 | $1,250,000,000 | $642,991,105 | $1,892,991,105 | – | $1,059 |
| Illinois | -$443,931,773 | $7,378,600,932 | $5,743,479,413 | $13,122,080,345 | 1665% | $1,036 |
| Indiana | -$228,700,000 | $3,014,287,495 | $2,831,054,188 | $5,845,341,684 | 1318% | $868 |
| Iowa | -$43,660,455 | $1,358,228,983 | $1,496,214,690 | $2,854,443,673 | 3111% | $905 |
| Kansas | $13,514,896 | $1,561,950,910 | $1,154,157,645 | $2,716,108,555 | – | $932 |
| Kentucky | $342,059,355 | $2,403,806,436 | $1,842,016,986 | $4,245,823,422 | – | $950 |
| Louisiana | -$514,832,133 | $3,160,523,381 | $1,960,935,249 | $5,121,458,630 | 614% | $1,102 |
| Maine | $110,714,348 | $1,250,000,000 | $645,944,718 | $1,895,944,718 | – | $1,410 |
| Maryland | -$2,604,782,910 | $3,811,534,780 | $1,952,954,533 | $5,764,489,321 | 146% | $953 |
| Massachusetts | $503,158,772 | $4,444,672,468 | $3,718,287,046 | $8,162,959,514 | – | $1,184 |
| Michigan | $215,473,000 | $5,569,433,975 | $4,394,510,607 | $9,963,944,582 | – | $998 |
| Minnesota | -$470,979,000 | $2,538,554,243 | $2,089,287,955 | $4,627,842,198 | 539% | $821 |
| Mississippi | $106,565,829 | $1,777,302,931 | $1,259,098,668 | $3,036,401,590 | – | $1,020 |
| Missouri | $52,965,166 | $2,773,950,806 | $2,499,324,557 | $5,273,275,363 | – | $859 |
| Montana | -$66,558,000 | $1,250,000,000 | $409,233,237 | $1,659,233,237 | 1878% | $1,552 |
| Nebraska | $162,771,567 | $1,250,000,000 | $802,781,938 | $2,052,781,938 | – | $1,061 |
| Nevada | -$650,334,637 | $2,902,454,982 | $945,070,418 | $3,847,525,399 | 446% | $1,249 |
| New Hampshire | -$54,600,000 | $1,250,000,000 | $558,345,102 | $1,808,345,102 | 2288% | $1,330 |

| New Hampshire | -$54,600,000 | $1,250,000,000 | $558,245,183 | $1,808,245,183 | 2289% | $1,330 |
| New Jersey | -$145,193,000 | $6,337,020,215 | $2,944,569,244 | $9,281,589,459 | 4365% | $1,045 |
| New Mexico | -$160,423,717 | $1,594,335,625 | $838,780,675 | $2,433,116,300 | 994% | $1,160 |
| New York | -$1,229,203,949 | $12,379,759,682 | $10,612,147,641 | $22,991,907,322 | 1807% | $1,182 |
| North Carolina | $353,700,000 | $5,196,748,534 | $3,783,654,988 | $8,980,403,522 | – | $856 |
| North Dakota | -$634,998,008 | $1,250,000,000 | $278,536,341 | $1,528,536,341 | 197% | $2,006 |
| Ohio | $1,386,444,000 | $5,553,441,961 | $5,415,968,242 | $10,969,410,204 | – | $938 |
| Oklahoma | -$520,800,000 | $2,141,538,421 | $1,392,397,620 | $3,533,936,041 | 411% | $893 |
| Oregon | -$634,914,734 | $2,568,859,439 | $1,540,499,474 | $4,109,358,913 | 485% | $974 |
| Pennsylvania | -$67,636,000 | $7,183,557,197 | $5,765,269,175 | $12,948,826,372 | 10621% | $1,011 |
| Rhode Island | -$271,333,333 | $1,250,000,000 | $592,841,749 | $1,842,841,749 | 461% | $1,740 |
| South Carolina | -$272,600,000 | $2,063,612,223 | $1,626,600,061 | $3,690,212,284 | 757% | $717 |
| South Dakota | $131,092,878 | $1,250,000,000 | $345,024,191 | $1,595,024,191 | – | $1,803 |
| Tennessee | $135,465,000 | $3,763,168,202 | $2,464,710,251 | $6,227,878,453 | – | $912 |
| Texas | -$4,081,812,000 | $16,445,251,204 | $10,337,277,468 | $26,782,528,672 | 403% | $924 |
| Utah | $727,600,000 | $1,493,813,670 | $1,012,752,533 | $2,506,566,203 | – | $782 |
| Vermont | $189,760,000 | $1,250,000,000 | $305,917,280 | $1,555,917,280 | – | $2,494 |
| Virginia | $444,400,000 | $3,709,339,072 | $2,676,624,514 | $6,385,963,586 | – | $748 |
| Washington | $637,678,000 | $4,188,785,028 | $2,435,472,640 | $6,624,257,668 | – | $870 |
| West Virginia | -$114,495,000 | $1,230,617,479 | $839,702,297 | $2,070,319,777 | 1075% | $1,155 |
| Wisconsin | $2,344,131,000 | $3,158,022,885 | $2,493,465,345 | $5,651,488,231 | – | $971 |
| Wyoming | -$192,100,707 | $1,250,000,000 | $131,311,647 | $1,381,311,647 | 651% | $2,387 |
| | | | | | | |
| Tribal Governments | unknown | $20,000,000,000 | – | $20,000,000,000 | n/a | n/a |
| U.S. Territories | unknown | $4,500,000,000 | $2,173,214,858 | $6,673,214,858 | n/a | $1,870 |
| | | | | | | |
| *State Subtotal* | *-$1,689,702,940* | *$195,300,000,000* | *$128,026,785,142* | *$323,326,785,142* | *11558%* | *$983* |
| *U.S. Totals* | *n/a* | *$219,800,000,000* | *$130,200,000,000* | *$350,000,000,000* | *n/a* | *$1,066* |

Notes: State revenues are projected through the end of calendar 2020 in seven states where full-year data are not available (AK, MD, NV, NM, OR, RI, WY). Federal aid as a percentage of revenue losses is specifically for state aid as a percentage of state revenue losses. States with revenue gains over the period are excluded. Per capita aid incorporates aid to both state and local governments.

Sources: American Rescue Plan Act; monthly state revenue reports (Reason Foundation data supplemented by the Tax Foundation); Tax Foundation analysis.

Prior federal legislation in response to the COVID-19 pandemic has already included substantial aid to states, some of which was flexible enough to be used to backfill any state revenue losses. The Families First Act, the CARES Act, and the Response and Relief Act collectively provided about $212 billion in fungible aid to state and local governments, and states have also been empowered to use a substantial portion of the $150 billion provided under the Coronavirus Relief Fund to cover existing expenses, like the salaries of public safety and public health officials. This relief compares favorably to the $144 billion provided during the Great Recession, even though state tax revenues ultimately declined about 10 percent during the Great Recession, compared to less than 0.2 percent in 2020. With local revenues *up* in aggregate, the need for an additional $350 billion in aid is decidedly unclear. States were understandably worried about their finances early in the pandemic, but as state revenue outlooks brightened, the demand for aid became divorced from reality.

This is not to say that every state or local government is doing well. States with a heavy reliance on the energy industry are struggling, a problem which predates the pandemic but was exacerbated by it. Tourism destination states have also been adversely impacted by the pandemic. Consequently, the worst losses are in energy states like Alaska and North Dakota (both of which facing losses in excess of 20 percent of revenue), while states like Florida, Hawaii, and Nevada also have losses ranging from 7 to 14 percent, even though average revenue losses are -0.2 percent, the median is -0.4 percent, and 23 states saw revenue gains.

Similarly, most localities did well, but a few are clearly struggling, often because of their chosen tax structure. Nationwide, property taxes account for 72 percent of local tax revenue, with local sales tax responsible for most of the remainder. A handful of cities, however, lean heavily on local income taxes which only generate revenue if people are living or working in the city. New York City and Philadelphia, in particular, rely heavily on municipal income taxes and face significant shortfalls even though local governments have seen annual revenue growth as a whole. These challenge are real, but the federal legislation's $350 billion price tag has no real connection to actual needs.

Where states *are* struggling, however, is with the intense demands on their unemployment compensation systems. Even though the federal government is spending three dollars for every dollar states spend on unemployment benefit payments, the state share is still daunting. States paid out $144 billion in benefits in 2020, compared to about $30 billion in a typical

year, and their trust funds are depleted, with many states taking out repayable federal loans, called Title XII Advances, to cover current needs. Eventually, states will have to replenish these funds, and to do so, they will have to raise employment taxes drastically—with taxes potentially going up by thousands of percent. To meet an immediate state need and fend off ruinous tax increases on rehiring, the federal government could consider shifting from a system that provides general aid on the basis of unemployment to one that offsets some of the states' unemployment compensation costs. Short of this, states receiving federal aid well in excess of general fund needs would do well to consider depositing the money into their unemployment compensation trust funds.

Enhancing the solvency of unemployment trust funds meets a real need. A $350 billion bailout package when state revenues are flat does not.

## Related Resources

COVID-19 Tax Resource Center

American Rescue Plan: Details & Summary

U.S. COVID-19 Relief Provided More Than $60,000 in Benefits to Many Unemployed Families

Does the American Rescue Plan Ban State Tax Cuts?

Which States Are Taxing Forgiven PPP Loans?

### Stay Informed on Tax Policy Research and Analysis

First Name | Email Address | Select State ▾ | Subscribe

### Was this page helpful to you?

Yes! No

## Topics

Center for Federal Tax Policy · Center for State Tax Policy · Alabama · Alaska · Arizona · Arkansas · California · Colorado · Connecticut · Delaware · Florida · Georgia · Hawaii · Idaho · Illinois · Indiana · Iowa · Kansas · Kentucky · Louisiana · Maine · Maryland · Massachusetts · Michigan · Minnesota · Mississippi · Missouri · Montana · Nebraska · Nevada · New Hampshire · New Jersey · New Mexico · New York · North Carolina · North Dakota · Ohio · Oklahoma · Oregon · Pennsylvania · Rhode Island · South Carolina · South Dakota · Tennessee · Texas · The District of Columbia · Utah · Vermont · Virginia · Washington · West Virginia · Wisconsin · Wyoming · Business Taxes · Individual and Consumption Taxes

## Tags

American Rescue Plan · COVID-19 (Coronavirus) · Federal Aid To States · Revenue Stability · Sources Of Revenue · State Budgets · Unemployment Insurance Taxes

## About the Author



**Jared Walczak**

Vice President of State Projects

Jared is Vice President of State Projects with the Center for State Tax Policy at the Tax Foundation. He previously served as legislative director to a member of the Senate of Virginia as political director for a statewide campaign, and consulted on research and policy development for a number of candidates and elected officials.

 Follow Jared Walczak

## Related Research



**President Biden's Infrastructure Plan Raises Taxes on U.S. Production**



**ARPA Allocates $2 Billion to Nonexistent County Governments**



**Capital Cost Recovery across the OECD**



**Does Your State Levy a Capital Stock Tax?**



**How the CARES Act Shifted the Composition of Tax Expenditures Towards Individuals**



**A Neutral Tax Code Counts Unemployment Compensation as Taxable Income**

**Help us achieve our vision of a world where the tax code doesn't stand in the way of success.**

Subscribe    Contribute

### About Us

The Tax Foundation is the nation's leading independent tax policy nonprofit. Since 1937, our principled research, insightful analysis, and engaged experts have informed smarter tax policy at the federal, state, and global levels. For over 80 years, our goal has remained the same: to improve lives through tax policies that lead to greater economic growth and opportunity.

### More Links

Donate
Press Room
Careers
Events

### Connect

f  Facebook
🐦 Twitter
in LinkedIn
▶ YouTube
🎙 Podcast

### Contact Us

Tax Foundation
1325 G St NW
Suite 950
Washington, DC 20005

202-464-6200

Copyright Tax Foundation 2021  |  Copyright Notice  |  Privacy Policy

# Exhibit H

Mar 6, 2021, 07:06am EST  |  6,464 views

# Senate's $1.9 Trillion Spending Bill Criticized For Blocking State Tax Relief, Rewarding Bad Gubernatorial Behavior



**Patrick Gleason** Contributor ⓘ ⊕

Policy

*I cover the intersection of state & federal policy and politics.*



U.S. Senate Majority Whip Sen. Dick Durbin (D-IL) speaks as Senate Majority Leader Sen. Chuck ... [+]

GETTY IMAGES

"Why would you want to raise taxes when you don't have to?" That's a question Connecticut Governor Ned Lamont (D) rhetorically posed in response to calls from fellow Democrats for tax hikes on upper income

households. While Governor Lamont is rejecting calls to enact what would be Connecticut's third income tax increase in the past decade, the Nutmeg State governor's position is a departure from the norm in his party, as his Democratic counterparts in other governors' mansions are moving to impose state-level tax increases this year to go along with whatever tax hikes President Joe Biden is able to enact.

While prominent blue state governors have released new budget proposals that call for state tax hikes in New York, Illinois, Pennsylvania, and Wisconsin, congressional Democrats are now concerned that Republicans will take red state fiscal policy in the opposite direction by cutting taxes in the places where the GOP controls state government, which is nearly half of the country. Senator Chuck Schumer (D-NY) has gone so far as to include language in the new $1.9 trillion spending package that prevents federal aid from being put toward state tax relief.

A managers amendment to the Senate version of the $1.9 trillion spending package that passed the House on February 27, which sends another $350 billion to state governments on top of the hundreds of billions they've already received through previous relief packages, stipulates that states or territories "shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase."

What that means is Senate Majority Leader Schumer and congressional Democrats want to block state legislators and governors from returning the next round of federal aid to states back to taxpayers in the form of tax cuts or rebates. Yet lawmakers in many states across the country have already begun moving forward with various forms of state-level tax relief to enact in

2021 that is not subject to these restrictions included in the $1.9 trillion spending bill.

Governors and legislators in West Virginia and Mississippi are advancing legislation to phase out their state income tax. In New Hampshire, a state where Republicans won back control of the statehouse in 2020, lawmakers have proposed legislation to eliminate the Granite State's tax on investment income (the state already does not tax wage income).

---

MORE FOR YOU

**Did You Get A Second Stimulus Check Today? Here's Why**

**Trump Signs Executive Orders To Extend COVID-19 Economic Relief, Includes Unemployment Benefits, Eviction Moratorium**

**Biden: Stimulus Bill Passed During Lame Duck Session Is 'At Best Just A Start'**

---

Tennessee is another no-income-tax state with one of the lowest tax burdens in the country. But as in New Hampshire, lawmakers in Tennessee are still finding ways to provide tax relief. Tennessee Representative Ron Gant (R) has proposed legislation to eliminate the remnants of the Volunteer State's professional privilege tax, which used to apply to more than 20 professions but now applies to only seven thanks to enactment of a 2019 bill that repealed the levy for most jobs. Legislation to enact income tax cuts and other forms of tax relief have been proposed or will soon be introduced in a number of other states where Republicans control both chambers of the state legislature.

Senate restrictions on the next round of state aid do not affect state tax relief efforts already in the works and others soon to be proposed. But this prohibition will prevent state officials from using any of the $350 billion in additional funds to replenish state unemployment compensation funds, which is among the most pressing needs and, according to the Tax Foundation's Jared Walczak, "would be one of the most responsible ways

states could spend a large, but one-time, infusion that isn't substantially needed to backfill lost revenues."

In addition to the restrictions on the use of state aid, the formula by which state aid is divvied out in the $1.9 trillion spending bill is also coming under fire. A bipartisan group of 22 governors issued a joint statement on February 27 urging the Senate to amend the formula. The new spending bill determines the amount of federal aid based on state unemployment rates, which these governors see as rewarding bad behavior and poor, unjustified decisions about restricting commerce.

"Unlike all previous federal funding packages, the new stimulus proposal allocates aid based on a state's unemployed population rather than its actual population, which punishes states that took a measured approach to the pandemic and entered the crisis with healthy state budgets and strong economies," notes the joint statement, which was organized by South Carolina Governor Henry McMaster (R) and signed by nearly half of the nation's governors.

"A state's ability to keep businesses open and people employed should not be a penalizing factor when distributing funds," the gubernatorial coalition

statement added. "If Congress is going to provide aid to states, it should be on an equitable population basis."

Senator Lindsay Graham proposed an amendment to the $1.9 trillion spending package that would revert back to the state aid funding formula used in the CARES Act. That amendment was defeated by a 48 to 51 vote in the wee hours of Saturday, March 6, shortly after 2:00 AM.

"The Democratic proposal creates a totally new formula for state and local government, which disproportionately rewards blue states like New York and California," Senator Graham said. "My amendment retains and keeps in place the CARES formula that was used in the bipartisan package that passed 96-0. It's a much fairer and better allocation for the country as a whole. Many states benefitted from the CARES formula and it should remain in place."

In addition to thwarting state-level tax relief and basing the next round of federal aid to states on a contested funding formula, the new federal spending bill also entices states to commit to higher levels of spending in perpetuity. It does so by increasing the federal funding match for states that expand Medicaid in accordance with Obamacare. This promise of more money from Washington is an attempt to get governors and lawmakers in the dozen states that have yet to impose Obamacare's Medicaid expansion to finally do so. Critics of Obamacare's Medicaid expansion point out that imposing it will make future state tax relief less likely and future tax hikes a greater possibility, as it adds pressure to the category of state spending that is already growing fastest.

Between its restrictions on state tax relief, a controversial funding formula that many believe rewards bad gubernatorial behavior, and its provision enticing states to permanently grow the size of their governments, it's not surprising that governors from both parties have spoken out against the $1.9 trillion spending package now working its way to President Biden's desk. What would be surprising is if enough Democratic senators shared these

objections such that it derailed the whole package. That's not expected to happened but only time will confirm.



**Be the first to get expert analysis as breaking news happens.**

Sign up for Topline email alerts for breaking news of the day.

You may opt out any time. By signing up for this newsletter, you agree to the Terms and Conditions and Privacy Policy

*Follow me on Twitter.*



**Patrick Gleason**

I am Vice President of State Affairs at Americans for Tax Reform, a Washington-based advocacy and policy research organization founded in 1985 at the request of President...

**Read More**

Reprints & Permissions

ADVERTISEMENT

Exhibit I

# COVID-19 Policy Update

**Akin Gump**
STRAUSS HAUER & FELD LLP

## Summary of American Rescue Plan Act of 2021

March 10, 2021

On Wednesday, March 10, the House passed the Senate-approved version of H.R. 1319, the American Rescue Plan Act of 2021, on a 220-211 vote (title-by-title summary available here). No Republicans supported the bill, and one Democrat, Rep. Jared Golden (D-ME), opposed the bill. Rep. Kurt Schrader (D-OR), who previously voted against the bill, voted to support the measure, which aims to accelerate activities to address the virus and provide additional economic support to individuals, state and local governments, and small businesses. The bill provides for a total of $1.88 trillion in federal investments.

Below, please find a summary of key provisions in the package.

### Vaccines and Testing

The measure notably provides a total of $91 billion for the Department of Health and Human Services (HHS) for a number of coronavirus activities, including for accelerated research, development, manufacturing and distribution of vaccines and therapeutics; diagnostic testing and contact tracing; and increasing the health care workforce, among other things.

$7.5 billion is set aside for the Centers for Disease Control and Prevention (CDC) to prepare, promote, administer, monitor and track vaccines. $7.6 billion is also included for vaccination, testing and associated activities at Community Health Centers, as well as $7.7 billion for HHS to establish, expand and sustain a public health workforce.

The package provides $47.8 billion for HHS activities to detect, diagnose, trace and monitor COVID-19 infections, directing HHS to implement a national strategy for testing, contact tracing, surveillance and mitigation. Approved use of these funds includes facilitating activities related to the distribution and administration of tests and other supplies for testing; expanding testing and contact tracing capabilities with respect to laboratory capacity, community-based testing sites and mobile testing units, among other things; and supporting the nation's public health workforce.

$6.1 billion is set aside for research, development, manufacturing, production and purchase of vaccines, therapeutics and ancillary medical products, and $10 billion is set aside to support the production, purchase and distribution of critical materials and equipment under the Defense Production Act (DPA).

**Contact Information**
**If you have any questions concerning this alert, please contact:**

**G. Hunter Bates**
Partner
hbates@akingump.com
Washington, D.C.
+1 202.887.4147

**Brian Arthur Pomper**
Partner
bpomper@akingump.com
Washington, D.C.
+1 202.887.4134

**Charles W. Johnson IV**
Partner
johnsonc@akingump.com
Washington, D.C.
+1 202.887.4295

**James Romney Tucker Jr.**
Partner
jtucker@akingump.com
Washington, D.C.
+1 202.887.4279

**Casey Christine Higgins**
Senior Policy Advisor
cchiggins@akingump.com
Washington, D.C.
+1 202.887.4223

**Christopher A. Treamor**
Counsel
ctreanor@akingump.com
Washington, D.C.
+1 202.887.4551

**Taylor M. Daly**
Senior Public Policy Specialist
tdaly@akingump.com
Washington, D.C.
+1 202.416-5541

The measure provides $50 billion, to remain available through fiscal year (FY) 2025, to the Federal Emergency Management Agency's (FEMA) Disaster Relief Fund in order to reimburse state and local governments for COVID-19-related expenses. Also of note, the amended version of the bill includes $8.5 billion for rural health care providers.

## Relief to State and Local Governments

The bill provides $219.8 billion, available through December 31, 2024, for states, territories and tribal governments to mitigate the fiscal effects stemming from the public health emergency with respect to COVID-19. Of this amount, a total of $195.3 billion is set aside for direct federal aid to states and D.C., $4.5 billion in payments to territories, and $20 billion for payments to tribal governments. Further, the language sets aside additional funds for D.C. in the form of $755 million in retroactive Coronavirus Aid, Relief and Economic Security (CARES) Act funding. The bill also provides $50 million, to remain available until expended, for the costs of administration of these funds.

The bill provides a total of $130.2 billion, to remain available through December 31, 2024, for metropolitan cities, municipalities and counties. Of this amount, $45.57 billion is set aside for payments to metropolitan cities using the formula for Community Development Block Grants, $65.1 billion for counties with populations of 200,000 or more, and $19.53 billion for cities and counties with populations under 50,000. The language stipulates that amounts provided to a locality cannot exceed 75 percent of the local government's budget as of January 27, 2020.

These funds for state governments, metropolitan cities, municipalities and counties may be used to cover costs incurred to:

- Respond to the public health emergency with respect to COVID-19 or its negative economic impacts, including assistance to households, small businesses and nonprofits, or aid to impacted industries such as tourism, travel and hospitality.

- Respond to workers performing essential work during the public health emergency by providing premium pay to eligible workers or grants to eligible employers.

- Provide government services to the extent of the reduction in revenue of states, territories or tribal governments due to the public health emergency.

- Make investments in water, sewer or broadband infrastructure.

Two restrictions on the use of funds are outlined in the language. States and territories are barred from using funds either to directly or indirectly offset a reduction in their net tax revenue resulting from a change in law, regulation or administrative interpretation during the covered period that reduces or delays any tax or tax increase. Further, states, territories, metropolitan cities, municipalities and counties are also prohibited from using funds for deposit into any pension fund.

With respect to reporting requirements, all states, territories, tribal governments, metropolitan cities, municipalities and counties receiving payments must submit "periodic reports" with a detailed accounting of the uses of funds.

A breakdown of estimated allocations to state and local governments is available here.

## Relief to Individuals

For individuals, the package includes an additional $1,400 in recovery rebates in order to supplement the $600 provided in December and fulfill Democrats' promise to provide $2,000 in economic impact payments for taxpayers.

The measure includes an expansion of the Child Tax Credit (CTC) and Earned Income Tax Credit (EITC), nearly tripling the maximum EITC for childless workers. The package increases the amount of the CTC, from $2,000 to $3,000, with a higher $3,600 credit for children under the age of 6, also allowing the CTC to be fully refundable.

Additionally, this bill includes an expansion of the Child and Dependent Care Tax Credit, which includes increasing the credit so households can receive a total of up to $4,000 for one child or $8,000 for two or more children.

After the House initially adopted the legislation and it moved to the Senate, Democratic leadership negotiated a $300-per-week unemployment supplement in lieu of the House-passed $400, as well as lower income thresholds for those receiving the $1,400 recovery rebate, to secure the legislation's passage.

In the previous House bill, the phaseout began at $75,000 adjusted gross income (AGI) and ended at $100,000 AGI. In the subsequent Senate version of the measure, the phaseout still begins at $75,000 but ends at $80,000 instead of $100,000. Similarly, for joint filers, the phaseout still begins at $150,000 but ends at $160,000 rather than $200,000 AGI.

Other provisions of note in the package include $21.55 billion in Emergency Rental Assistance; $5 billion to support communities' efforts to provide supportive services and safe housing solutions; and $9.961 billion in funding through the Department of the Treasury to states, territories, tribes and tribally designated housing entities to provide direct assistance to homeowners.

## Relief to Businesses

The American Rescue Plan Act notably includes the Restaurants Revitalization Fund, which is based on the original $109 billion Real Economic Support That Acknowledges Unique Restaurant Assistance Needed To Survive (RESTAURANTS) Act passed by the House last year and provides $28.6 billion in relief for small and mid-sized restaurants. It also added an additional $1.25 billion in funding for the $15 billion Shuttered Venue Operator Grant (SVOG) program passed in December to provide relief to independent live music venues, performing arts centers, movie theaters and museums.

The measure contains new funds to support small businesses, providing $15 billion in new funding for Targeted Economic Injury Disaster Loan (EIDL) grants. Regarding the Paycheck Protection Program (PPP), the bill expands program eligibility to include additional nonprofits such as 501(c)(5) labor and agricultural organizations and community locations of larger nonprofits, allocating $7 billion for this purpose. In addition, it permits recipients of SVOG funding also to apply for a second PPP loan. The measure also provides $10 billion for the State Small Business Credit Initiative (SSBCI) to allow state governments to create programs which utilize private capital for low-interest loans and other investment to support entrepreneurs.

The bill extends and expands the Employee Retention Tax Credit (ERTC) through December 31, 2021; allows certain businesses to claim the credit for a greater share of employee wages; and expands the credit to cover newly formed businesses.

Regarding paid sick leave, the package provides an extension and expansion of the paid sick and Family and Medical Leave Act (FMLA) leave tax credits created in the Families First Coronavirus Response Act of 2020. Specifically, it provides payroll tax credits for employers who voluntarily provide paid leave through the end of September 2021 and expands eligibility to state and local governments that provide this benefit.

akingump.com

# Exhibit J

March 17, 2021

# Latest COVID-19 Relief Bill Brings State Tax Policy To A Halt

Eric Carstens, Stephen Kranz, Mark Nebergall

McDermott Will & Emery

 + Follow    Contact



**Inside SALT**

On March 11, 2021, US President Joe Biden signed the American Rescue Plan Act of 2021 (ARPA), the COVID-19 relief bill that includes $350 billion in relief to states and localities. To prevent states from using federal relief funds to finance tax cuts, Congress included a clawback provision requiring that any relief funds used to offset tax cuts during the next three years be returned to the federal government. Here is the text of the provision:

- A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit or otherwise) or delays the imposition of any tax or tax increase.

This language broadly prohibits states from taking legislative or administrative action through the end of 2024 that reduces state tax revenues by any means (deduction, credit, delay, rate change, etc.) if doing so could be characterized as the use of federal relief funds to offset, directly or indirectly, the tax reduction. Practically speaking, this limitation will completely hamstring state and local governments from the normal ebb and flow of tax policy changes, adjustments and interpretations. Taken to its logical conclusion, this language freezes state legislative and administrative tax policy development out of fear anything they may do would require the return of federal relief funds. We expect the US Department of the Treasury will issue guidance clarifying this provision in the coming weeks.

**Practice Note:** This provision of ARPA is, in our view, the most significant federal pre-emption of state tax policy in history. For the next three years, legislators and tax administrators alike will be scrutinized as their tax policy decisions are evaluated through the lens of this prohibition. This

level of congressional control over state tax policy decisions and fiscal autonomy likely violates the Tenth Amendment of the US Constitution and would dismay the framers' basic notions of federalism.

While Congress has the ability to limit the use of federal funds in ensuring its policy goals are accomplished, the overly broad state tax limitation adopted by Congress goes far beyond its stated purpose and prevents states from furthering ARPA's goals by using tax policy to craft their own COVID-19 relief measures. Any regulation or administrative interpretation that reduces state tax revenue or delays the implementation of a tax is, effectively, barred by the unprecedented intrusion into state tax policy-making.

The effects of ARPA's state tax limitation are immediate and far-reaching. It will chill continuing state efforts to couple/decouple state tax codes to or from the Tax Cuts and Jobs Act of 2017. Additionally, ARPA already stalled legislation pending in Maryland that would delay, for one year, implementation of its digital advertising services gross receipts tax, restoring return filing and tax payment deadlines due this April. These a just a few of the many examples of state tax bills, regulations and administrative guidance abruptly halted by Congress through the enactment of ARPA.

**Legislative Fix?**

While it is too early to tell whether Congress will take remedial action walking back this intrusion into state tax policy, there is a proposal pending in the US Senate that would do so. Specifically, on March 11, Senator Mike Braun (R-IN) introduced a bill (S. 730, the Let States Cut Taxes Act) that would remove the prohibition. The bill was referred to the US Senate Committee on Finance upon introduction and, if enacted, would retroactively repeal the jaw-dropping congressional intervention in state tax and fiscal policy. Stay tuned for more on this development.

[View source.]

  

---

## LATEST POSTS

- **American Rescue Plan Act of 2021: Employment Law Update**

- **COVID-19 Relief Bill Offers COBRA Reform and Temporarily Increases DCAP Maximum**

- **Weekly IRS Roundup March 8 – March 12, 2021**

- **Can't Camouflage Express Trademark Contract Terms**

- **Doctrine of Equivalents Analysis Should Not Be Simple Binary Comparison**

See more »

DISCLAIMER: Because of the generality of this update, the information provided herein may not be applicable in all situations and should not be acted upon without specific legal advice based on particular situations.

© McDermott Will & Emery 2021 | Attorney Advertising

**WRITTEN BY:**

McDermott Will & Emery

Contact    + Follow

Eric Carstens     + Follow

Stephen Kranz     + Follow

Mark Nebergall     + Follow

**PUBLISHED IN:**

American Rescue Plan Act of 2021     + Follow

Biden Administration     + Follow

Coronavirus/COVID-19     + Follow

Federal Funding     + Follow

New Legislation     + Follow

Relief Measures     + Follow

State Taxes     + Follow

Tax Cuts     + Follow

Constitutional        + Follow

Tax        + Follow

**MCDERMOTT WILL & EMERY ON:**



# Exhibit K



**FISCAL FACT**

No. 754
Mar. 2021

# Four Questions Treasury Must Answer About the State Tax Cut Prohibition in the American Rescue Plan Act

**Jared Walczak**
Vice President of State Projects

## Key Findings

- The American Rescue Plan Act's restriction on states' Fiscal Recovery Funds being used to directly or indirectly offset a net tax cut is vague and raises difficult questions of interpretation and application. A broad interpretation of this prohibition may be unconstitutional.

- This restriction potentially implicates a wide range of tax decisions, not just rate reductions but also federal tax conformity, excluding unemployment benefits from income taxation during the pandemic, adjusting standard deductions, or awarding discretionary tax incentives.

- States will require answers to many questions, but particularly: (1) what constitutes a net tax reduction? (2) how is a net tax reduction determined to have resulted from a policy change? (3) which potential expenditures could be deemed to create fiscal capacity for a net tax cut? and (4) how would offsetting a tax reduction be defined, especially across multiple years?

- U.S. Department of Treasury guidance will be crucial as states seek to navigate this new environment.

The Tax Foundation is the nation's leading independent tax policy research organization. Since 1937, our research, analysis, and experts have informed smarter tax policy at the federal, state, and global levels. We are a 501(c)(3) nonprofit organization.

©2021 Tax Foundation
Distributed under
Creative Commons CC-BY-NC 4.0

Editor, Rachel Shuster
Designer, Dan Carvajal

Tax Foundation
1325 G Street, NW, Suite 950
Washington, DC 20005

202.464.6200

taxfoundation.org

# Introduction

States are set to receive $195.3 billion in fiscal relief under the American Rescue Plan Act (ARPA), equivalent to 20 percent of the annual tax collections of state governments.[1] With state revenues essentially flat in 2020 (a net decline of less than 0.2 percent), the greatest challenge for states may be figuring out what to do with it. The State and Local Fiscal Recovery Funds can only be used for certain enumerated types of expenditures, and they specifically cannot be used to cut state taxes (there is no similar prohibition for localities), either directly or indirectly, or for deposits into pension funds.[2]

That prohibition on indirectly offsetting a state tax cut is extremely vague and potentially quite expansive, and it has created significant consternation in state capitols. A Treasury spokesperson stipulated on Wednesday that the provision does not prohibit states from enacting tax cuts so long as those reduction do not rely on federal aid.[3] This may signal that Treasury guidance will construe the provision narrowly. If this assurance is to mean anything, however, Treasury will need to answer several important questions, outlined in this paper.

The restriction on the state tax cuts is brief and vague, but potentially quite broad:

> "A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase."[4]

At the same time, however, the list of expenditures to which states *can* put federal aid is relatively short, particularly given that most states have either no revenue shortfall or only a modest one, and that many have struggled to spend the $150 billion in Coronavirus Relief Fund assistance appropriated under the CARES Act for economic and public health responses to the pandemic, a purpose to which state Fiscal Recovery Funds can also be dedicated. States may use this latest aid to:

1. Respond to the public health emergency or its negative economic impacts, which includes aid to households, businesses, and impacted industries, and is likely to include covering the compensation of state health and public safety officials and current unemployment benefit claims, consistent with Treasury's guidance on the Coronavirus Relief Fund, which was dedicated to similar purposes;

2. Supplement the pay of essential workers;

---

1   For state allocations and revenue gains or losses, see Jared Walczak, "State Aid in American Rescue Plan Act Is 116 Times States' Revenue Losses," Tax Foundation, Mar. 3, 2021, https://www.taxfoundation.org/state-and-local-aid-american-rescue-plan/.

2   H.R. 1319 (2021), Section 9901.

3   David A. Lieb, "Treasury says state tax cuts OK if separated from virus aid," Associated Press, Mar. 17, 2021, https://www.wfmj.com/story/43514133/treasury-says-state-tax-cuts-ok-if-separated-from-virus-aid.

4   H.R. 1319 (2021), Section 9901.

3.  Pay for general government services to the extent of any pandemic-induced revenue losses in the most recent full fiscal year; and

4.  Make necessary investments in water, sewer, or broadband infrastructure.

Notably, assuming that this list is all-encompassing, states would be prohibited from using the funding to cover general operating expenses beyond what is necessary to backfill revenue losses. They cannot use the money to increase their general fund expenditures, nor, presumably, could they deposit the aid in a rainy day fund or use it to replenish their depleted unemployment compensation trust funds. And they certainly cannot use it on tax cuts (or pension plans, where deposits are also prohibited).

The restriction on direct use to facilitate a tax cut is largely uncontroversial. While some policymakers might have contemplated giving away the state aid in the form of temporary tax cuts absent the restriction, the federal government's prohibition is reasonable and clearly within its authority to impose.

Because money is fungible, however, it is very difficult to be sure what sort of uses of state aid might be interpreted as indirectly offsetting a net tax cut, even if the state had the resources to cut taxes in the absence of the federal assistance. Violation of the provision would result in the U.S. Department of the Treasury recouping the funds, previously transferred to a state, which were deemed to have been instrumental in facilitating the tax cut.

A great deal is at stake. At a theoretical level, the principle of fiscal federalism is implicated here, as a broad interpretation of the federal prohibition would represent an unprecedented degree of state entanglement in state fiscal policy, using federal dollars to dictate state policy in a way that vastly exceeds what has been attempted in the past. And at a practical level, the potential field of preemption is vast, not just what most people might think of as tax cuts.

What might run afoul of the prohibition? A non-exhaustive list would include states acting to:

- Inflation-adjust their standard deduction or personal exemption;

- Expand the earned income tax credit;

- Tinker with sales tax exemptions;

- Adjust tax incentives;

- Follow the federal government's lead in excluding $10,200 of unemployment compensation from taxation;

- Offset local property tax burdens;

- Conform to the federal government's revised treatment of forgiven loans under the Paycheck Protection Program; or

- Take administrative action to stave off a large unemployment insurance tax increase that might otherwise be triggered by the insolvency of their trust funds.

It is, therefore, vital that the federal government provides greater clarity on what does and doesn't constitute indirectly offsetting a net tax cut.

# Four Questions

Treasury guidance should provide greater clarity for states. Particularly, states would benefit from answers to the following questions:

## 1. What constitutes a net tax reduction?

The bill language prohibits offsetting a "reduction in the net tax revenue of such State or territory." No baseline is specified. If a current policy baseline is intended, then any provision that would result in a reduction in revenue compared to the continuation of the *status quo* would be subject to the restriction, even if state revenues increased.

Imagine, for instance, that state revenues were projected to rise $500 million and the state increased a deduction for low-income filers, resulting in an increase in only $450 million. Because this is lower than the amount that would have been raised in the absence of a policy change, is this a net tax cut (the current policy baseline position), or because net tax revenue is higher than in the previous year, is it outside the prohibition?

Since the intention of the restriction is to prevent the recovery funds from facilitating a tax cut, using a collections baseline is eminently more sensible. Clearly, in the above scenario, the tax reduction was facilitated through state revenue growth, not any assistance provided by the federal government. But while this seems clearly right as a matter of policy and intent, it is not as clear as it might be in the language, even though the inclusion of the word "net"—in addition, presumably, to allowing changes in multiple taxes to offset each other—does suggest it. Treasury should make the logic explicit and provide important clarity for states on this point.

## 2. How is a net tax reduction determined to have resulted from a policy change?

This may seem like a foolish question, and in some instances it would be. The law speaks to reductions in net tax revenue "resulting from a change in law, regulation, or administrative interpretation during the covered period [March 3, 2021 through December 31, 2024] that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase." This raises two questions, one of measurement and one of timing.

On measurement, how does Treasury propose to determine exactly how much revenue was forgone by the implementation of a tax reduction? States make estimates, of course, both before and after, but how much of any change in overall state revenues came from a tax reduction cannot be known with precision. How does Treasury plan to calculate it for purposes of deciding whether to claw back state aid, and how much?

On timing, the question is, what constitutes a change in law, regulation, or administrative interpretation during the covered period. If a state adopted a multiyear phasedown of a tax rate prior to the covered period, set to continue in the coming years, would the implementation of these reduced rates—provided for in law, prospectively—constitute a change in law? If a revenue agency had to sign off on the reduction by confirming that certain preestablished conditions had been met, but lacked discretion beyond that administrative determination, would this count as a regulation or administrative interpretation? What governs in determining what took place prior to the covered period and what takes place within it, current law or current policy?

Or if a state has rolling conformity with the Internal Revenue Code and the federal government amends its provisions in a way that might generate a net tax cut—say, by excluding a portion of unemployment benefits from tax (a provision to which many states conform) or by expanding the child tax credit (which has some limited mirroring in state laws)—does the automatic update to these new provisions implicate the provision? This would be particularly ironic, given that ARPA both threatens to claw back state aid if states implement net tax cuts (at least under some circumstances) and provides for tax reductions, within the covered period, to which some states automatically conform.

Again, relying on the presumption that the prohibition is only intended to apply to tax reductions states could not undertake with their own resources, future changes already enacted or contingently provided for under existing law should not come under the restrictions spelled out in ARPA. This too, however, is ambiguous, and Treasury should clarify this point.

## 3. Which potential expenditures could be deemed to create fiscal capacity for a net tax cut?

It is easy to imagine indirectly offsetting a tax cut in a way that Congress might legitimately wish to proscribe. If these new federal relief dollars cannot be directly funneled into tax relief, it is rational that Congress would not want states to be able to play a shell game by which they use federal aid to cover expenses in the general operating budget, using the state revenue freed up by this infusion to cut taxes. Gimmicks like this were undoubtedly at the heart of the restriction not only on direct but also on indirect offsetting of state tax cuts, and guardrails against this activity may be appropriate—and are certainly obligatory under the legislation.

But with such broad and vague language, it is equally easy to imagine scenarios in which the mere *concept* of the fungibility of money is sufficient to trigger the restriction, even where federal aid did not create the fiscal capacity for a tax change.

It matters, therefore, what states can spend the money on, and which of these expenses might reasonably be interpreted as offsetting any policy a state may adopt resulting in a reduction in net tax revenue. Is the list of four categories of expenditures exhaustive? It would seem to be. Will those categories be interpreted expansively? That remains to be seen. Nothing in the language of the provision would seem to allow depositing money into any sort of fund for future use, for instance, yet Congress expressly prohibits deposits into pension funds. Does that mean that other deposits, perhaps into a rainy day fund or an unemployment compensation trust fund, might be permissible as responses to the negative effects of the pandemic, particularly if those funds were depleted in the past year?

Some officials, moreover, seem to regard this relief as their ticket for funding long-languishing transportation projects or growing the state's annual budget. It is hard to understand how these expenditures could meet with approval under the text of the bill, but some, at least, are hoping for a remarkably generous Treasury ruling on this question.

Assume, for now, that the enumerated expenses are the only ones on which this federal aid can be spent, and that the most straightforward interpretations (if such a thing is possible) are adopted. The only federal aid dollars that can be clawed back are those which are unused by 2024 or are put to an impermissible use, like offsetting a tax cut or spending in a way not authorized under the bill.

It seems implausible that a new round of grants to businesses or individuals, permitted in the first bucket (responding to the public health emergency and its negative economic effects), could be understood as offsetting a tax cut, since such grants are not ordinary governmental expenses or part of a general operating budget. They are supplemental to the state's ordinary activities and specific to the coronavirus crisis, so the expenditure creates no fiscal capacity for a tax cut, provided the state doesn't use this aid to allow a reduction in the state's general outlays. (How would this be determined?) Presumably aid money spent this way could not be recouped if a state implemented a net tax cut because, by definition, it did not contribute to it (even indirectly). States would appreciate having this assurance from Treasury.

The same can likely be said of supplemental wages to private sector essential workers. This is not an expenditure currently found in any state budget, so offering this assistance with federal aid doesn't free up a single dollar for tax cuts. It would be extremely surprising if aid spent this way could be recaptured.

The limited set of infrastructure projects authorized under the bill—water, sewer, and broadband— pose a more interesting question. Infrastructure projects usually come out of the capital budget, which is distinct from the general fund budget. Some taxes flow directly to capital projects, while most general taxes go to the general fund, which is for operating expenses. (Terminology sometimes varies across states, but the concepts are the same.) A state might already have, say, a rural broadband project in the works, and could fund it with these aid dollars. That frees up money in the capital budget, but not the general fund budget. Were a state to cut a tax that flows into the general fund (like, usually, income or sales taxes), could that lead to the recoupment of aid which created additional capacity in capital accounts? (Presumably it *would* for taxes that flow to capital projects, like, for instance, the motor fuel tax.)

States can theoretically shift money from the general fund to the capital budget, or divert tax revenues from general taxes there, and sometimes do. Does the mere possibility of a future transfer govern, or would a state actually have to do so during the covered period to create a situation in which an authorized infrastructure investment could be deemed to offset a net tax cut?

That leaves two remaining allowable expenses. The first is a subset of a prior category. Assuming states can cover payroll for public health and public safety officials, this reduces state outlays in a way that creates fiscal capacity—money they would have budgeted otherwise, but which is now available. This might well be interpreted as providing an indirect offset for a net tax cut. The second is the final broad category, but one only available to some states: the relief can be used to cover general government expenditures to the extent of revenue losses arising from the pandemic, and if a state turned around and provided a net tax cut at the same time, that would almost certainly violate the prohibition.

However, that the above seems logically consistent with the provision, and maybe even necessary for making it logically coherent, does not mean that such an interpretation is assured. Treasury should provide clear guidance on which expenses can and cannot be deemed to contribute to offsetting a tax cut.

## 4. How would offsetting a tax reduction be defined, especially across multiple years?

Imagine that a state experienced a revenue loss of $200 million due to the economic effects of the COVID-19 pandemic, a loss it is permitted to offset with the Recovery Funds. (This raises an additional question: how does Treasury propose to determine what portion of any revenue losses in the relevant fiscal year are attributable to the coronavirus crisis?) In subsequent years, however, this state experiences substantial growth, with revenues rising $400 million the next year and a further $100 million the year after that. The revenue baseline is now $300 million higher than it was pre-pandemic. If the state were to cut taxes by $100 million per year after that, this would still leave it with revenues above not only its pandemic-level receipts but also its pre-pandemic high. The $500 million in revenue growth is more than enough to facilitate the tax cut—if the state prioritizes it over government growth—whether or not the state had ever received that $200 million to offset pandemic losses.

Money, however, is fungible. If the state never received that aid, it would still have enough money to cut taxes without reducing revenues, but in that case, it would have had less to set aside for additional government expenditures or to set aside for a rainy day. Does the original $200 million get clawed back?

And if it has the potential to—contingent on whether this is even a net tax cut (see the first question)—does it matter if the expenditure and the cut were in different years? In other words, can federal aid used in one year be deemed to offset a tax cut made in another, or is each year (or possibly, in states with biennial budgets, each budget cycle) discrete?

Each of these questions and many more deserve to be answered. The constitutionality of the provision, moreover, may well hinge on how these ambiguities are resolved. The federal government

undeniably has the power to impose certain conditions on the direct expenditure of the funds it provides states, but it does not possess the blanket authority to commandeer state policy as a condition of receiving federal funds. States unambiguously have the power to establish their own revenue levels. It would certainly raise red flags, for instance, if the federal government withheld Medicaid funding from states which legalized marijuana or tried to dictate state immigration policy via Community Development Block Grants. Such provisions would be presumptively unconstitutional.

Clawing back federal aid under a broad interpretation of indirect offsets to tax cuts would run into the same constitutional problems. If funding is contingent on states accepting a constraint on their policymaking ability, that constraint must be unambiguously related to the federal interest served by the funding, and not be so coercive as to reach the point where pressure turns into compulsion, under the precedent set in *South Dakota v. Dole* (1987).[5] In that case, the Supreme Court approved a federal provision that made 5 percent of federal highway funding contingent on adopting 21 as the drinking age, but cautioned that if significantly more of the funding had been predicated on it, that would have been unduly coercive.

In *National Federation of Independent Business v. Sebelius* (2012),[6] meanwhile, the Court held that the federal government could not make Medicaid funding contingent on a state's willingness to implement Medicaid expansion. Although that case is a maze of plurality opinions, this particular holding was considerably less controversial, with three justices in the 5-4 majority upholding the Affordable Care Act agreeing that this provision was unconstitutional. A broad policy tying states' hands for three years, therefore, is constitutionally dubious at best, while a narrow interpretation—a prohibition on directly funding a tax cut, which would be inconsistent with Congress's purpose, and some narrow guardrails to avoid shell games—would likely stand.

## Conclusion

Given the narrow range of possible uses of the federal aid that could reasonably be interpreted as offsetting a tax cut, many states might be at minimal risk regardless of the tax policy choices they make. However, the vague language of this prohibition has every state nervous and unsure of what it can do.

Can California, which suspended certain structural deductions within its tax code when it anticipated a massive revenue shortfall, reverse those changes now that it has a $26 billion surplus without incurring a reduction in its federal aid? Can governors dip into their "opportunity funds" to provide discretionary tax incentive packages to businesses, or does that result in a dollar-for-dollar recapture? Does the decision to conform to the provisions of ARPA itself potentially run afoul of its tax provision by reducing taxes on unemployment benefits?

States need answers to these questions, and they need them soon.

---

5    *South Dakota v. Dole*, 483 U.S. 203 (1987).
6    *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012).

Exhibit L




**nuveen**    Fortify your *income* potential    ›
A TIAA Company

# The new suit attacking Biden's stimulus law, explained

Ohio wants red states to be able to get something for nothing from the federal government.

By Ian Millhiser  |  Updated Mar 19, 2021, 9:32am EDT

f  🐦  ⬀ SHARE



──────── Powered by TripleLift ────────



The New York Times
↻ Replay
SUBSCRIBE TO THE TIMES
⊕ Learn More

f FACEBOOK



Ohio Attorney General David Yost meets with law enforcement and members of the Ohio National Guard posted at the Ohio Capitol building on January 17, 2021. | Zach D. Roberts/NurPhoto/Getty Images

A few things in life are certain. The sun rises in the east and sets in the west. Everyone dies. Taxes must be paid.

And if a Democratic president signs a historic piece of legislation, a Republican state attorney general will file a lawsuit claiming that the new law is unconstitutional.

Indeed, by the standards of such lawsuits, the claim in **Ohio v. Yellen**, a lawsuit filed by Ohio's Republican Attorney General Dave Yost, is fairly mild. Yost does not seek a court order striking down the entire $1.9 trillion American Rescue Plan, the stimulus law passed in March. Rather, he makes a fairly targeted attack on a provision he labels the law's "tax mandate."

This lawsuit follows a **letter from 21 state attorneys general to Treasury Secretary Janet Yellen**, which makes similar arguments to those raised by Yost, so it's likely additional suits will be filed soon.

**SUBSCRIBE FOR $1 A WEEK.**

From the arts to technology, science and fashion, enjoy in-depth reporti...

Ad   The New York Times    View Site

***MOST READ***



Matt Gaetz's disastrous Tucker Carlson interview, explained



be filed soon.

The American Rescue Plan appropriates $195.3 billion in aid to states, and Ohio's share is about $5.5 billion. Like every other state, Ohio has the option to turn down the funds. If it does decide to take this free money, however, it must comply with a provision of the law specifying that "a State or territory shall not use the funds provided under this section ... to either directly or indirectly offset a reduction in the net tax revenue of such State or territory."

Essentially, Congress wanted to make sure the money it provided to help states fund public programs would actually go to fund public programs, not to cut taxes.

Congress's power to provide conditional grants to states is **broad but not unlimited**, and Ohio argues that the tax-cut restriction exceeds two constitutional limits on this power to place conditions on federal grants.

As explained below, one of the state's arguments is quite radical and could do significant harm to major federal programs such as Medicaid if the courts take it seriously. Ohio's second assertion is stronger and more plausible — indeed, it's the sort of argument likely to prevail in a conservative judiciary — although there is some language in the court filings that might **undercut its reasoning**.


**Top Articles**
**READ MORE**

The case will be heard by Judge Douglas Cole, a Trump appointee, so there's a very good chance that Ohio will have a receptive audience from the trial court. However Cole decides the case, his decision will likely be appealed to the United States Court of Appeals for the Sixth Circuit, which is dominated by very conservative Republican appointees, and then potentially to a Supreme Court with a 6-3 conservative majority.

So there's a decent chance that Ohio ultimately prevails, and that states will be allowed to take the money offered under the Rescue Plan without having to comply with the requirement not to spend that money on tax cuts. It is less clear, however, whether the courts will embrace the more radical of Ohio's two legal arguments.

## Conditional federal grants, briefly explained

The Constitution permits Congress to levy taxes, and then to spend this money to "**provide for the common defense and general welfare of the United States.**" One aspect of this power to raise and spend money

### Sign up for The Weeds newsletter

Vox's German Lopez is here to guide you through the Biden administration's unprecedented burst of policymaking. **Sign up to receive our newsletter each Friday.**


Millennials are stuck in the world boomers built


A super-famous TikTok star appeared on Jimmy Fallon. It didn't go great.


You can't go looking for ball lighting. It finds you.


Joe Biden's $2 trillion infrastructure and jobs plan, explained


What we don't know is awesome.


**V**
### The Weeds
As the Biden administration ramps up, sign up for our essential weekly policy newsletter

Email (required)

is that Congress may offer grants to state governments, provided those states agree to certain conditions.

In a 1987 case, **South Dakota v. Dole**, however, the Supreme Court held that there are some constitutional limits on the federal government's power to impose such conditions on grants to the states — and two of these limits are relevant in the *Ohio* case.

First, if Congress wants to place a condition on a grant to states, it "must do so unambiguously ... enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation." So, if the terms of the grant are confusing or uncertain, the state typically won't be required to comply with those terms.

The second limit that's relevant to the *Ohio* case is that a condition on a federal grant may be struck down if the "financial inducement" offered by Congress is not "**so coercive as to pass the point at which pressure turns into compulsion**" — an argument that will be familiar to anyone who followed the **first round of litigation challenging the Affordable Care Act**.

Ohio's argument that the tax-cut restriction is unconstitutionally ambiguous is a fairly strong legal claim — largely because of uncertainty about what it means to "indirectly offset a reduction" in tax revenue. As Daniel Hemel, a law professor at the University of Chicago and an expert on tax law, told me, "money is fungible, so I'm not quite sure what it means for the funds to indirectly offset a reduction in net tax revenue resulting from a tax cut."

That said, Ohio only briefly lays out its claim that the "tax mandate" is unconstitutionally coercive in its **court filings**, and there's some language in one of its motions that cuts against its argument that the ban on using federal funds to pay for tax cuts is unconstitutionally ambiguous.

"Because 'money is fungible,'" the state argues, "any money received through the Act will 'indirectly,' at least, 'offset a reduction in the net tax revenue' of a State that reduces the tax burdens on its citizens by law, regulation, or administrative interpretation. So every change in tax policy that leads to a decrease in tax revenue violates the Tax Mandate."

The state, in other words, appears to concede that the word "indirectly" is *not* ambiguous. Under the state's reading of the law, the Rescue Plan bans states from enacting *any* tax cut. Ohio may not like that condition, but the fact that Ohio views this condition as too onerous does not make it ambiguous.

That said, on Thursday the Treasury Department put out a statement offering its own interpretation of the contested provision — the Biden administration says that **states may cut taxes** so long as they don't use Rescue Plan funds specifically to pay for those tax cuts.

That could diminish the stakes of the *Ohio* lawsuit considerably. But the fact that Treasury's interpretation of the law conflicts with Ohio's does suggest that the word "indirectly" is open to multiple interpretations.

## Ohio's other argument against the "tax mandate" is quite radical

The state's other argument is that the tax-cut restriction is unconstitutionally coercive. This argument is quite a stretch. The federal government is offering Ohio $5.5 billion in free money. Ohio has an absolute right to refuse this money if it chooses to, and the federal government will take no action

By signing up, you agree to our Privacy Notice and European users agree to the data transfer policy. For more newsletters, check out our newsletters page.

SUBSCRIBE

—————— Powered by TripleLift ——————



**FACTS. $1 A WEEK.**
Benefit from expert reporting on the subjects that matter to you. Subscr...

Ad    The New York Times    View Site

to, and the federal government will take no action
against the state if it turns down this free money.

Yes, the money comes with a condition that Ohio doesn't like. But the only penalty if Ohio
decides that it does not want to accept the money and the conditions that come with it is that
Ohio will not receive free money if it doesn't agree to the conditions. That's hardly coercion.

The Supreme Court hasn't placed much emphasis on *Dole*'s warning that, in rare cases, a
conditional grant may be "so coercive" as to become unconstitutional, but there is one very
high-profile case where the Court did strike down a condition as unconstitutionally coercive.

In **NFIB v. Sebelius** (2012), the Supreme Court struck down a provision of the Affordable Care
Act intended to encourage every single state to expand its Medicaid program. As originally
drafted, Obamacare required every state to either expand Medicaid to cover everyone under
age 65 who earned less than 133 percent of the federal poverty rate, or else a state could lose
all of its existing Medicaid funding.

As Chief Justice John Roberts explained in an opinion comparing this kind of conditional grant
to a "gun to the head," "Medicaid spending accounts for over 20 percent of the average State's
total budget, with federal funds covering 50 to 83 percent of those costs." So states that did
not agree to expand their Medicaid program risked losing at least 10 percent of their operating
funds.

That kind of condition, Roberts claimed, amounted to coercion, and so he concluded that
states must have the option to turn down the new Medicaid funds without losing funding for
their existing Medicaid programs.

Ohio, for what it's worth, argues that the Rescue Plan's aid to states is similar to the conditional
grant struck down in *NFIB* **because the Rescue Plan is very generous**.

> The American Rescue Plan Act provides Ohio $5.5 billion in federal funds. That is a
> tremendous amount of money; it equals roughly 7.4 percent of Ohio's total expenditure
> in 2020. No State, in the current economic situation, can turn down this "financial
> inducement." So here, as in *NFIB*, the States have "no real option" but to take the funds
> on offer.

Essentially, Ohio claims that, because the states are being offered so much money — and
because they are being offered that money after the pandemic eviscerated many states'
budgets — those states don't really have the option of turning down the Rescue Plan's funding.

But there's a big difference between the stimulus law and the provision of Obamacare struck
down in *NFIB*. As originally drafted, Obamacare would have stripped states of funding for
*existing* state programs unless the state agreed to accept new funds and expand those
programs. The Rescue Plan, by contrast, does not threaten any of Ohio's existing federal
grants.

If Ohio turns down the funding it's entitled to under
the Rescue Plan, then Ohio will be in exactly the
same position it would have been in if the federal
government had never offered it new money in the
first place.

Indeed, if Ohio is correct that conditions on a
federal grant are unconstitutional simply because
the federal government offers a state such a good
deal that no state would reasonably refuse that
deal, then Medicaid itself could be declared



Looking to
**lower your**
**mortgage payment?**

**Get Your Quote**

(877) 246-8952
**loanDepot**

loanDepot.com, LLC. All rights reserved. NMLS ID#174457
(www.nmlsconsumeraccess.org). For more licensing information
visit. www.loanDepot.com/licensing. Equal Housing Opportunity

deal, then Medicaid itself could be declared unconstitutional.

The Medicaid program is riddled with conditions imposed by the federal government — among other things, federal law requires states to spend Medicaid funds on health care for low-income people, and not on highways or policing or a fancy new wardrobe for the state's governor. And, as Roberts noted in *NFIB*, the Medicaid program funds at least 10 percent of the typical state's budget.

No state would reasonably turn down all of this money. But that doesn't make Medicaid coercive, it just makes it a very good deal.

In any event, the bottom line in the *Ohio* case is that the state's claim that the tax-cut restriction is unconstitutionally ambiguous is strong enough that it has a very good chance of prevailing, especially in a conservative judiciary. Ohio's coercion argument, by contrast, would so radically transform the legal doctrines governing conditional federal grants that major programs like Medicaid could be in danger.

And yet, it's still possible such a radical argument might prevail in a conservative judiciary.

# Exhibit M

# A Last-Minute Add to Stimulus Bill Could Restrict State Tax Cuts

Republicans say Congress is infringing on state sovereignty by trying to limit the ability of local governments to control their finances.



**Subscribe for $1 a week.** Ends today.

![President Biden signing the bill]

President Biden signing the $1.9 trillion economic relief plan into law on Thursday at the White House. The restriction is intended to ensure that states use federal funds to keep their local economies humming.  Doug Mills/The New York Times

 **By Alan Rappeport**

WASHINGTON — A last-minute change in the $1.9 trillion economic relief package that President Biden signed into law this week includes a provision that could temporarily prevent states that receive government aid from turning around and cutting taxes.

The restriction, which was added by Senate Democrats, is intended to ensure that states use federal funds to keep their local economies humming and avoid drastic budget cuts and not simply use the money to subsidize tax cuts. But the provision is causing alarm among some local officials, primarily Republicans, who see the move as federal overreach and fear conditions attached to the money will impede upon their ability to manage their budgets as they see fit.

Officials are scrambling to understand what strings are attached to the $220 billion that is expected to be parceled out among states, territories and tribes and are already pressing the Treasury Department for guidance about the restrictions they will face if they take federal money.

Under the new law, $25 billion will be divided equally among states, while $169 billion will be allocated based on a state's unemployment rate. States can use the money for pandemic-related costs, offsetting lost revenues to provide essential government services, and for water, sewer and broadband infrastructure projects.



Johnson&Johnson

**What goes into making**

The answer may surprise you.

**LEARN MORE**

But they are prohibited from depositing the money into pension funds — a key worry of Republicans in Congress — and cannot use funds to cut taxes by "legislation, regulation or administration" through 2024.

Dig deeper into the moment.
Special offer: Subscribe for $1 a week.

Democrats slipped the new language into the legislation last week after several senators from the party's moderate wing expressed concern that some states would seize on the opportunity to use emergency relief money to subsidize tax cuts. They worked with

Senator Chuck Schumer, the majority leader, on language for the amendment, according to a Democratic Senate aide.

Senator Joe Manchin III, Democrat of West Virginia, explained why he pushed for the language in a briefing this week, arguing that states should not be cutting taxes at a time when they need more money to combat the virus. He urged states to postpone their plans to cut taxes.

"How in the world would you cut your revenue during a pandemic and still need dollars?" Mr. Manchin said.

Senator Ron Wyden, Democrat of Oregon, said the funds were meant "to keep teachers and firefighters on the job and prevent the gutting of state and local services that we saw during the Great Recession."

Are you in the care of a fiduciary?

"It's important that there are guardrails to prevent these funds from being used to cut taxes for those at the top," he added.

But some Republican-led states are pointing to the apparent prohibition as a violation of their sovereignty and calling for that part of the law to be repealed. They see the requirement that states refrain from cutting taxes as an unusual intervention by the federal government in state tax policy.

"It is an intrusion into what would traditionally be a state prerogative of how we balance our budget," said Ben Watkins, the director of the Florida Division of Bond Finance. "If they want to give us this money to deal with Covid, then they should just give it to us with no strings attached."

Funding for state and local governments was one of the most contentious issues during stimulus talks, with Republicans saying Democrat-led states were being rewarded for mismanaging their finances and labeling the aid as a "blue-state bailout."

Those concerns were amplified in the latest legislation, which allocates money to a state based on a formula that considers its unemployment rate rather than its population. Conservative-leaning states, many of which had less onerous coronavirus restrictions and did not shut down as much business activity, claim they are essentially being penalized for prioritizing their economies during the pandemic.

But early analyses of the bill show that both conservative-leaning and liberal-leaning states will receive big chunks of cash. California, Florida, New York and Texas will each get more than $10 billion in aid, according to a Tax Foundation tally.

Still, the tax language has angered Republicans — none of whom voted for the rescue package — and on Thursday, Senator Mike Braun, Republican of Indiana, introduced legislation to reverse it.



"Democrats are trying to ban states from cutting taxes with a sneaky amendment to the $1.9 trillion so-called Covid relief package," Mr. Braun said. "Not only did this blue-state bailout bill penalize states for reopening by calculating state funds based on unemployment, now they are trying to use it as a back door to ban states from cutting taxes."

## Frequently Asked Questions About the New Stimulus Package

### How big are the stimulus payments in the bill, and who is eligible?

The stimulus payments would be $1,400 for most recipients. Those who are eligible would also receive an identical payment for each of their children. To qualify for the full $1,400, a single person would need an adjusted gross income of $75,000 or below. For heads of household, adjusted gross income would need to be $112,500 or below, and for married couples filing jointly that number would need to be $150,000 or below. To be eligible for a payment, a person must have a Social Security number. Read more.

### What would the relief bill do about health insurance?

### What would the bill change about the child and dependent care tax credit?

### What student loan changes are included in the bill?

### What would the bill do to help people with housing?

The restrictions have created a conundrum for states because, while many cities are facing budget crunches, state finances have turned out to be relatively healthy.

A New York Times analysis this month found that, on balance, state revenues were generally flat or down slightly last year compared

with 2019 as expanded unemployment benefits allowed consumer spending and tax revenues to keep flowing.

"Idaho would potentially subsidize poorly managed states simply because we are using our record budget surplus to pursue historic tax relief for our citizens," Gov. Brad Little of Idaho said this week. "We achieved our record budget surplus after years of responsible, conservative governing and quick action during the pandemic, and our surplus should be returned to Idahoans as I proposed."

Gov. Jim Justice, a Republican of West Virginia, criticized Mr. Manchin in an interview this week with CNN.

"He's hurting his own people in the state of West Virginia," Mr. Justice said. "I do not condone it."

The provision is also raising questions about what actually constitutes a tax cut and whether the law could prevent states from other types of tax relief. The language of the legislation appears to offer states little wiggle room.



ADVERTISEMENT

"For it is in g
that we rece
-Prayer of Saint

GIVE FOR LE

Jared Walczak, the vice president for state projects at the Tax

Foundation's Center for State Tax Policy, said that the fine print in the law raised many complicated questions for states that, in some cases, would be awarded money for things that they either do not need or that they already had plans to pay for out of their budgets. It is not clear, for example, if a state could use aid money for an expense related to the coronavirus that it was already planning to pay for and then offer tax credits with the additional surplus.

"If the federal government intends to forbid any sort of revenue negative tax policy, no matter what its size, because a state received some funding, that would be a radical federal entanglement in state fiscal policy that may go beyond what was intended," Mr. Walczak said.

Such questions will largely hinge on how Treasury Secretary Janet L. Yellen interprets the legislation and what guidance the Treasury Department gives to states.

A department official noted that the law says that states and territories that receive the aid cannot use the funds to offset a reduction in net tax revenue as a result of tax cuts because the money is intended to be used to support the public health response and avoid layoffs and cuts to public services. More guidance on the matter is coming, the official said.

The lack of clarity also raises the risk that states use the money for projects or programs that do not actually qualify under the law and then are forced to repay the federal government. States are required to submit regular reports to the Treasury Department accounting for how the funds are being spent and to show any other changes that they have made to their tax codes. The department will also be setting up a system of monitoring how the funds are being used.

Emily Swenson Brock, the director of the Federal Liaison Center at

the Government Finance Officers Association, said that the eligible uses of the federal aid appeared to be relatively limited for the states and that some might actually find it challenging to deploy the money in a useful way.

"It's complicated here for the states," Ms. Brock said, adding that her organization had asked the Treasury Department for an explanation. "Congress is reaching in and telling these states how they can and can't use that money."



e-signatures
gle Drive.

Before they receive federal funds, states will have to submit a certification promising to use the money according to the law. They could also decline funding or, if they are set on tax cuts, they could offset them with other sources of revenue that do not include the federal funds.

For many states, the federal money is welcome even if they do not necessarily need it for public health purposes.

Melissa Hortman, the speaker of the Minnesota House of Representatives, said that she was hopeful that the federal government gives states the flexibility to use the money to make

up for lost revenue from the virus. She suggested that the state should look to make new investments in education and transportation. Minnesota is expected to have a budget surplus for the next two years and will receive more than $2 billion in aid.

"It's not too much money," said Ms. Hortman, a Democrat. "Our country has just lived through a once-in-a-hundred-year pandemic."



### Congress Clears $1.9 Trillion Aid Bill, Sending It to Biden

March 10, 2021



### What's in the Stimulus Bill? A Guide to Where the $1.9 Trillion Is Going

March 7, 2021



### Virus Did Not Bring Financial Rout That Many States Feared

March 1, 2021

Alan Rappeport is an economic policy reporter, based in Washington. He covers the Treasury Department and writes about taxes, trade and fiscal matters. He previously worked for The Financial Times and The Economist. @arappeport

A version of this article appears in print on March 13, 2021, Section B, Page 1 of the New York edition with the headline: Stimulus Bill Limits States On Tax Cuts. Order Reprints | Today's Paper | Subscribe

    

# Exhibit N

Politics

# Treasury Clears States to Cut Taxes -- But Not With Stimulus

By Laura Davison

March 18, 2021, 9:24 AM MST
*Updated on  March 18, 2021, 2:32 PM MST*

---

▶  Biden administration offers response on use of aid funds

---

▶  Republicans are seeking answers to tax-cut questions

---

The Biden administration said in a response to concerns raised by Republicans that state governments accepting pandemic-relief money from Washington are allowed to cut taxes, but only if they don't use the federal aid to offset those reductions.

ADVERTISING

The Treasury Department's statement addresses a provision in the recently enacted $1.9 trillion stimulus law that provided more than $360 billion in aid to states and cities. The measure said states couldn't use the money to pay for net revenue reductions through 2024.

The law does not prohibit states from cutting taxes nor does it mandate them to return the funding if a state reduces levies, a Treasury spokesperson said in an emailed statement. States must replace that revenue from those tax reductions using other money in their budget, the Treasury said. If states did use relief-fund money to pay for a tax cut, then they could be required to reimburse the federal government for that, the department said.

## The latest in global politics

Get insight from reporters around the world in the Balance of Power newsletter.

Enter your email                                                        **Sign Up**

Please enter a valid email address

By submitting my information, I agree to the Privacy Policy and Terms of Service and to receive offers and promotions from Bloomberg.

The response addresses a growing concern, particularly among politicians from Republican-led states, that accepting federal-rescue funds would prohibit them from reducing taxes through 2024. Uncertainty about the restrictions on the funds prompted Oklahoma Attorney General Mike Hunter and 20 other state attorneys general to send a letter to Treasury Secretary Janet Yellen earlier this week asking her to clarify whether the provision strips states of their "core sovereign authority to enact and implement basic tax policy."

Asked during a phone briefing Thursday how the Treasury will enforce the law if states shift money within their budgets, department officials said the agency is in the process of crafting rules that will explain how the restrictions work.

On Wednesday, Ohio sued the Biden administration over the provision, claiming the rule illegally restricts the state's power to change its tax structure and economic policy. Ohio Attorney

General Dave Yost said the last-minute addition by Senate Majority Leader Chuck Schumer holds hostage the $195 billion portion of the money for states.

## Seeking Guidance

Several House Republicans have also sent a letter to Yellen asking her to advise on whether various forms of tax relief, including making unemployment benefits tax exempt or issuing state-wide stimulus checks, would violate the rules in the stimulus bill.

Republicans say the issue needs to be resolved in relatively short order. The law gives the Treasury Department 60 days to establish the fund, release the rules and distribute the funding. Most state legislatures only meet part time. Many are in session now, but adjourn in late spring or early summer.

The aid to states was a point of contention during debate on the stimulus. Republicans objected to including the money, arguing that it would serve as a bailout for Democratic-run states that had mismanaged their budgets and that many states hadn't suffered severe revenue shortfalls as a result of the pandemic.

The provision added by Schumer was intended to focus the money on where it's needed most, by targeting it based on state population and unemployment levels. It bars states from "either directly or indirectly" using the funds to offset a reduction in tax revenue "resulting from a change in law, regulation, or administrative interpretation."

Democrats say the provision was a necessary guardrail to prevent states from using federal money to finance tax cuts. Schumer has said governors should use the money to focus on ending the pandemic, including on public health and social-assistance programs.

*(Updates with Treasury comment from briefing in fifth paragraph.)*

Terms of Service  Do Not Sell My Info (California)    Trademarks  Privacy Policy
©2021 Bloomberg L.P. All Rights Reserved
Careers  Made in NYC  Advertise  Ad Choices     Contact Us  Help

# Exhibit O



Accessibility

# Ducey calls for $600 million in permanent income tax cuts

By **Jeremy Duda** - January 15, 2021

More than six years after he was first elected governor on a platform of getting Arizona's income tax rates "as close to zero as possible," Gov. Doug Ducey is looking to follow through on one of the core promises of his 2014 campaign.

It's unclear exactly how close to zero Arizona's income tax rates will go. Nor is it clear exactly what his tax cuts will look like and who they will affect. Much may depend on negotiations with the legislature.

But what is clear is that Ducey will push to make $600 million income tax cuts, phased in over the next three years, and that he wants those cuts to be broad-based so they will affect as many Arizonans as possible.

The tax cut is part of the governor's $12.6 billion budget plan for the upcoming fiscal year, which his administration unveiled on Friday. Ducey is earmarking $200 million in his budget proposal for the fiscal year 2022 for tax cuts. That total will rise to $400 million in 2023 and $600 million in 2024.

Ducey signaled his intent for a larger-than-usual tax cut — he's made much smaller tax cuts each year he's been governor, another of his 2014 campaign pledges — in his State of the State address on Monday, telling the Republican-controlled legislature, "On tax reform, let's think big."

The tax cut idea is the result of surprisingly good revenue projections following a year of economic downturn caused by the COVID-19 pandemic and subsequent restrictions on economic activity. Arizona's general fund, which faced a projected budget deficit of as much as $1.1 billion in April of last year, is now expected to have a surplus of $352 million at the end of the fiscal year in July, the governor's office said.

"Arizonans have been through a lot. Our small businesses have been through a lot. So, with some of that additional revenue, he wants to make sure that they get to keep their money that they have earned," Daniel Scarpinato, the governor's chief of staff, told reporters on Friday.



Arizona's graduated income tax rates range from 2.59% for individuals earning up to $10,602 to 4.5% for people earning $158,996 or more annually. Individuals who earn at least $250,000 per year, and couples earning at least $500,000, will also face a 3.5% surcharge on income above those amounts as a result of Proposition 208, which the voters approved in November. Two lawsuits seek to overturn that tax hike.

Scarpinato said the governor wants to reduce and simplify income taxes for as many Arizonans as possible. In addition to cuts to the actual tax rates, that could also include things Ducey's proposal from last year to eliminate income taxes on veterans' pensions.

"What we're looking at is how to bring the rates down, how to make it more simple, and how to make sure that as many, if not all taxpayers, see a reduction in their income tax," Scarpinato said.

Individual income taxes brought in about $4.5 billion in the last fiscal year, making up the second largest chunk of state revenue after sales taxes, which generated nearly $5.4 billion. The governor's budget plan projects that the state will still bring in about $5.6 billion in individual income tax revenue in fiscal year 2022, nearly $6 billion in fiscal year 2023, and nearly $6.2 billion in fiscal year 2024.

Those figures don't include projected revenue from Proposition 208. That money goes into a new student support and safety fund created by the ballot initiative, not into the general fund.

Because of the way Arizona's income rates are structured, any cut will likely affect taxpayers across the board, including those who will pay the Proposition 208 surcharge.

Scarpinato defended the governor's decision to cut taxes amid the ongoing economic uncertainty of the COVID-19 pandemic. He noted that Ducey's budget still puts a record $6.1 billion into K-12 education, and that there's still new money for other priorities as well.

"This isn't a situation of having to pick or choose. This is a situation of being able to fulfill our commitments and our obligations to the people of Arizona and the programs that we know are going to continue to help keep the state moving forward, while also recognizing that we still have additional revenue," he said.

However, history has shown that today's surplus can quickly turn into a deficit, and that tax cuts that go into effect when revenues are strong can become a drag on the state's budget when the economy goes south. And while spending increases can be reversed with a simple majority vote in the legislature, it takes a two-thirds vote in each chamber to raise taxes.

In 2011, then-Gov. Jan Brewer signed sweeping legislation that reduced corporation income tax rates, commercial property tax rates and other taxes, with the cuts scheduled to begin phasing in several years later to allow Arizona's economy to recover from the shock from the Great Recession before they went into effect. Legislative Democrats and K-12 education advocates have long blamed those tax cuts for reducing funding schools and other budget priorities, including in 2015, when Ducey, in his first year as governor, had to grapple with a budget deficit.

Joe Thomas, president of the Arizona Education Association, worried about the revenue that K-12 schools could lose from Ducey's proposed tax cut.

"It's reckless. I don't understand what the governor is thinking," Thomas said.

Thomas added the state would be better served using that money to prepare for the coming fiscal cliff in 2025. That's when Proposition 123, a 10-year plan approved by voters in 2016 that settled a



long-running K-12 funding lawsuit by using state trust land to increase funding, expires.

Phoenix Mayor Kate Gallego also took aim at the tax cut plan, noting that it will reduce the cities' allotment of the state's shared revenue pool. Gallego said that will cost Phoenix $25 million per year when the full cuts go into effect, a cut that will be "felt most profoundly" by the city's police and fire departments.

"I firmly believe we must build up our first responders and provide the resources they need, not recklessly slash their ability to do their jobs and continue the necessary reforms we have already begun," Gallego said in a press statement.

Senate Minority Leader Rebecca Rios, D-Phoenix, said she hopes the tax cut isn't an attempt to "backfill" the money that top earners will pay under Prop. 208. But if the governor is going to cut taxes, Rios said she and her Democratic colleagues in the legislature would prefer to see them targeted toward low-income and working class families.

*\*\*\*UPDATED: This story has been updated to include additional comments.*

---

### Jeremy Duda

Associate Editor Jeremy Duda is a Phoenix native and began his career in journalism in 2003 after graduating from the University of Arizona. Prior to joining the Arizona Mirror, he worked at the Arizona Capitol Times, where he spent eight years covering the Governor's Office and two years as editor of the Yellow Sheet Report. Before that, he wrote for the Hobbs News-Sun of Hobbs, NM, and the Daily Herald of Provo, Utah. Jeremy is also the author of the history book "If This Be Treason: the American Rogues and Rebels Who Walked the Line Between Dissent and Betrayal."

Exhibit P

# Arizona Senate bill would allow some to avoid Proposition 208 surtax

     



Proposition 208 would increase funding for Arizona teachers, support staff and education programs through a surtax on high earners.

PHOTOS BY ROCIO HERNANDEZ AND SKY SCHAUDT/KJZZ

 By Jeff Gifford – Digital Editor, Phoenix Business Journal
Feb 26, 2021, 4:26pm EST

**IN THIS ARTICLE**

**Government & Regulations**
Industry

A bill in the Arizona Senate would alter the state's tax system and let some businesses avoid paying a new tax surcharge passed by voters last November.

The Arizona Capitol Times reported that Senate Bill 1783 creates a new tax category that didn't exist when Proposition 208 was passed and therefore would not be subject to the ballot initiative. Rather, it would be an alternative option for business owners.

The measure would allow small business owners whose business incomes pass through to them to compute their tax on their personal income tax forms after deducting business expenses, the Times reported.

Those owners would be able to choose the cheaper option between paying a 4.5% tax on their adjusted business income or paying the Prop 208 surcharge of 3.5% surcharge on adjusted personal income of more than $250,000 for individuals or $500,000 for married couples in addition to previous income tax rate.

The bill's sponsor, Chandler Republican Sen. J.D. Mesnard, told



THE BUSINESS JOURNALS

MENTAL HEALTH
IN THE WORKPLACE 2021

THURSDAY, APRIL 28

CLICK TO REGISTER

POWERED BY

Menninger®

Paycor

ASSOCIATION PARTNER

AMERICAN
PSYCHOLOGICAL
ASSOCIATION

the Times that the bill ensures that small business are not affected by the proposition, but one of the key advocates of the initiative, David Lujan, said the surcharge already only touched net income, after business and other deductions.

What's more, Lujan said, the bill creates the same 4.5% tax rate for income from estates and trusts, the Times reported.

Proposition 208 passed with 52% of the votes in November. Proceeds from the surtax would go to Arizona schools. One economist told the Phoenix Business Journal approximately 3% of Arizona's tax filers will be affected by the measure.

Opponents of the measure have filed several lawsuits aiming to stop the surtax from going into effect. Earlier in February, a Maricopa County Superior Court judge denied a request for an injunction to halt the implementation of the surtax, saying that the constitutionality of the proposition will likely be decided in the case, but it was not appropriate to make a decision now.

The measure must be debated by the full Senate before coming to a vote.

# Exhibit Q

# azcentral.

ARIZONA

# Drivers will have to pay the $32 Arizona car registration fee for two more years

**Maria Polletta** The Republic | azcentral.com

Published 7:54 p.m. MT Jun. 3, 2019 | **Updated 2:21 p.m. MT Jun. 7, 2019**

Arizona drivers, don't say goodbye to that $32 vehicle-registration fee just yet.

Motorists will continue to pay the full amount for the next two years rather than seeing a gradual phase-out before the fee's repeal, state officials confirmed Monday.

"The fee will remain at $32 for fiscal year 2020 and fiscal year 2021 ... then drops to $0 by July 1, 2021," Governor's Office spokesman Patrick Ptak said via email.

The Department of Transportation said it does not plan to pro-rate registration fees for drivers who must renew before the fee is repealed, however.

For example, a driver whose registration is up in December 2020 would pay the full $32 fee upon renewing for one year, even though the fee would disappear halfway through that person's registration period.

## Budget face-off prompted repeal

The planned elimination of the unpopular public-safety fee, which for months had angered drivers and lawmakers alike, emerged from a drawn-out budget stalemate last month.

Sen. Michelle Ugenti-Rita, who pushed for a repeal in the Senate, refused to vote for any budget plan that didn't address the fee.

A five-year phase-down deal reached by Gov. Doug Ducey's office and Republican leadership in the Legislature failed to appease the Scottsdale Republican, whose vote was critical in GOP budget talks. And the two-year phase-down she countered with initially went nowhere.

But after a few days of gridlock, Ugenti-Rita announced she had reached a deal with Ducey to get rid of the "very unpopular" and "very unnecessary" fee by July 2021.

At the time, she did not elaborate on what would happen to the fee between now and then. The details later were published in state budget documents.

## How does this affect state coffers?

The Legislature passed a bill creating the public-safety fee — and giving the director of the Arizona Department of Transportation the authority to set it — last April.

State Rep. Noel Campbell, R-Prescott, sponsored the legislation because he wanted a permanent funding source for the highway patrol.

For years, lawmakers had covered highway-patrol needs by taking money collected for road repairs, a strategy that left roads and bridges crumbling throughout the state. The fee was intended to cover the highway patrol budget.

At the time, state officials estimated the fee would cost $18 and generate about $149 million. ADOT later announced the fee would be nearly double that amount, providing an updated revenue estimate of $185 million.

It was not immediately clear whether drivers wanting to take advantage of the state's two- and five-year registration options should avoid doing so until the fee disappears.

*Reach the reporter at maria.polletta@arizonarepublic.com or 602-653-6807. Follow her on Twitter @mpolletta.*

**Support local journalism.** *Subscribe to azcentral.com today.*

# Exhibit R





Office of the Attorney General
State of Georgia

Office of the Attorney General
State of Arizona

Office of the Attorney General
State of West Virginia

March 16, 2021

**VIA EMAIL & U.S. MAIL**

The Honorable Janet L. Yellen
Secretary
Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220
(202) 622-1100
correspondence@treasury.gov

Re:  **Treasury Action to Prevent Unconstitutional Restriction on State's
Fiscal Policy through American Rescue Plan Act of 2021**

Dear Secretary Yellen:

The undersigned State Attorneys General request that the Department of the Treasury take immediate action to confirm that certain provisions of the American Rescue Plan Act (the "Act") do not attempt to strip States of their core sovereign authority to enact and implement basic tax policy.  Those provisions, found in section 9901 of the Act,[1] forbid States from using COVID-19 relief funds to "directly or indirectly offset a reduction in … net tax revenue" resulting from state laws or regulations that reduce tax burdens—whether by cutting rates or by giving rebates, deductions, credits, "or otherwise[.]"[2] This language could be read to deny States the ability to cut taxes in any manner whatsoever—even if they would have provided such tax relief with or without the prospect of COVID-19 relief funds.  Absent a more sensible interpretation from your department, this provision would amount to an unprecedented and unconstitutional intrusion on the separate sovereignty of the States through federal usurpation of essentially *one half* of the State's fiscal ledgers (*i.e.*, the revenue half). Indeed, such federal usurpation of state tax policy would represent the greatest attempted invasion of state sovereignty by Congress in the history of our Republic.

---

[1] https://www.congress.gov/117/bills/hr1319/BILLS-117hr1319enr.pdf.

[2] *Id.* at pp. 1319-223.

Section 9901 of the American Rescue Plan Act, which amends sections 602 and 603 of the Social Security Act, explains what States may and may not use COVID-19 recovery funds for. Most pertinent here, subsection 602(c)(2)(A) (the "Tax Cut Prohibition") prohibits the States from "us[ing] the funds provided under this section … to either *directly or indirectly* offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase."[3] States must certify that they will use any COVID-19 relief funds provided under the Act "in compliance with subsection (c) of this section[,]" and if a State fails to comply, the Act requires the State to repay the funds in "an amount equal to the amount of funds used in violation of such subsection[.]"[4]

The import of the Act's prohibition against "offsetting" reductions in state tax revenue is unclear, but potentially breathtaking. This provision might have been intended merely to prohibit States from *expressly* taking COVID-19 relief funds and rolling them directly into a tax cut of a similar amount. But its prohibition on "indirectly" offsetting reductions in tax revenue, combined with the list of prohibited kinds of tax reductions (rate cuts, rebates, deductions, credits, or "otherwise"), could also be read to prohibit tax cuts or relief of any stripe, even if wholly unrelated to and independent of the availability of relief funds. After all, money is fungible, and States must balance their budgets. So, in a sense, *any* tax relief enacted by a state legislature after the State has received relief funds could be viewed as "using" those funds as an "offset" that allows the State to provide that tax relief.

Several real and hypothetical examples of state tax policy sharpen this troubling point:

- Arizona voters at the 2020 election voted for a large tax increase related to education that has nothing to do with COVID-19 and the Arizona Legislature may seek to provide an alternative tax structure for small businesses—again having nothing to do with COVID-19 or the federal funds.

- Arizona is phasing out law-enforcement fees on vehicle registration renewals.

---

[3] "Covered period" is defined in Section 602(g)(1) as the period that begins on March 3, 2021, and "ends on the last day of the fiscal year of such State … in which all funds received by the State … from a payment made under this section or a transfer made under section 603(c)(4) have been expended or returned to, or recovered by, the Secretary."

[4] It further provides that "in the case of a violation of subsection (c)(2)(A), the amount the State … shall be required to repay shall be the lesser of—(1) the amount of the applicable reduction to net tax revenue attributable to such violation; and (2) the amount of funds received by such State … pursuant to a payment made under this section or a transfer made under section 603(c)(4)."

- During the current legislative session and prior to the passage of the Act, Georgia's House of Representatives passed a bill, now under consideration by its Senate, that would extend a tax credit for families who adopt a child out of foster care.

- Also during the current legislative session and prior to the passage of the Act, Georgia's House of Representatives passed a bill that raises the standard deduction, which would provide Georgians with an estimated $140 million in state income tax relief that largely benefits those of lower to middle incomes.

- The West Virginia Legislature is considering a bill to extend the Neighborhood Investment Tax Credit (a charitable program) and increase the annual tax credit cap from $3 million to $5 million. These changes are projected to reduce West Virginia tax revenue by roughly $2 million per year in future years.

- Another bill in West Virginia would expand a limited aircraft repair and maintenance sales tax exemption to all such activities. This change will result in a small reduction in sales tax collections.

- Alabama legislators are currently considering legislation that would allow tax exemptions for organizations that provide care for the sick and terminally ill, offer services for children who are victims of sexual or physical abuse, furnish new homes for victims of natural disasters, and respond to emergencies and provide life-saving, rescue, and first-aid services; tax deductions that would benefit people with special needs and enable citizens to purchase storm shelters to protect their families from tornadoes; and tax credits for hospitals and universities engaged in research and development beneficial to society.

- The Indiana General Assembly is considering a tax credit for donations to public school foundations as well as a tax credit for donations to qualified foster care organizations. It is also considering various sales tax exemptions for purchases such as public safety equipment.

- Kansas is considering decoupling part of its income tax code from the federal tax code, to end a state-level income tax increase caused by pass-through changes from prior federal tax law revisions.

- Kansas is considering giving property or income tax deferrals or credits to small businesses impacted by closure orders during the COVID-19 pandemic.

- Under bipartisan legislation proposed in Kentucky, homeowners in a proposed tax increment financing district meant to revitalize a predominantly minority area of Louisville hurt by decades of disinvestment would pay property taxes for the next three decades based on their property's assessed value this year. And a housing developer would be able to defer 80% of its annual property taxes, up to $7.64 million, to offset construction costs.

- Montana's Legislature is considering a very slight income tax cut for most income earners.

- Montana's Legislature is also considering increasing its current education tax credit for families.

- In Oklahoma, a bill has passed the House that would, among other things, restore the refundability of the state's Earned Income Tax Credit.

- Suppose a property decreases in value resulting in a decrease of legally assessed value, and the state keeps the assessed tax *rate* consistent—which results in a decrease in assessed *tax amount*.

- Similarly, suppose a property increases in value, but the State decreases the assessed rate such that the amount of tax assessed remains unchanged.

- Assume that projected state revenue is set to increase 10%, and a state legislature adopts measures such that the state's revenue collection "only" increases 8%.

Not one of these common changes to state tax policy has any real or direct connection to the State's potential receipt of COVID-19 relief funds, yet each of them could be deemed a tax "rebate," "deduction," "credit," or "otherwise" that could result in a "reduction in the net tax revenue" of the State. Thus, each of these otherwise lawful enactments could be construed as violations of the Act's prohibition on "offsetting" tax cuts.

Put aside the gross federal overreach inherent in trying to take state tax policy hostage in this way. If this expansive view of this provision were adopted, it would represent an unprecedented and unconstitutional infringement on the separate sovereignty of the States. When Congress attaches conditions to a States' receipt and use of federal funds, those conditions must (1) be placed "'unambiguously[,]'" (2) relate to "'the federal interest'" for which the spending program was established, (3) not violate other constitutional provisions, and (4) not contain a financial inducement "so coercive as to pass the point at which 'pressure turns into compulsion.'" *See generally South Dakota v.*

*Dole*, 483 U.S. 203, 207-208, 211 (1987); *National Federation of Independent Business v. Sebelius*, 567 U.S. 519 (2012).  Spending conditions imposed on States that do not meet these requirements are not "necessary and proper" for exercising Congress' spending power and also infringe on powers "reserved to" the States. U.S. Const. Art. I, Section 8, Clause 18; U.S. Const. Amd. X.  The Act's Tax Cut Prohibition violates these requirements.

First, if the Tax Cut Prohibition were interpreted to place any limits on how States could enact tax relief not directly connected to the relief funds provided by the Act, it would impose a hopelessly ambiguous condition on federal funding.  The examples listed above make the point: how is a State to know, when accepting the relief funds, whether any of these kinds of commonplace and sensible tax relief measures are "indirectly" offset by COVID-19 relief funds? Is it enough that the funds help balance a state budget that *also* contains tax relief measures? What if the presence of relief funds in 2021's budget effectively frees up funds to offer tax relief in 2022? Absent a clear and narrowing construction by Treasury regulation, States cannot possibly know the bargain they are striking in accepting the relief funds.  Yet the "legitimacy of Congress' power to legislate under the spending power … rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'" *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 17 (1981).

Second, for similar reasons, a maximalist construction of the Tax Cut Prohibition would result in federal conditions that do not relate to the federal interest for which the spending program was established: relief from the economic harms caused by COVID-19.  It is one thing to require that coronavirus-stimulus-related money be spent on coronavirus-related stimulus.  It is quite another, and beyond Congress's Spending Power, to forbid States from providing tax relief *of any kind*, *for any reason*, merely to ensure that federal funds are spent for their intended purpose.

Third, a broad construction of the Tax Cut Prohibition would violate separation of powers and fundamental democratic principles, and would effectively commandeer half of the State's fiscal ledgers, compelling States to adopt the one-way revenue ratchet of the current Congress for the next three years.  For example, if citizens wish to lower their overall tax burden in the next two election cycles, they cannot elect a candidate for state office that could actually carry out such a policy.  Similarly, elected officials who wish to spend more public funds would now have a ready excuse for why state surpluses cannot be used to cut taxes: Congress forbids that, so we "have" to spend it instead.  Such a system would eliminate the democratic accountability that federalism serves to protect. *See*, *e.g.*, *New York v. United States*, 505 U.S. 144, 169 (1992) ("Accountability is thus diminished when, due to federal coercion, elected state officials cannot regulate in accordance with the views of the local electorate[.]").  The upshot is that, for purposes of setting tax policy, there would now be a single sovereign in the United States: Congress.

But fundamental to our Constitution is separate federal and state sovereigns, who can each set their own taxing policies based on their own independent legislatures.

In addition, a governor could—by mere stroke of a pen—accept the stimulus funds and thereby bind both (1) the legislature of that state and (2) his or her successor as governor from cutting any tax or tax assessment. Congress has no such power to intrude upon the democratic structures of the States, whose republican forms of government are guaranteed by Article IV. Notably, the 117th Congress cannot even bind the 118th Congress from enacting legislation contrary to its legislation. Yet a broad construction of the Tax Cut Prohibition would let the governors of the States in 2021 prohibit future state governors and legislatures from enacting revenue-reducing measures in 2024.

Fourth, the expansive view of the Tax Cut Prohibition is unconstitutionally coercive. No one could dispute that Congress cannot force States to pursue certain tax policies at the state level. *Cf. Sebelius*, 567 U.S. at 577 (plurality) ("'[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.' Otherwise the two-government system established by the Framers would give way to a system that vests power in one central government, and individual liberty would suffer." (quoting *New York*, 505 U.S. at162)). Congress may not micromanage a State's fiscal policies in violation of anti-commandeering principles nor coerce a State into forfeiting one of its core constitutional functions in exchange for a large check from the federal government. Such "economic dragooning" of the States cannot withstand constitutional scrutiny. *Id*. at 582.

Yet the Act arguably compels that result. The COVID-19 pandemic has wreaked economic havoc across much of the Nation, leaving many citizens in need of short-term financial support, and Congress determined that some of that support would flow through the States. Although some States have weathered the crisis better than others, it is difficult to envision many, if any, turning down this support for their citizens. For example, Arizona has an annual budget of around $12.4 billion from its general fund, and the moneys from the State Recovery Fund are anticipated to be $4.8 billion—40 percent of one year's general fund budget. As another example, West Virginia's share represents over 25% of one year's budget. Many States put to the Hobson's choice of taking this financial support or maintaining their sovereign independence to set their own tax policy will be hard pressed to decline the federal funds.

Given the foregoing, we ask that you confirm that the American Rescue Plan Act does not prohibit States from generally providing tax relief through the kinds of measures listed and discussed above and other, similar measures, but at most precludes *express* use of the funds provided under the Act for direct tax cuts rather than for the purposes specified by the Act. In the absence of such an assurance by March 23, we will take appropriate additional action to ensure that our States have the clarity and assurance

necessary to provide for our citizens' welfare through enacting and implementing sensible tax policies, including tax relief. We look forward to hearing from you promptly. Please direct your response to joe.kanefield@azag.gov, and we will forward.[5]

Sincerely,

| | | |
|---|---|---|
| Mark Brnovich<br>Attorney General of Arizona | Christopher M. Carr<br>Attorney General of Georgia | Patrick Morrisey<br>Attorney General of West Virginia |
| Steve Marshall<br>Attorney General of Alabama | Leslie Rutledge<br>Attorney General of Arkansas | Ashley Moody<br>Attorney General of Florida |
| Lawrence G. Wasden<br>Attorney General of Idaho | Theodore E. Rokita<br>Attorney General of Indiana | Derek Schmidt<br>Attorney General of Kansas |
| Daniel Cameron<br>Attorney General of Kentucky | Jeff Landry<br>Attorney General of Louisiana | Lynn Fitch<br>Attorney General of Mississippi |
| Eric S. Schmitt<br>Attorney General of Missouri | Austin Knudsen<br>Attorney General of Montana | Douglas J. Peterson<br>Attorney General of Nebraska |
| Mike Hunter<br>Attorney General of Oklahoma | Alan Wilson<br>Attorney General of South Carolina | Jason R. Ravnsborg<br>Attorney General of South Dakota |
| Ken Paxton<br>Attorney General of Texas | Sean D. Reyes<br>Attorney General of Utah | Bridget Hill<br>Attorney General of Wyoming |

---

[5] Please note this letter is not intended to be and is not in any way a waiver of any legal rights, claims, defenses, or immunities possessed by the States regarding this matter.

# Exhibit S

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

STATE OF OHIO,

        *Plaintiff,*

v.

JANET YELLEN, in her official capacity as Secretary of the Treasury; RICHARD K. DELMAR, in his official capacity as acting inspector general of the Department of Treasury; and U.S. DEPARTMENT OF THE TREASURY;

        *Defendants.*

No. 1:21-cv-181

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

## **INTRODUCTION**

1.  This suit challenges an unconstitutional provision in the American Rescue Plan Act—a provision that allows the federal government to commandeer state taxing authority, and that the Act coerces the States into accepting.

2.  The Act includes a $195.3 billion aid program intended to, among other things, help States recover from the pandemic-caused downturn.

3.  The aid program, which appears in §9901 of the Act, contains a provision that this complaint calls the "Tax Mandate."

4.  The Tax Mandate forbids States from using funds received under the Act to "directly or indirectly" offset a "reduction in net tax revenue" caused by a change in tax policy. American Rescue Plan Act of 2021, Pub. L. No. 117-2, §9901 (2021) (adding §602(c)(2) to the Social Security Act (42 U.S.C. §801 et seq.)).

5.  Another provision in §9901 empowers the Secretary of the Treasury to recoup federal funds that she thinks the State used to offset revenue loss from a tax reduction in violation of the Tax Mandate. *Id.* (adding §602(e) to the SSA).

6.  Money is fungible, so *any* revenue lost from a tax credit, deduction, rebate, delay, or decrease that Ohio legislators or executive officers may implement would be "indirectly" offset by the $5.5 billion the State expects to receive pursuant to the Act. Thus, the Tax Mandate effectively prohibits reductions in taxes: any State that reduces taxes, and that experiences a loss in tax revenue, is subject to having billions of dollars in federal funding recouped by the Department of the Treasury.

7.  Congress has no direct authority to "require the States to govern according to Congress's" preferred tax regime. *New York v. United States*, 505 U.S.

144, 162 (1992). And while the Spending Clause of the U.S. Constitution empowers Congress to "provide for … the general Welfare," Congress may not use its influence under the Spending Clause to *coerce* the States to adopt Congress's tax preferences, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (op. of Roberts, C.J.).

8.     Congress, through the Act, has coerced Ohio and its sister States into accepting a limitation on their sovereign authority as a condition for their being allowed to use badly needed federal funding.

9.     Ohio seeks to enjoin federal officials from enforcing the unconstitutional Tax Mandate, and seeks declaratory relief establishing that the State of Ohio, under the Tenth Amendment to the U.S. Constitution, retains the freedom to manage its own tax policy.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. §1331 and §§2201–02.

11.     Venue is proper in this judicial district under 28 U.S.C. §1391(e)(1).

12.     The State of Ohio has standing to challenge the Tax Mandate, and to seek injunctive and declaratory relief. The Mandate injures the State by unconstitutionally intruding on the State's sovereign authority, by interfering with the State's orderly management of its fiscal affairs, and by subjecting the State to the risk that it may be made to return funding to the federal government. *See Celebrezze v. U.S. Dep't of Transp.*, 766 F.2d 228, 232 (6th Cir. 1985); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989); *Texas v. United States*, 809 F.3d 134, 155–57 (5th Cir. 2015); *see also Barnes v. E-Systems*, 501 U.S. 1301, 1304 (1991)

2

(Scalia, J., in chambers). Injunctive or declaratory relief would redress the State's injuries.

## PARTIES

### I.     Plaintiff

13.     Plaintiff, the State of Ohio, is a sovereign State of the United States of America.

### II.    Defendants

14.     Janet L. Yellen is the Secretary of the Treasury, and is named in her official capacity. The Secretary of the Treasury is responsible for administering the coronavirus local fiscal recovery fund created by §9901 of the American Rescue Plan Act of 2021.

15.     Richard K. Delmar is the Acting Inspector General of the Department of Treasury, and is named in his official capacity. The Inspector General is responsible for monitoring and oversight of existing coronavirus relief funds to the States, and is generally responsible for informing the Secretary of the Treasury about programs administered by the Department and advising on the necessity for corrective action.

16.     The Department of the Treasury is an agency of the United States and is additionally responsible for administering the coronavirus local fiscal recovery fund created by §9901 of the American Rescue Plan Act of 2021.

## FACTUAL ALLEGATIONS

### I.     The American Rescue Plan Act

17.     On March 11, 2021, President Biden signed into law a $1.9 trillion stimulus package, the "American Rescue Plan Act," H.R. 1319. The text of the Act is

3

available at https://www.congress.gov/bill/117th-congress/house-bill/1319/text.

18.    The Act appropriates $195.3 billion in aid to the States and the District of Columbia.  Pub. L. No. 117-2, §9901 (adding §602(b)(3)(A) to the Social Security Act).  Of that amount, $25.5 billion is allocated equally among the States and the District.  The remainder, minus additional money for Washington, D.C., is distributed based on each State's average number of unemployed individuals from October through December of 2020.  *Id.* (adding §602(b)(3)(B) to the SSA).

19.    The State of Ohio is expected to receive $5.5 billion in aid under the Act. Jared Walczak, *State Aid in American Rescue Pan Act is 116 Times States' Revenue Losses*, Tax Foundation (Mar. 3, 2021), https://taxfoundation.org/state-and-local-aid-american-rescue-plan/.  Additional billions will be sent to Ohio's localities directly and are not the subject of this suit.  *Id.*

20.    The American Rescue Plan Act's funds are available to the States "through December 31, 2024."  Pub. L. No. 117-2, §9901 (adding §602(a) to the SSA).

21.    The Act's "Tax Mandate" is the provision in §9901 of the Act that provides:

> A State or territory shall not use the funds provided under this section or transferred pursuant to section 603(c)(4) *to either directly or indirectly offset a reduction in the net tax revenue* of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

(emphasis added).

22.    If a State violates the Tax Mandate, the Secretary of the Treasury shall

recoup the lesser of: (1) the amount of the applicable reduction to net tax revenue; or (2) the amount of funds the State received from the federal government. Pub. L. No. 117-2, §9901 (adding §602(e) to the SSA).

23.     The Act does not provide any process for a State to dispute an alleged violation of the Tax Mandate.

24.     The Act gives the Secretary broad authority to issue regulations "necessary or appropriate to carry out" the program. *Id*. (adding §602(f) to the SSA).

## II.     Ohio's Budget

25.     The State expects to receive $5.5 billion from the American Rescue Plan Act to help Ohio and its citizens recover from the devastating effects of the pandemic.

26.     $5.5 billion fills such a large and urgent need in Ohio's budget that Ohio has no real choice except to take the funds, especially while attempting to respond to the economic instability wrought by the COVID-19 pandemic.

27.     The pandemic brought a drastic economic slowdown, substantially affecting available funds and thus Ohio's ability to support needed programs.

28.     The State of Ohio is obligated to maintain a balanced budget. If anticipated receipts and available balances in the State's general revenue fund will likely be less than appropriations from that fund, the Governor must order spending reductions to prevent a deficit. Ohio Rev. Code §126.05; *see also* Ohio Legislative Service Commission, A Guidebook for Ohio Legislators at 98–99 (2021), https://www.lsc.ohio.gov/documents/reference/current/guidebook/17/Guidebook.pdf.

29.     In April 2020, tax revenues fell $866.5 million below estimate, a 35.3

percent drop. *See* Monthly Financial Report at 13, Ohio Office of Budget and Management (May 11, 2020), https://archives.obm.ohio.gov/Files/Budget_and _Planning/Monthly_Financial_Report/2020-05_mfr.pdf. In May 2020, Governor DeWine ordered $775 million in spending cuts, including to K-12 schools and Medicaid. *See* Randy Ludlow, *Coronavirus in Ohio: $775 million in budget cuts due to pandemic include $300 million reduction to schools*, THE COLUMBUS DISPATCH (May 5, 2020), https://www.dispatch.com/news/20200505/coronavirus-in-ohio-775-million-in-budget-cuts-due-to-pandemic-include-300-million-reduction-to-schools.

30. Tax revenues for fiscal year 2020 fell $1.1 billion below estimate. More broadly, total non-federal revenues finished the fiscal year $1.2 billion below estimate. *See* Monthly Financial Report at 11, Ohio Office of Budget and Management, (July 10, 2020), https://archives.obm.ohio.gov/Files/Budget_and_ Planning/Monthly_Financial_Report/2020-07_mfr-final.pdf.

31. Ohio's economy contracted 3.5 percent between the end of 2019 and the third quarter of 2020, mirroring the national economy, which experienced the largest economic decline since just after World War II. *See* Monthly Financial Report at 2, Ohio Office of Budget and Management (Mar. 10, 2021), https://archives.obm.ohio.gov /Files/Budget_and_Planning/Monthly_Financial_Report/2021-03_mfr.pdf; Baseline Forecast Testimony at 1, Ohio Legislative Service Commission, *available at* https://www.lsc.ohio.gov/documents/budget/134/mainoperating/IN/HF%20forecast% 20testimony.pdf (last visited Mar. 16, 2021).

32. Meanwhile, demand for various state services has increased. Medicaid

enrollment, for example, has increased by 369,100 individuals since February 2020. *See* Monthly Financial Report at 22, Ohio Office of Budget and Management (Mar. 10, 2021), https://archives.obm.ohio.gov/Files/Budget_and_Planning/Monthly _Financial_Report/2021-03_mfr.pdf.

33.     For fiscal year 2019, a comparatively "normal" year, which ran July 1, 2018, through June 30, 2019, the State of Ohio budgeted $78 billion and spent $71 billion.  For fiscal year 2020, which ended June 30, 2020, the State budgeted $77.9 billion and spent $74.6 billion.  For fiscal year 2021, Ohio budgeted $93.3 billion, and through the first nine-and-a-half months of the fiscal year, it has spent 62.1 percent of that budget.  *See* Ohio Office of Budget and Management, Ohio Checkbook, https: //checkbook.ohio.gov/State/Budgets/default.aspx (last visited Mar. 15, 2021) (to view the data for each year, select the dropdown menu under "Fiscal Year," which is located at the top of the graph).

34.     The amount of money at stake—$5.5 billion—represents 7.7 percent of Ohio's 2019 expenditures, 7.4 percent of Ohio's 2020 expenditures, and 5.9 percent of Ohio's anticipated 2021 budget.

35.     Looking at the nation as a whole, total state spending reached $2.26 trillion in fiscal year 2020, up from $2.1 trillion in fiscal year 2019.  *See* Summary: 2020 State Expenditure Report at 1, National Association of State Budget Officers, https://higherlogicdownload.s3.amazonaws.com/NASBO/9d2d2db1-c943-4f1b-b750- 0fca152d64c2/UploadedImages/Issue%20Briefs%20/Summary_of_2020_State _Expenditure_Report.pdf.  Thus, the $193.6 billion package to the fifty States

(subtracting $1.7 billion for the District of Columbia), represents 8.6 percent of total state expenditures for 2020 and 9.2 percent for 2019.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of U.S. Constitution, Article I; Violation of the Spending Clause, U.S. Const., Art. I, §8, cl.1**

36.    The State incorporates by reference the allegations of the preceding paragraphs.

37.    Article I of the U.S. Constitution enumerates Congress's legislative powers.

38.    Article I does not give Congress the power to "issue direct orders to the governments of the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018).

39.    Congress may not use the Spending Clause, art. I, §8, cl. 1, to "indirectly coerce[] a State to adopt a federal regulatory system as its own." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012) (op. of Roberts, C.J.).  Congress violates its Spending Clause power when it coerces States into agreeing to limit their sovereign authority by offering financial inducements that States cannot practically refuse.  *Id.*

40.    In the current economic climate, Ohio has "no real choice," *id.* at 587, but to accept the $5.5 billion available through the American Rescue Plan Act—a figure that represents 7.4 percent of Ohio's total expenditures in fiscal year 2020.

41.    By accepting that money, the State must sacrifice its sovereign authority to set tax policy as it sees fit, because changes to tax policy that reduce revenues violate the Tax Mandate.  Such violations could be used to force the State to return funding received through the Act.

8

42. Because Ohio and other States are coerced into accepting the limitations on their sovereign authority that the Tax Mandate imposes, Congress exceeded its authority under the Spending Clause when it enacted the Tax Mandate.

43. In addition, Spending Clause legislation must articulate "unambiguously" the conditions it imposes on the States, enabling them to understand the consequences of accepting funds. *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). The Tax Mandate runs afoul of this requirement, because it is ambiguous regarding what precisely constitutes a change in state tax policy that "indirectly" offsets a loss in tax revenue.

44. None of Congress's other enumerated powers authorized it to enact the Tax Mandate.

### SECOND CLAIM FOR RELIEF
### Violation of the U.S. Constitution, Tenth Amendment; Violation of Anticommandeering Principle

45. The State incorporates by reference the allegations of the preceding paragraphs.

46. The Tenth Amendment states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

47. "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York v. United States*, 505 U.S. 144, 162 (1992). This prohibition against commandeering state governments serves important values, such as safeguarding

individual liberty and promoting political accountability. *Murphy*, 138 S. Ct. at 1477.

48.     The Constitution neither takes the power to set state tax policy from the States, nor empowers the federal government to commandeer state taxing authority.

49.     Because the Tax Mandate commandeers the States' sovereign authority to set tax policy, it violates the Tenth Amendment.

## PRAYER FOR RELIEF

50.     The State requests that this Court:

a.  Declare the Tax Mandate in §9901 of the American Rescue Plan Act of 2021—the provision amending the Social Security Act to include the new §602(c)(2)(A), *see* Pub. L. No. 117-2, §9901—to be in excess of Congress's powers enumerated in Article I, and thus unenforceable;

b.  Declare that the Tax Mandate violates the Tenth Amendment to the Constitution of the United States, and is thus unenforceable;

c.  Enjoin the defendants, and any other agency or employee of the United States, from recouping funds, as provided in Pub. L. No. 117-2, §9901, based on a violation of the Tax Mandate; and

d.  Enjoin the defendants, and any other agency or employee of the United States, from otherwise enforcing the Tax Mandate against Ohio.

Dated:  March 17, 2021          DAVE YOST
                                       Ohio Attorney General

                                       */s/ Benjamin  M. Flowers*
                                       BENJAMIN M. FLOWERS* (0095284)
                                       Solicitor General
                                         *Counsel of Record
                                       ZACHERY P. KELLER (0086930)
                                       MAY DAVIS (PHV application pending)
                                       Deputy Solicitors General
                                       30 East Broad Street, 17th Floor
                                       614-466-8980
                                       benjamin.flowers@ohioattorneygeneral.gov

                                       Counsel for the State of Ohio

11

Exhibit T



March 23, 2021

The Honorable Mark Brnovich
Attorney General
State of Arizona
2005 N Central Avenue
Phoenix, AZ 85004

Dear Attorney General Brnovich:

I write in reply to your March 16, 2021 letter regarding Treasury's implementation of section 9901 of the American Rescue Plan Act (the "Act"), which provides funds to States, territories, Tribal governments, and localities to help them manage the economic consequences of COVID-19.

In the Act, Congress has provided funding to help States manage the public health and economic consequences of COVID-19 and it has given States considerable flexibility to use that money to address the diverse needs of their communities. At the same time, Congress placed limitations to ensure that the money is used to achieve those purposes – including provisions stating that this funding may not be used to offset a reduction in net tax revenue resulting from certain changes in state law.

It is well established that Congress may place such reasonable conditions on how States may use federal funding. Congress includes those sorts of reasonable funding conditions in legislation routinely, including with respect to funding for Medicaid, education, and highways. Here, the Act provides a broad outlay of federal funds, and accordingly includes restrictions to ensure that those funds are properly applied. Earlier COVID-19 relief measures providing state funding also included restrictions that barred States from spending those funds on certain ineligible expenditures.

Nothing in the Act prevents States from enacting a broad variety of tax cuts. That is, the Act does not "deny States the ability to cut taxes in any manner whatsoever." It simply provides that funding received under the Act may not be used to offset a reduction in net tax revenue resulting from certain changes in state law. If States lower certain taxes but do not use funds under the Act to offset those cuts—for example, by replacing the lost revenue through other means—the limitation in the Act is not implicated.

It is also important to note that States choosing to use the federal funds to offset a reduction in net tax revenue do not thereby forfeit their entire allocation of funds appropriated under this

statute. The limitation affects States' ability to retain only those federal funds used to offset a reduction in net tax revenue resulting from certain changes in state law.

Treasury is crafting further guidance—including guidance to address more specifically the issues raised by your letter and the procedures Treasury will use for any future recoupment—that will provide additional information about how this provision will be administered. We will provide this guidance before a State must submit a certification under § 602(d)(1). We also expect to engage in an ongoing dialogue throughout the program.

These funds will provide transformative relief to States, territories, and Tribal governments, and our communities should be able to use the funds to recover from the economic fallout due to the pandemic, which is what Congress intended. I hope to work with your State, as well as others across the country, to ensure these funds can be used in ways that align with the goals of the statute without undue restrictions.

Sincerely,

Janet L. Yellen

cc:  The Honorable Christopher M. Carr
     The Honorable Patrick Morrisey
     The Honorable Steve Marshall
     The Honorable Leslie Rutledge
     The Honorable Ashley Moody
     The Honorable Lawrence G. Wasden
     The Honorable Theodore E. Rokita
     The Honorable Derek Schmidt
     The Honorable Daniel Cameron
     The Honorable Jeff Landry
     The Honorable Lynn Fitch
     The Honorable Eric S. Schmitt
     The Honorable Austin Knudsen
     The Honorable Douglas J. Peterson
     The Honorable Mike Hunter
     The Honorable Alan Wilson
     The Honorable Jason R. Ravnsborg
     The Honorable Ken Paxton
     The Honorable Sean D. Reyes
     The Honorable Bridget Hill

# Exhibit U

Mar 16, 2021, 08:38am EST  |  12,122 views

# How Senator Joe Manchin's Move To Block Tax Relief In His Own State Costs All U.S. Taxpayers



**Patrick Gleason** Contributor ⓘ ⊕

Policy

*I cover the intersection of state & federal policy and politics.*



Sen. Chuck Schumer (D-NY) passes Sen. Joe Manchin (D-WV) as Manchin speaks on the phone outside the ... [+]

GETTY IMAGES

The prohibition of state tax relief included in the $1.9 trillion spending bill signed into law by President Joe Biden on March 11, dubbed the American Rescue Plan Act (ARPA), has emerged as one of the most controversial aspects of the package. While this ban on state tax cuts, believed by many to be unconstitutional, was inserted as an amendment by Senate Majority Leader Schumer (D-N.Y.), it turns out this

provision was the demand of Senator Joe Manchin (D-W. Va.), the supposedly moderate Democrat who effectively controls the fate of the filibuster.

Senator Manchin's demand for the insertion of language banning state tax cuts was reportedly motivated by his opposition to West Virginia Governor Jim Justice's (R) proposal to phase out the state income tax. Senator Manchin took action to make sure that none of the billions West Virginia is set to receive from the new spending package will be used to facilitate the state income tax phaseout sought by Governor Justice and West Virginia state legislators. So in an effort to block state income tax relief for his constituents, Manchin has imposed a federal restriction on relief for taxpayers nationwide, one of questionable legality to boot.

"He's hurting his own people in the state of West Virginia," Governor Jim Justice said of Senator Manchin's amendment prohibiting state tax relief. "I do not condone it."

At the same time that the ARPA seeks to prohibit states from cutting taxes, it does nothing to stop states from accepting billions in additional federal aid and then turning around and raising state taxes. In fact, lawmakers in Hawaii are moving to do just that right now with a proposal to raise the top marginal state income tax rate to 16%, which would be the highest in the U.S.

Though Hawaii is the state most dominated by Democrats, it's not the only state where Democratic lawmakers are looking to raise state taxes. New York Governor Andrew Cuomo (D), Illinois Governor J.B. Pritzker (D), and others are also pushing for blue state tax increases despite the windfall of federal aid they have already received in the past year and are scheduled to collect under the ARPA. Governors Tim Walz (D-Minn.), Tony Evers (D-Wis.), and Tom Wolf (D-Pa.) are also proposing tax hikes this year. But unlike in New York and Illinois, Republicans in the Wisconsin, Minnesota, and Pennsylvania state legislatures have the ability to stop the tax increases proposed by their Democratic governors.

MORE FOR YOU

**One Governor Hopes To Pile Onto Joe Biden's Capital Gains Tax Hike With A State-Level Cash Grab**

**Senate's $1.9 Trillion Spending Bill Criticized For Blocking State Tax Relief, Rewarding Bad Gubernatorial Behavior**

**West Virginia Governor's Income Tax Elimination Plan Is Met With Misinformation & Misdirection**

In his attempt to block state income tax relief for his own constituents, some legal experts think Senator Manchin may have blocked what many believe to be among the most sensible uses of one-time ARPA money, which is the refilling of unemployment insurance (UI) trust funds and the repayment of federal unemployment insurance loans. According to the Tax Foundation's Jared Walczak, filling unemployment insurance funds and repaying federal UI loans "would be one of the most responsible ways states could spend a large, but one-time, infusion that isn't substantially needed to backfill lost revenues."

Some state legislators this author has spoken to, in states that already have budget surpluses even before receiving any ARPA funds, plan to ignore the ARPA's legally dubious prohibition on state tax relief and proceed with planned tax cuts that have been in the works for months. In fact, some of these state lawmakers will dare the Biden administration to sue them if the White House thinks states don't have the sovereignty to set fiscal policy as they see fit.

It's not only Republican legislators and governors who will be inclined to ignore this federal attempt to bar state tax relief. In New Mexico, where Democrats control the governor's mansion and both chambers of the legislature, state officials are planning to forestall tax increases by putting ARPA funds into the unemployment trust fund. As mentioned, some legal experts believe such a move is prohibited by Senator Manchin's amendment blocking the use of ARPA funds for state tax relief both directly and indirectly. As such, moves by lawmakers in New Mexico and elsewhere to fill UI trust funds could be met with legal challenges.

Senator Mike Braun (R-Ind.) has introduced Senate legislation that would repeal the ARA's prohibition of state tax relief. Congressman Dan Bishop (R-N.C.) has introduced a companion bill in the House.

"Democrats are trying to ban states from cutting taxes with a sneaky amendment to the $1.9 trillion so-called COVID relief package," Senator Braun said in a March 11 press release. "Not only did this blue state bailout bill penalize states for reopening by calculating state funds based on unemployment, now they are trying to use it as a back door to ban states from cutting taxes. My bill would make sure they don't get away with it."

Unless repealed, the state tax relief prohibition language in the ARPA is expected to produce lawsuits for years to come. As Reason Magazine's Eric Boehm explained during the March 15 Reason Roundtable podcast, the provision Senator Manchin had added to the ARPA seeks to give the federal government "the ability to basically take states to court for the next few years if they try to do anything that would be considered a reduction in taxes or a rebate or a tax credit program, something like that."

"Money is fungible of course," Boehm adds, "so what dollars are used for what, who knows, but if any of these bailout dollars are connected either directly or indirectly, the law says, to those offsets, states could end up in court."

It seems that in an attempt to block his own constituents from receiving state income tax relief, Senator Manchin has possibly thwarted tax relief in states across the country while precluding some of the most sensible uses of ARPA funds. In the process, Manchin's amendment has created a nationwide legal mess that will take some time, and costly lawsuits, to sort out.

"It's childishness," Governor Justice said of Senator Manchin's effort to block state tax relief, adding "Joe needs to grow up and get by that. For God's sake, he's hurting his own people."

UPDATE: hours after publication of this article, a coalition of 21 state attorneys general sent a joint letter to U.S. Treasury Secretary Janet Yellen "seeking immediate confirmation that the most recent COVID-19 stimulus bill does not strip states of their well-established authority to tax or not tax their citizens," stated the press release issued by West Virginia Attorney General Patrick Morrisey.

**Forbes** | Topline

**Be the first to get expert analysis as breaking news happens.**

Sign up for Topline email alerts for breaking news of the day.

| Email address | Submit |

You may opt out any time. By signing up for this newsletter, you agree to the Terms and Conditions and Privacy Policy

*Follow me on* *Twitter*.

 **Patrick Gleason**

I am Vice President of State Affairs at Americans for Tax Reform, a Washington-based advocacy and policy research organization founded in 1985 at the request of President... **Read More**

Reprints & Permissions

ADVERTISEMENT

# Exhibit V

# The Weirton Daily Times

**BREAKING NEWS**      Car rams into police at Capitol barricade; officer killed

# Justice blames Manchin for stimulus provision limiting use for tax reform



Photo Courtesy/WV Legislative Photography BRIEFING — Gov. Jim Justice speaks to the public and media during a virtual briefing Monday.

4 articles remaining...

CHARLESTON — President Joe Biden's COVID-19 relief package could be approved by the U.S. House of Representatives as soon as today, but a provision placed in the bill triggered Gov. Jim Justice on a rant against West Virginia's lone Democratic U.S. Senator.

Justice, during his Monday morning virtual COVID-19 briefing with press from the State Capitol Building, cast blame on U.S. Sen. Joe Manchin, D-W.Va., for a provision in the $1.9 trillion stimulus package that would limit any use of federal coronavirus relief dollars to offset losses due to legislated changes in state tax revenues.

*"This is terrible, this is absolutely terrible,"* Justice said. *"What was written into the law was written in there primarily by Joe Manchin. Joe Manchin is supposed to be your representative, West Virginia. You know what he is doing? He's trying to hit at me. That's all there is to it."*

The provision states that *"A state ... shall not use the funds provided ... to either directly or indirectly offset a reduction in the net tax revenue of such state ... resulting from a change in law, regulation, or administrative interpretation ... that reduces any tax ... or delays the imposition of any tax or tax increase."*

*"In this situation, (Manchin) has absolutely bent back double triple to hit at me for some reason,"* Justice said. *"What he is doing is hurting West Virginia. It's just a slap at West Virginians."*

A spokesperson for Manchin would neither confirm nor deny the senator's involvement with that provision. But in a statement Monday, Manchin said Justice should be working with him instead of criticizing him.

*"Instead of political attacks that do nothing to help hard working West Virginians, I welcome the opportunity to speak with Governor Justice about the best possible ways to improve the lives of West Virginians with the more than $2 billion in federal funding that I secured for our state in this bill,"* Manchin said.

Justice unveiled his tax reform legislation last week, though the bill has yet ~~~~~~~~~~~~~~~~~~~~~~~~~~~~ ouse of Delegates or state Senate.

4 articles remaining...

It includes a one-year 60 percent cut in most personal income tax classifications, along with a $52 million tax rebate for families making less than $35,000 per year. The total tax reductions total more than $1.087 billion.

The Justice tax reform plans also includes $902.6 million in proposed tax increases in the consumer sales and use tax; a tiered severance tax for fossil fuels; a tax on certain luxury goods; and increased taxes on cigarettes, tobacco products, e-cigarettes, beer, wine, liquor, and soda. Even with additional savings and efficacies, the plan leaves a $90 million gap.

The $1.9 trillion Biden package includes $350 billion in aid to state, county, and municipal governments. The funding can be used to offset losses in tax revenue attributed to the COVID-19 pandemic and shutdowns, though the bill includes provisions prohibiting states from using the funding for state pension plans as well as offsetting tax cuts.

Manchin said the $1.9 trillion package includes $1.25 billion for the state and $624 million in direct funding for county and municipal governments. The bill also includes $800 million for state education funding, $260 million for childcare, $10 million for Head Start, $140 million for broadband expansion as well as $2 million for Wi-Fi hotspots, and millions more in funding for vaccine distribution and rural healthcare.

*"Policy differences do not justify personal attacks,"* Manchin said. *"I want to work with Governor Justice in the best interest of our state."*

Manchin has been a vocal critic of Justice's handling of the $1.25 billion sent to West Virginia for state and local government COVID-19 expenses last April through the $2.2 trillion federal C.A.R.E.S. Act. Manchin accused Justice last year of taking too long to send money out to local governments in the hope of the federal government easing restrictions to allow C.A.R.E.S. Act funds for budget backfill.

According to the State Auditor's Office, more than $660 million of the $1.25 billion of C.A.R.E.S. Act .......... nent dollars remains in the

4 articles remaining...

Justice and state revenue officials said that $400 million of that balance is needed to pay off a $157 million interest-free loan through the U.S. Department of Labor to keep West Virginia's unemployment trust fund solvent as well as additional funding to replenish the fund. The interest-free period was set to end March 14.

During his Feb. 10 State of State address, Justice called for the creation of a third Rainy Day Fund to help cover possible shortfalls as the personal income tax is phased out. During his remarks before lawmakers, he speculated about the federal government possibly forgiving the state's unemployment loan, freeing up that $660 million to put into the new rainy day *"bucket."*

*"What do you think's going to happen with the Biden Stimulus package? What could happen? They could forgive all of the dollars that we've put out towards unemployment,"* Justice said last month. *"What if we had hundreds and hundreds and hundreds more millions of dollars? Put them in the bucket. Don't spend them."*

Justice walked back that idea Monday while also criticizing the Biden coronavirus package for limiting how the state can use those dollars.

*"My additional rainy day bucket had nothing ... in the world to do with taking C.A.R.E.S. money and putting it over here in a rainy day bucket that is for tax relief,"* Justice said. *"If we have just happened to run our state better than other states that are absolutely run by Democrats and totally out of control ... should we not have the option to do with those monies whatever we want to do with those monies that will only help West Virginians and help us become better and bring more and more opportunities to us?"*

The Biden plan includes $1,400 in direct payments to individuals making less than $75,000, a $3,000 child tax credit and makes it fully refundable, and extends enhanced unemployment benefits until Sept. 6 at $300 per week — a deal pushed for by Manchin after the House of Representative passed a $400-per-week extension through August.

4 articles remaining...

Both Manchin and U.S. Sen. Shelley Moore Capito, R-W.Va, attempted to make the package less broad and more specifically tailored to the economic issues created by the pandemic. During those negotiations, Justice was on the record calling for a large stimulus package. He stood by those statements Monday, though admitted the bill had unneeded items.

*"I frankly believe that really and truly a bigger stimulus package at this point and time is what is needed to finally get up the steepest part of the mountain,"* Justice said. *"To be perfectly honest, our federal government has a way of putting in so much pork into the situation that ... it's a terrible mistake, but it's what happens all the time."*

(Adams can be contacted at sadams@newsandsentinel.com)

## NEWSLETTER

Today's breaking news and more in your inbox

EMAIL ADDRESS

I'm interested in (please check all that apply)

☐ Daily Newsletter　☐ Breaking News

SUBSCRIBE

4 articles remaining...

# Exhibit W

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/democrats-to-states-no-new-tax-cuts-11615333751

OPINION  |  REVIEW & OUTLOOK

# Democrats to States: No New Tax Cuts

The Covid bill says more spending is fine, but cutting taxes is barred.

By [The Editorial Board](#)

March 9, 2021 6:49 pm ET



Senate Majority Leader Chuck Schumer holds a press conference on COVID Relief and Rescue package passed by the Senate, New York, March 7.
**PHOTO:** LEV RADIN/ZUMA PRESS



**Listen to this article**
4 minutes

Democrats in Congress aren't satisfied with spending $1.9 trillion to help blue states and union friends. They've also launched a sneak attack against conservative states. Read their legislation's lips: No new state tax cuts.

That's the news from a provision added last week by Senate Democrats that limits how states and localities can use their $360 billion windfall. States can use the loot to provide government services, cover revenue losses during the pandemic and "respond to the public health emergency" or "its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality."

 OPINION: POTOMAC WATCH



### Passing Covid-19 To Find Out What's In It

  (play)

00:00   | 1x |   

SUBSCRIBE

Much of the relief will invariably flow to government union pension funds, which are underfunded in states like Illinois, New Jersey and Connecticut. To inoculate themselves from GOP attacks, Democrats specified in the bill that relief funds may not be used "for deposit into any pension fund." But money is fungible. States can pay out of their general funds for pensions and use the federal cash for something else.

Majority Leader Chuck Schumer also snuck a provision into his "perfecting amendment" allowing states to use federal funds to provide "premium pay" of up to $13 an hour (and $25,000 total) to workers who are "performing such essential work" as defined by the Governor of each state.

NEWSLETTER SIGN-UP

# Opinion: Morning Editorial Report

All the day's Opinion headlines.

| PREVIEW |                                                    SUBSCRIBE

But here's the political gut punch. The bill explicitly bars states from cutting taxes. States "shall not use the funds," the bill says, "to either directly or *indirectly* [our emphasis] offset a reduction in the net tax revenue" that results "from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase."

Wow. Democrats in Washington are trying to dictate to governors and state legislatures that they can't change their tax laws if they accept their share of the $1.9 trillion. The sweeping prohibition would last through 2024, and the bill grants Treasury Secretary Janet Yellen authority to write regulations "as may be necessary or appropriate to carry" it out.

The language is so expansive that states could be limited from making any changes to their tax codes that reduce revenue even if they don't use federal funds as direct offsets. Much will depend on how Ms. Yellen defines "indirectly." States that don't comply with her interpretation will have to repay federal funds.

Several states including West Virginia, Mississippi, Arkansas and Idaho are considering tax cuts to attract people and business. Some GOP legislatures also want to start or expand private-school choice programs that give tax credits to businesses and individuals that donate money for scholarships. Treasury could say these policies break the law. Beltway Democrats are essentially barring GOP-led states from improving their competitiveness against high-tax Democratic states.

Democrats in California recently approved $600 stipends for low-income residents and undocumented immigrants, and these and other handouts to liberal constituencies appear permissible under the bill as "assistance to households." A corporate tax cut? No way.

The constitutionality of this is open to question. The Supreme Court's "anti-commandeering" doctrine prohibits Congress from using federal funds to coerce states. But even if the tax cut ban doesn't meet the Court's legal test of coercion, it's still an egregious affront to constitutional federalism. In the 2020 election, Democrats failed in their goal of retaking statehouses, but now they plan to control them anyway from Washington.

*Appeared in the March 10, 2021, print edition.*

Copyright © 2021 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

# Exhibit X

| CONGRESS

# Variety of last-minute changes made to Senate aid package

## Fixes would restore aid to cities and counties; boost child care, Medicaid funds; expand eligibility for rural health care fund and more



Senate Majority Leader Charles E. Schumer offered a "perfecting amendment" that was adopted before passage of the relief bill. The amendment added billions of dollars in aid. (Tom Williams/CQ Roll Call)

By **Paul M. Krawzak**

Posted March 8, 2021 at 6:00am, Updated at 11:07am

A "perfecting amendment" that the Senate adopted just before final passage of a $1.9 trillion aid package would add billions of dollars for local governments, restaurants and child care grants to states.

The changes came in a 58-page amendment from Majority Leader Charles E. Schumer, D-N.Y., covering various sections of the wide-ranging relief bill. Further modifications to initial amendment text obtained by CQ Roll Call before it was adopted by voice vote Saturday morning were written into the margins.

The biggest changes involved restoring $10 billion in direct aid to cities and counties, which had been cut from the initial Senate substitute amendment to the House-passed aid bill. The restored funds bring the total for local governments to $130.2 billion while preserving a $10 billion fund for state broadband infrastructure projects that the earlier amendment made room for.

In addition, the final amendment would create a $1 billion annual program, championed by Senate Finance Chair Ron Wyden, D-Ore., for communities and tribal governments that have historically been harmed by federal government policies.

In a statement for the record, Wyden cited communities across the Western United States, including his home state, that are situated on federal lands without a substantial local tax base to pay for government services. Federal environmental and wildlife protection laws have sapped rural counties' ability to benefit from revenue-sharing arrangements involved in extraction of resources like timber, oil and gas.

Eligible communities include counties, parishes or boroughs, as well as the District of Columbia, Puerto Rico, Guam and the U.S. Virgin Islands. The fund would presumably benefit communities that have complained of the fiscal impact of Biden administration regulations prohibiting oil and gas exploration.

The money in Wyden's program is available so far only for the 2022 and 2023 fiscal years, so more would need to be appropriated in subsequent legislation. Of the $2 billion, $500 million would be set aside for tribal governments.

# Changes to state, local funds

Restrictions on direct aid to states would change somewhat under Schumer's perfecting amendment.

Gone is a requirement that the $195.3 billion be split into two tranches, with the second allotment made available 12 months later; instead, Treasury Secretary Janet Yellen would be given the optional authority to withhold 50 percent of the funds upfront. The language stipulates that Yellen "shall" exercise that authority based on each state's unemployment rate.

In addition, the prescribed uses of funds for both states and localities would be revised from the earlier substitute amendment. A restriction on the uses of funds based on the need to provide government services would be tightened to stipulate that states and localities could use the money only to replace the amount of revenue lost during the pandemic compared with the prior full fiscal year.

State and local governments would gain the ability to use their allotments to provide "premium pay" to essential workers of up to $13 per hour, capped at a maximum of $25,000. Essential workers are defined as those "needed to maintain continuity of operations of essential critical infrastructure sectors" or others as designated by state and local officials as critical to "health and well-being" of their residents.

States would also gain more federal help with Medicaid costs associated with providing home- and community-based services. A 7.35 percentage-point boost in the federal matching percentage in the original version would jump to 10 percentage points in Schumer's perfecting amendment.

State grants for child care services would increase by $5 billion over a decade from the underlying Senate version.

And as restaurants and bars earlier celebrated on Saturday after the bill passed, an extra $3.6 billion for those hard-hit businesses was freed up in Schumer's amendment, bringing total grants to $28.6 billion.

# Disabled children, rural hospitals

It wasn't immediately clear how Democrats fit all the changes into the fiscal 2021 budget resolution's $1.89 trillion ceiling.

But there were changes made tightening eligibility for nonprofits to benefit from forgivable loans under the Paycheck Protection Program, which a source involved in the discussions said was how the restaurant grants grew in size. Both provisions were in the jurisdiction of the Senate Small Business Committee.

The flurry of activity on Friday and Saturday that resulted in trimming added unemployment benefits from $400 to $300 per week, coupled with a one-week extension to Sept. 6, also probably freed up substantial extra funds for Medicaid, child care and state and local funds in the Senate Finance Committee's jurisdiction.

Other health care-related changes wouldn't cost additional money but would expand eligibility to receive slices of an $8.5 billion fund for rural health care providers and suppliers. For instance, the perfecting amendment would strike a requirement that the parent organization receiving the funds remit all of the money directly to the provider.

It would also expand the definition of rural provider to include hospitals in rural census tracts within metropolitan statistical areas or others that serve rural patients, including in urban areas with fewer than 500,000 residents. Providers of home health, hospice or long-term care services at an individual's home located in a rural area would also qualify under the expanded definition, as would rural health clinics owned by hospitals or other providers.

Changes were also made in the Senate Health, Education, Labor and Pensions Committee's jurisdiction. The final amendment took $3 billion out of funds set aside for K-12 education technology grants primarily for low-income and disabled children, instead creating a new $3 billion pot for grants under the Individuals with Disabilities Education Act. Of that funding, $550 million would be reserved for programs for preschools and infants and toddlers.

Also, a new workers' compensation fund for federal workers who came down with COVID-19 between Jan. 27, 2020, and Jan. 27, 2023, removed from the earlier version, would be restored in the final Senate bill. Federal employees who only worked remotely during that time wouldn't be eligible.

Out of $26.1 billion in the bill for urban transit agency grants, a provision that would have allowed some local transit agencies to claim an additional amount was removed, presumably to more evenly distribute the remaining funds.

## 'Injurious species'

And it appears the "Byrd rule" — named for former Sen. Robert C. Byrd, D-W.Va. — intended to restrict what can be included in filibuster-proof budget reconciliation bills, struck a couple of other provisions in the earlier substitute.

The late amendment removes language that would have restricted access to $10 billion in small-business credit allocations unless states presented plans for how minority-owned and community development financial institutions would participate. A requirement that states draw up plans for how the money would benefit "business enterprises owned and controlled by socially and economically disadvantaged individuals" was also removed.

The amendment also removes prescriptive language on $10 million appropriated for the U.S. Fish and Wildlife Service. The agency was supposed to use the money to identify and track species that would potentially transmit pathogens that could make humans sick, as well as "develop regulations to make emergency listings for injurious species."

The preliminary Schumer amendment would have removed only the requirement that the Fish and Wildlife Service develop the emergency listings regulations; handwritten changes would strike all of the prescribed uses of the $10 million, however. Instead, the money would have to be used under the existing statute governing illegal trafficking in wildlife and plants, known as the Lacey Act.

A final handwritten fix at the end of the 58-page amendment would change the way in which $280 million for Native American community development block grants is

distributed. The underlying bill would have made the money available "without competition," but those two words were struck by the perfecting amendment.

*Peter Cohn, David Lerman, Jennifer Shutt and Tia Yang contributed to this report.*

## TRENDING STORIES



**One Capitol Police officer killed, one injured when vehicle rams them at Capitol barricade**



**Biden's infrastructure plan would boost science, tech, R&D funding**



**CDC: Fully vaccinated people can travel safely**



**President Biden: Open the White House virtual visitor logs**



**Photo of the day: Recess reflection**



**At the Races: It's April, no foolin'**

## RELATED STORIES



**Senate passes massive COVID-19 relief bill, sending changes back to House**



### House Democrats prep changes to coronavirus relief package



### Biden coronavirus relief plan clears Senate budget hurdle after 'vote-a-rama'



### Democrats planning swift moves on budget resolution next week

THE SOURCE FOR NEWS ON
CAPITOL HILL SINCE 1955

About
Contact Us
Advertise
Events
Privacy

RC Jobs
Newsletters
The Staff
Subscriptions

CQ Roll Call is a part of FiscalNote, the leading technology innovator at the intersection of global business and government. Copyright 2021 CQ Roll Call. All rights reserved.

# Exhibit Y

# POLITICO

**pot opportunity in the market with**
**0+ real-time scans.**

E✷TRADE

Open an account


**TAX**

# Yellen: Treasury faces 'thorny questions' about restrictions on state tax cuts

Republicans are up in arms about the provision, which has already resulted in one lawsuit against the administration.



Treasury Secretary Janet Yellen speaks during a virtual roundtable Feb. 5 in Washington. | Jacquelyn Martin/AP Photo

By **TOBY ECKERT**
03/26/2021 06:23 PM EDT



Treasury Secretary Janet Yellen said on Wednesday the department has "a host of thorny questions" to work through before it can give states guidance on a provision in the $1.9 trillion Covid relief package that prohibits them from using federal aid to subsidize tax cuts.

Two issues she singled out: How to treat tax exemptions that states may provide for unemployment benefits, like the federal government is doing, and exactly how to determine whether a state is using federal money for a tax cut.

Advertisement



Invest in your credit. Purchase Equifax Complete™ Premier and get a 30-day trial for $4.95

Learn more about your credit with reports, trends, and summaries today.

**START TODAY**

**EQUIFAX** | Powering the World with Knowledge™

"We will have to define what it means to use money from this act as an offset for tax cuts. And given the fungibility of money, it's a hard question to answer, but that's what we're required to do, and we will — we will do our best to offer guidance on it," she told the Senate Banking Committee.

Republicans are up in arms about the provision, which says states, the District of Columbia, territories and tribal governments can't use the $220 billion in aid that Congress gave them to "indirectly or directly" offset the cost of tax cuts.

Ohio has already sued the Biden administration over the provision, saying it's unconstitutional, and more suits could follow, likely from other red states. West Virginia Attorney General Patrick Morrisey tweeted Tuesday, "We're now

getting ready for Court," saying the Biden administration's response to a request for clarity on the issue "is unacceptable."

Sen. Mike Crapo (R-Idaho) told Yellen that states are "hamstrung" and "this is an issue that needs immediate clarity."

Yellen noted that Treasury has 60 days from enactment of the law, which President Joe Biden signed March 11, "to complete that work to get the money to distribute to the state and local governments, and there are a host of thorny questions that we have to work through to connect with the issue that you just mentioned."

"We simply are going to have to try to craft guidance in that period of time," she said. "We're working on it 24/7 to get it out as rapidly as we possibly can."

Crapo, who is co-sponsoring legislation to remove the restriction on tax cuts from the law, told Yellen, "I'm going to encourage you to do everything you can in developing this guidance to answer those thorny questions in a way that gives maximum flexibility to the states and local communities."

Treasury officials have noted that the federal government often attaches conditions to funding it provides to states. They also have said states are still free to cut taxes, but not to pay for them with federal pandemic relief money.

Still, Crapo said it's not a cut-and-dry issue. For instance, he noted that some states may follow the federal government's lead in exempting some unemployment benefits from taxes. He asked Yellen whether that would "be a penalty that the state would have to pay for if it did that?"

Yellen said Treasury has "been asked this question by a number of states," and "we are examining that question carefully."

# Exhibit Z



March 12, 2021

# The American Rescue Plan Act Greatly Expands Benefits through the Tax Code in 2021

Garrett Watson, Erica York

| American Rescue Plan: Summary |
| --- |
| $1,400 Stimulus Payments |
| Unemployment Benefits |
| Expanded Child Tax Credit |

## American Rescue Plan Act of 2021 (ARPA)

The United States has provided about $6 trillion (https://www.covidmoneytracker.org/) in total economic relief to the American people during the coronavirus pandemic, including the $1.9 trillion that was approved when President Biden signed the American Rescue Plan Act (ARPA) into law (https://www.ft.com/content/ecc0cc34-3ca7-40f7-9b02-3b4cfeaf7099) on Thursday, amounting to about 27 percent of gross domestic product (GDP). (https://www.washingtonpost.com/world/2021/03/10/coronavirus-stimulus-international-comparison/)  Much of the economic relief in the American Rescue Plan is administered through the tax code in the form of direct payments (stimulus checks) and expanded Child Tax Credit (CTC) in 2021. The size and method of relief will revive debates over the proper role of spending in the tax code and whether the temporary benefits should become permanent after the economy has recovered.

Policymakers will need to determine if the tax code is the proper vehicle to disburse such cash benefits and if the IRS can handle the additional responsibilities. Over the course of many years, the IRS has been tasked with an ever-growing list of administrative duties that go well beyond simple revenue collection—everything from poverty alleviation to education, housing, and health-care benefits. The American Rescue Plan, in addition to other pandemic response measures, would now require the IRS to administer additional benefits on a recurring monthly basis, much as a traditional spending agency, all while processing upwards of 160 million tax returns.

While several of the provisions in the American Rescue Plan are targeted toward the pandemic, like the extended unemployment insurance benefits, other aspects, like the expanded Child Tax Credit, are unrelated and not well targeted toward the pandemic. Overall, about $850 billion is directed to individuals while about $65 billion is directed to businesses.



**What's in the $1.9 Trillion American Rescue Plan Act?**

*Topline summary of relief in Billions of Dollars*

Note: *Subject to change pending estimate of Senate version of unemployment insurance expansion.
Source: Joint Committee on Taxation and Committee for a Responsible Federal Budget

TAX FOUNDATION @TaxFoundation

Most of the provisions are temporary expansions for 2021 to combat the pandemic. However, some policymakers are already considering making permanent (https://www.cbsnews.com/news/child-tax-credit-monthly-checks-parents-democrats/) several of the newly expanded benefits like the Child Tax Credit later this year, which would have a budgetary cost of well over $1 trillion over the next 10 years.

Below we provide more detail on the three major tax-related benefits in the American Rescue Plan: a third round of direct payments, extended unemployment insurance (UI) benefits and a $10,200 unemployment insurance income exemption for 2020, and an expansion of the Child Tax Credit.

## $1,400 Stimulus Payments (Economic Impact Payments)

The American Rescue Plan Act provides a third round of stimulus payments up to $1,400 for adults and any dependent. Households with earnings of more than $80,000 for single filers, $120,000 for Head of Household filers, and $160,000 for married filing jointly will not receive any payment. The payments begin to phase out at $75,000 for single filers, $112,500 for Head of Household filers, and $150,000 for joint filers—meaning about 89 percent of filers will receive a payment (see Table 1).

The payment design creates steep phaseout rates for higher earners, which means they face high marginal tax rates and disincentives to work and could encourage filers to increase traditional retirement contributions in 2021 to reduce their AGI and receive an additional payment.

## Relief Rebates in American Rescue Plan Act

*Individual Economic Relief Rebate by Filing Status*



Source: American Rescue Act (Senate Version), Tax Foundation calculations.

TAX FOUNDATION                                                                                     @TaxFoundation

### Conventional Distributional Effect of Direct Payments in the American Rescue Plan Act

| Income level | Percent Change in After-Tax Income | Share of Filers with a Rebate | Average Rebate Amount |
|---|---|---|---|
| 0% to 20% | 24.70% | 100% | $2,172 |
| 20% to 40% | 10.81% | 100% | $2,537 |
| 40% to 60% | 6.41% | 100% | $2,431 |
| 60% to 80% | 4.21% | 99.5% | $2,611 |
| 80% to 90% | 1.97% | 74.5% | $1,792 |
| 90% to 95% | 0.40% | 25.0% | $509 |
| 95% to 99% | 0.01% | 1.6% | $17 |
| 99% to 100% | 0.00% | 0% | $0 |
| Total | 3.7% | 89.0% | $2,157 |

Source: Tax Foundation General Equilibrium Model, January 2021.

## Unemployment Benefits

The American Rescue Plan also extends the three federal unemployment insurance expansions first created by the CARES Act through September 6, 2021. The American Rescue Plan increases the total number of weeks of benefits available to individuals who cannot return to work safely from 50 to 79, matching the expiration of the broader UI benefits.

The law maintains the federal supplement at its current level of $300 a week for weeks beginning after March 14 and before September 6, 2021. The American Rescue Plan provides 53 weeks of federal UI benefits after the state benefits end, up from 24 weeks.

The American Rescue Plan contains a new provision to exempt $10,200 of unemployment benefits received in 2020 from income taxes. The exclusion is retroactive, applying to unemployment insurance benefits received last year, largely to reduce the issue of surprise tax bills. It only applies to individuals with incomes below $150,000. The Joint Committee on Taxation (JCT) estimates the exemption will reduce federal revenue by $24.9 billion.

More than 45 million tax returns have already been filed with the IRS in the ongoing tax season, which is currently set to end on April 15. The last-minute exemption is bound to create confusion for taxpayers and puts additional pressure on the IRS to quickly provide instructions and guidance for those who have already filed their returns. Ideally, the exemption would have been made prior to the tax season's commencement in mid-February to ensure a smoother tax season for the agency and taxpayers.

## Expanded Child Tax Credit

Finally, the American Rescue Plan greatly expands the Child Tax Credit by allowing households with children to claim up to $3,600 for younger children or $3,000 for children age 6 or older regardless of earned income. While the CTC currently phases in with income and only $1,400 can be refunded to low-income households, the American Rescue Plan allows the full credit for low-income households, which raises marginal tax rates on these filers as they are no longer provided the credit as income rises. As such, it introduces a new disincentive to work (https://www.aei.org/research-products/report/the-conservative-case-against-child-allowances/) for low-income earners, though the magnitude of the disincentive is disputed.

The expanded CTC would also be paid out monthly, which will be a major administrative challenge for the IRS. The agency must obtain projected incomes, filing statuses, and number of qualifying dependents for each eligible household to accurately advance the payments. While the Biden administration hopes to have this process ready by July, that may be an unrealistic timeline (https://www.politico.com/newsletters/weekly-tax/2021/02/08/whats-next-on-the-child-tax-credit-793236); it took the IRS two years to establish advance payments of the Affordable Care Act's premium tax credits.

As the public health situation and the economy hopefully improve this spring and summer, policymakers will have an opportunity to evaluate the effectiveness and the costs of the expanded benefits in the American Rescue Plan and determine whether they should be allowed to expire or otherwise be reformed.

### Related Resources

COVID-19 Tax Resource Center

American Rescue Plan Act Allocates $2 Billion to Nonexistent County Governments

U.S. COVID-19 Relief Provided More Than $60,000 in Benefits to Many Unemployed Families

American Rescue Plan Direct Payment Design and Marginal Tax Rates

Making the Expanded Child Tax Credit Permanent Would Cost Nearly $1.6 Trillion

Expanding Child Tax Credit as Monthly Payment for Pandemic Relief

State & Local Aid Allocation in the American Rescue Plan

**Does the American Rescue Plan Ban State Tax Cuts?**

**Which States Are Taxing Forgiven PPP Loans?**

*Banner image attribution: f11photo, Adobe Stock*