BRIAN M. BOYNTON
Acting Assistant Attorney General
BRIAN D. NETTER
Deputy Assistant Attorney General
ALEXANDER K. HAAS
Director, Federal Programs Branch
BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch
MICHAEL P. CLENDENEN
STEPHEN EHRLICH
CHARLES E.T. ROBERTS
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
100 L Street, NW
Washington, DC 20005
Tel.: (202) 305-9803
Email: stephen.ehrlich@usdoj.gov

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona,<br><br>Plaintiff,<br><br>v.<br><br>Janet Yellen, in her official capacity as Secretary of the Treasury, *et al.*,<br><br>Defendants. | Case No. 2:21-cv-00514-DJH<br><br>**DEFENDANTS' OPPOSITION TO ARIZONA'S MOTION FOR PRELIMINARY INJUNCTION** |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................1

BACKGROUND ................................................................................1

      A.    Statutory Background .......................................1

      B.    Factual and Procedural Background ...................4

LEGAL STANDARDS ....................................................................4

ARGUMENT ...................................................................................4

I.      Arizona Lacks Article III Standing. ...................................4

II.     Arizona Is Not Likely To Succeed on the Merits. .............7

      A.    Congress Validly Exercised its Spending Clause Authority to Restrict the Use of Rescue Plan Funds. ...........8

      B.    The Rescue Plan Provides Clear Notice of the Funding Condition. ..................................11

      C.    The Rescue Plan Is Not Coercive. ...........................13

III.    The Balance Of Harms And The Public Interest Preclude A Preliminary Injunction. ....................................16

CONCLUSION ...............................................................................17

# TABLE OF AUTHORITES

**Cases**

*Abbott v. Perez,*

    138 S. Ct. 2305 (2018) .................................................................................6

*Alaska v. U.S. Dep't of Transp.,*

    868 F.2d 441 (D.C. Cir. 1989) ....................................................................6

*Alcoa, Inc. v. Bonneville Power Admin.,*

    698 F.3d 774 (9th Cir. 2012) ......................................................................7

*Am. Beverage Ass'n v. City & Cnty. of San Francisco,*

    916 F.3d 749 (9th Cir. 2019) ......................................................................4

*Ariz. Dream Act Coal. v. Brewer,*

    757 F.3d 1053 (9th Cir. 2014) ...........................................................16, 17

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*

    548 U.S. 291 (2006) ...........................................................................7, 12

*Babbitt v. Farm Workers,*

    442 U.S. 289 (1979) ...................................................................................6

*Bennett v. Ky. Dep't of Educ.,*

    470 U.S. 656 (1985) .....................................................................11, 12, 13

Defs.' Opp'n to Pl.'s Prelim. Inj. Mot. | ii

2:21-cv-00514-DJH

*Benning v. Georgia,*

    391 F.3d 1299 (11th Cir. 2004)................................................................13

*Bucklew v. Precythe,*

    139 S. Ct. 1112 (2019) ...................................................................................8

*Caribbean Marine Servs. Co. v. Baldrige,*

    844 F.2d 668 (9th Cir. 1988)........................................................................16

*Charles v. Verhagen,*

    348 F.3d 601 (7th Cir. 2003) ......................................................................13

*Citizens Bank of Md. v. Strumpf,*

    516 U.S. 16 (1995)............................................................................................9

*City of Los Angeles v. Barr,*

    929 F.3d 1163 (9th Cir. 2019)......................................................................12

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*

    527 U.S. 666 (1999) ........................................................................................8

*Cutter v. Wilkinson,*

    423 F.3d 579 (6th Cir. 2005) ......................................................................13

*Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.,*

    526 U.S. 629 (1999) ......................................................................................13

Defs.' Opp'n to Pl.'s Prelim. Inj. Mot. | iii

2:21-cv-00514-DJH

*Garcia v. Google, Inc.,*

    786 F.3d 733 (9th Cir. 2015) ..................................................................................4


*Gill v. Whitford,*

    138 S. Ct. 1916 (2018) ..........................................................................................17


*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.,*

    959 F.3d 178 (5th Cir. 2020) ..........................................................................14, 15


*Jackson v. Birmingham Bd. of Educ.,*

    544 U.S. 167 (2005) .............................................................................................13


*Kansas v. United States,*

    214 F.3d 1196 (10th Cir. 2000) ..........................................................................11


*Lujan v. Defs. of Wildlife,*

    504 U.S. 555 (1992) ...............................................................................................5


*Madsen v. Women's Health Ctr., Inc.,*

    512 U.S. 753 (1994) .............................................................................................17


*Maryland v. King,*

    567 U.S. 1301 (2012) ..........................................................................................17


*Massachusetts v. Mellon,*

    262 U.S. 447 (1923) ...............................................................................................6

Defs.' Opp'n to Pl.'s Prelim. Inj. Mot. | iv

2:21-cv-00514-DJH

*Mayhew v. Burwell,*

    772 F.3d 80 (1st Cir. 2014) .................................................................11, 15

*Mayweathers v. Newland,*

    314 F.3d 1062 (9th Cir. 2002) ...................................................................13

*Mazurek v. Armstrong,*

    520 U.S. 968 (1997) ...................................................................................16

*Miss. Comm'n on Env't Quality v. EPA,*

    790 F.3d 138 (D.C. Cir. 2015) .............................................................14, 15

*Mont. Env't Info. Ctr. v. Stone-Manning,*

    766 F.3d 1184 (9th Cir. 2014) ....................................................................7

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*

    567 U.S. 519 (2012) ...........................................................................*passim*

*Nat'l Park Hosp. Ass'n v. Dep't of Interior,*

    538 U.S. 803 (2003) .....................................................................................7

*New York v. United States,*

    505 U.S. 144 (1992) ...............................................................................14, 16

*Nken v. Holder,*

    556 U.S. 418 (2009) .....................................................................................4

*Oklahoma v. U.S. Civ. Serv. Comm'n,*
    330 U.S. 127 (1947)............................................................................10

*Pennhurst State Sch. & Hospital v. Halderman,*
    451 U.S. 1 (1981)...........................................................................12, 13

*Pub. Serv. Comm'n of Utah v. Wycoff Cnty.,*
    344 U.S. 237 (1952)..............................................................................7

*Rimini St., Inc. v. Oracle USA, Inc.,*
    139 S. Ct. 873 (2019)............................................................................9

*S.C. Dep't of Educ. v. Duncan,*
    714 F.3d 249 (4th Cir. 2013)...............................................................11

*Sabri v. United States,*
    541 U.S. 600 (2004)............................................................................10

*Sampson v. Murray,*
    415 U.S. 61 (1974)..............................................................................17

*South Dakota v. Dole,*
    483 U.S. 203 (1987).............................................................. 1, 8, 10, 14

*Steward Mach. Co. v. Davis,*
    301 U.S. 548 (1937)............................................................................14

*Susan B. Anthony List v. Driehaus,*

    573 U.S. 149 (2014) .........................................................................................5, 6

*United States v. Morrison,*

    529 U.S. 598 (2000) ..............................................................................................8

*Van Wyhe v. Reisch,*

    581 F.3d 639 (8th Cir. 2009)..............................................................................13

*Voisine v. United States,*

    136 S. Ct. 2272 (2016) .........................................................................................9

*Walters v. Nat'l Ass'n of Radiation Survivors,*

    468 U.S. 1323 (1984) .........................................................................................17

*Wash. State Grange v. Wash. State Republican Party,*

    552 U.S. 442 (2008) ..............................................................................................8

*Winter v. Nat. Res. Def. Council, Inc.,*

    555 U.S. 7 (2008)............................................................................................4, 16

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ..............................................................................................8

**Statutes**

42 U.S.C. § 802 ..............................................................................................*passim*

42 U.S.C. § 803 .................................................................1

42 U.S.C. § 804 .................................................................1

42 U.S.C. § 805 .................................................................1

American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021),

    (codified at 42 U.S.C. §§ 802–805) ....................................1

### Other Authorities

Office of Information and Regulatory Affairs, Regulatory Review Status,

    https://www.reginfo.gov/public/do/eoDetails?rrid=166315...............3, 4

*Offset*, Black's Law Dictionary (11th ed. 2019) ......................................9

Treasury Statement on State Fiscal Recovery Funds and Tax Conformity

(Apr. 7, 2021), https://go.usa.gov/xHW6R....................................3

Yellen Letter to State AGs (Mar. 23, 2021),

    https://go.usa.gov/xHW65 ............................................3

**INTRODUCTION**

As part of the American Rescue Plan Act, Pub. L. No. 117-2, 135 Stat. 4 (2021) ("Rescue Plan" or "Act"), Congress appropriated nearly $200 billion in new funding for state governments. 42 U.S.C. § 802. Congress gave States considerable flexibility to use these new federal funds, which may be directed to a broad variety of state efforts to respond to the public health emergency created by the COVID-19 pandemic and to its economic effects, including by funding state-level government services and by providing assistance to households, small businesses, and industries. *Id.* § 802(c). To ensure that the new federal funds would be used for the broad categories of state expenditures it identified, Congress specified that States cannot use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. *Id.* § 802(c)(2)(A) (the "offset provision"). That is a straightforward exercise of Congress's well-settled Spending Clause authority to attach conditions that "preserve its control over the use of federal funds." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 579 (2012) ["*NFIB*"] (plurality opinion).

In seeking a preliminary injunction, Arizona argues that the offset provision is unconstitutionally "ambiguous" and unconstitutionally "coercive" because it would prevent the State from cutting taxes. But Arizona's motion suffers from jurisdictional defects and rests on a fundamental misunderstanding of both the challenged statute and the governing law. The motion should be summarily denied.

**BACKGROUND**

**A.      Statutory Background**

On March 11, 2021, Congress enacted the American Rescue Plan Act. *See* Pub. L. No. 117-2, § 9901(a) (codified at 42 U.S.C. §§ 802–805). The Rescue Plan establishes a "Coronavirus State Fiscal Recovery Fund," allocating $220 billion to broadly "mitigate the fiscal effects" of the pandemic on States, territories, and Tribal governments through 2024. 42 U.S.C. § 802(a)(1); *see id.* § 803(a) (additional

$130 billion for localities). Nearly $200 billion is allocated for the States and the District of Columbia. *Id.* § 802(b)(3)(A).

The Rescue Plan provides States with considerable latitude, in scope and duration, to use the funds for pandemic-related purposes. Through 2024, a State may use the funds "to cover costs incurred":

> (A) to respond to the public health emergency with respect to the Coronavirus Disease 2019 (COVID–19) or its negative economic impacts, including assistance to households, small businesses, and nonprofits, or aid to impacted industries such as tourism, travel, and hospitality;

> (B) to respond to workers performing essential work during the COVID–19 public health emergency by providing premium pay to eligible workers of the State, territory, or Tribal government that are performing such essential work, or by providing grants to eligible employers that have eligible workers who perform essential work;

> (C) for the provision of government services to the extent of the reduction in revenue of such State, territory, or Tribal government due to the COVID–19 public health emergency relative to revenues collected in the most recent full fiscal year of the State, territory, or Tribal government prior to the emergency; or

> (D) to make necessary investments in water, sewer, or broadband infrastructure.

*Id.* § 802(c)(1). The Rescue Plan thus allows States to use the funds for "government services" to the extent the pandemic has resulted in a "reduction in revenue," to respond broadly to the public-health emergency and its negative economic effects, to support essential workers during the pandemic, and to invest in certain infrastructure areas. *Id.*

The Rescue Plan includes two "further restriction[s]" to ensure that the broad outlay of funds is used for the identified purposes while funds are available. 42 U.S.C. § 802(c)(2). One limitation (not challenged here) states that a State may not "deposit" Rescue Plan funds "into any pension fund." *Id.* § 802(c)(2)(B). The

other limitation (at issue here) provides in relevant part that a State:

> shall not use the funds provided under [§ 802] . . . to either directly or indirectly offset a reduction in the net tax revenue of such State or territory resulting from a change in law, regulation, or administrative interpretation during the covered period that reduces any tax (by providing for a reduction in a rate, a rebate, a deduction, a credit, or otherwise) or delays the imposition of any tax or tax increase.

*Id.* § 802(c)(2)(A).[1]

By its terms, this funding condition applies only to reductions in "net" tax revenue. *Id.* This limitation on the use of funds is not implicated at all by a State's choice to modify its tax code—including by cutting taxes—if the changes, taken together, do not result in a reduction of *net* tax revenue. If a State chooses to reduce its net tax revenue, it may not use the Rescue Plan funds to "offset" that reduction. If it does, the State will be required to repay (or its allocation will be reduced by) only the lesser of: the amount of funds used to offset the "reduction to net tax revenue" or "the amount of funds received." 42 U.S.C. § 802(e).

The Rescue Plan further authorizes the Secretary of the Treasury "to issue such regulations as may be necessary or appropriate to carry out this section." 42 U.S.C. § 802(f). The Secretary has provided some initial guidance. *See* Yellen Letter to State AGs (Mar. 23, 2021), https://go.usa.gov/xHW65; Treasury Statement on State Fiscal Recovery Funds and Tax Conformity (Apr. 7, 2021), https://go.usa.gov/xHW6R. And the Secretary will provide further guidance imminently through an interim final rule. *See* Office of Information and Regulatory Affairs, Office of Management & Budget, Regulatory Review Status (last visited April 30, 2021), https://www.reginfo.gov/public/do/eoDetails?rrid=166315. Once the Treasury Department issues the regulations, a State may re-

---

[1] The "covered period" began on March 3, 2021 and "ends on the last day of the fiscal year of such State . . . in which all funds received by the State . . . have been expended or returned to … the Secretary." 42 U.S.C. § 802(g)(1).

ceive federal funds after providing a certification (in a form the agency will provide) indicating that it needs the funds to carry out the activities specified in § 802(c) and that it will use the funds in compliance with that provision. 42 U.S.C. § 802(d)(1). States that receive funds must provide periodic reports and other information as the Secretary may require. *Id.* § 802(d)(2).

## B. Factual and Procedural Background

On March 25, 2021, Arizona brought this suit alleging that the offset provision is unconstitutionally ambiguous and "represents an unprecedented and unconstitutional intrusion on the separate sovereignty of the States." Compl. ¶ 1, ECF No. 1. Arizona expects to receive about $4.7 billion under the Rescue Plan. *Id.* ¶ 40. The State requests immediate relief to "enjoin the [offset] provision's enforcement as it applies to Arizona." Mot. for Prelim. Inj. ("PI Mot.") 3, ECF No. 11.

## LEGAL STANDARDS

"A preliminary injunction is an extraordinary remedy that may be awarded only if the plaintiff clearly shows entitlement to such relief." *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, 916 F.3d 749, 754 (9th Cir. 2019). In determining whether to issue a preliminary injunction, courts consider the movant's likelihood of success on the merits, the threat of irreparable harm, the balance of the equities, and whether an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where the federal government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Because Arizona seeks to upend the status quo by enjoining a duly enacted federal statute, it has a higher burden. *See Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc).

## ARGUMENT

## I. ARIZONA LACKS ARTICLE III STANDING

To satisfy the "irreducible constitutional minimum" of Article III standing—as is required to invoke this Court's jurisdiction—Arizona must first demonstrate "a concrete and particularized" injury in fact that is "actual or imminent." *Lujan v.*

*Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). In a suit to enjoin the future enforcement of a statute, "the injury-in-fact requirement" demands that the plaintiff "alleg[e] an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and [that] there exists a credible threat of [enforcement] thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotation omitted).

Arizona cannot meet that standard because its asserted injuries are hypothetical and speculative. Its complaint and preliminary-injunction motion are silent as to how it intends to use Rescue Plan funds, let alone whether it plans to use them in a manner inconsistent with the offset provision. Under that provision, a State may not use the new federal funds to offset a reduction in net tax revenue that results from changes in state law. 42 U.S.C. § 802(c)(2)(A). But Arizona does not allege that it has enacted any tax cuts, let alone tax cuts that would (taken together with any tax increases) reduce net tax revenue. Nor does it allege that it intends to use Rescue Plan funds to offset any reduction in its net tax revenue. Arizona does nothing more than guess about how it might be injured. *See, e.g.*, PI Mot. 12 ("*If* The Tax Mandate Unambiguously Prohibits Tax Cuts Broadly, It Is Unconstitutional." (emphasis added)); *id.* at 7 (discussing "potentially broad" interpretation of the statute); *id.* at 10 (posing a litany of hypothetical "questions"); Compl. ¶¶ 6, 9, 12, 22, 39 (relying on similar contingencies or hypotheticals).

The Arizona Legislature's various tax-reduction proposals do not strengthen the State's position. *See* PI Mot. 6. The State has not enacted any tax law, shown that the law will decrease net tax revenue, or alleged any intent to use Rescue Plan funds to offset that hypothetical reduction. In other words, merely proposing a tax cut is *not* itself the "course of conduct arguably affected with a constitutional interest" and "proscribed by a statute" required for pre-enforcement standing. *Driehaus*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)).

The offset provision only restricts using Rescue Plan funds to offset a reduction in net tax revenue resulting from a change in law, not any tax change on its own.

Unable to demonstrate that the Rescue Plan restricts any conduct that Arizona intends to undertake, let alone that any recoupment is imminent, the State asserts a general intrusion on its "sovereign interests." Compl. ¶¶ 20–22; *see* PI Mot. 17. But no State has a sovereign interest in using *federal funds* distributed under the Rescue Plan to offset a reduction in net tax revenue. And Arizona, of course, retains the freedom to decline the funds.

Arizona's reliance on its sovereign taxing authority and its "power to create and enforce a legal code" also cannot be reconciled with the Supreme Court's decision in *Massachusetts v. Mellon*, which held that Article III jurisdiction is not satisfied by raising "abstract questions . . . of sovereignty" related to funding conditions, but only by "the actual or threatened operation of the statute"—precisely what Arizona has failed to demonstrate here. *Compare* 262 U.S. 447, 478–79, 484–85 (1923), *with* Compl. ¶¶ 20–21 *and* PI Mot. 17. Contrary to Arizona's cited cases, no concrete manifestation of its sovereign interests are at stake here. *See Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018) (concerning a federal court injunction barring implementation of a state statute); *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989) (concerning whether a state statute had been preempted by federal law). As noted, Arizona has not alleged any plan to use Rescue Plan funds to offset a reduction in net tax revenue resulting from a change in state law, and even then, only federal money—not state power—would be at stake.

Arizona's cursory assertion that the offset provision harms the State by creating uncertainty over "the scope of its prohibition" and the "risk" of recoupment are also unavailing. Compl. ¶ 22. Again, Arizona can alter taxes as it deems appropriate, with no effect on the amount of its grant, if it does not offset a reduction in net tax revenue with Rescue Plan funds. And the State need not certify and then

receive funds until after Treasury issues its implementing regulations. Indeed, Arizona's reliance on *Arlington Central* only underscores that disputes over the clarity of grant conditions are resolved, as there, in the context of a concrete controversy—not in the abstract. *See* PI Mot. 9–10 (citing *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006)).

For similar reasons, even if Arizona had Article III standing, its challenge to the offset provision would not be ripe. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807–08 (2003). Arizona's claimed harm here rests on the potential recoupment of some Rescue Plan funds based on the State's speculation over how the Secretary may implement the Act. *See* PI Mot. 2–3, 7, 10, 12 & n.2; *Alcoa, Inc. v. Bonneville Power Admin.*, 698 F.3d 774, 793 (9th Cir. 2012). But before recoupment even comes into play, the Treasury Department will issue "necessary or appropriate" regulations. 42 U.S.C. § 802(f). Then, Arizona must: submit a certification, *id* § 802(d)(1), receive the funds from the Treasury, enact state tax law changes, show a reduction in net tax revenue due to those changes, and then use Rescue Plan funds to offset that reduction. So the State is nowhere close to some "concrete action applying [Treasury's] regulation to [Arizona's] situation in a fashion that harms or threatens to harm [it]." *Nat'l Park Hosp. Ass'n*, 538 U.S. at 808; *see Mont. Env't Info. Ctr. v. Stone-Manning*, 766 F.3d 1184, 1190 (9th Cir. 2014). Particularly given the extraordinary nature of Arizona's requested injunction, it is critical to ensure that the jurisdictional prerequisites for this suit are satisfied. *See Pub. Serv. Comm'n of Utah v. Wycoff Cnty.*, 344 U.S. 237 (1952).

## II.   ARIZONA IS NOT LIKELY TO SUCCEED ON THE MERITS.

On the merits, Arizona has not come close to demonstrating that Congress exceeded the bounds of its Spending Clause authority. The Constitution empowers Congress to raise and spend revenue to "provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Congress "may, in the exercise of its spending power, condition its grant of funds to the States

upon their taking certain actions that Congress could not require them to take." *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 686–87 (1999); *NFIB*, 567 U.S. at 576; *Dole*, 483 U.S. at 207. But Congress's Spending Clause authority is subject to certain limitations. Congress must use its spending power in pursuit of "the general welfare" and ensure that its "conditions on the receipt of federal funds" are related to the federal interest. *Dole*, 483 U.S. at 206–07. Congress's "desire[] to condition the States' receipt of federal funds" must be unambiguous. *Id.* at 207. And Spending Clause conditions must not violate "other constitutional provisions" or, in some circumstances, be "coercive." *Id.* at 208, 211.

In this case, Arizona contends that the offset provision violates the Spending Clause and the Tenth Amendment. *See id.* at 207. But Arizona bears a heavy burden to demonstrate that the offset provision is "unconstitutional in all its applications." *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019); *United States v. Morrison*, 529 U.S. 598, 607 (2000); *see also Wash. State Grange v. Wash. State Republican Party,* 552 U.S. 442, 450 (2008). Here, Congress has validly exercised its Spending Clause authority, and Arizona's arguments fail.

## A. Congress Validly Exercised its Spending Clause Authority to Restrict the Use of Rescue Plan Funds.

The Rescue Plan is a lawful exercise of Congress's Spending Clause authority. Designed to assist in the Nation's economic recovery during and following a pandemic, the Rescue Plan appropriates nearly $200 billion in new federal funding for States and the District of Columbia. 42 U.S.C. § 802(b)(3)(A). With that funding, States have considerable flexibility to "mitigate the fiscal effects" of the COVID-19 pandemic as they see fit within the broad parameters specified by Congress. *Id.* § 802(a)(1), (c)(1). Unsurprisingly, Congress sought to ensure that its monetary outlay would be used as intended. To that end, it included a guardrail that prohibits States that choose to accept the federal money from using those funds to "directly or indirectly offset a reduction" in "net tax revenue" resulting

from changes in state law. 42 U.S.C. § 802(c)(2)(A).

The offset provision is, by any measure, a modest restriction on an otherwise generous outlay of federal funds. By its plain terms, the offset provision applies only when a State uses Rescue Plan funds to "offset" a reduction in "net" tax revenue resulting from changes in state law. *Id.* That restriction is not implicated if reductions in some taxes are balanced with increases in others because no "net" tax revenue reduction would then occur. A State also does not transgress the limitation if it does not "use" Rescue Plan funds to "offset" a reduction in net tax revenue. *Id.* The term "use" connotes "volitional" "active employment" of federal funds. *Voisine v. United States*, 136 S. Ct. 2272, 2278–79 (2016). And the term "offset" means "[t]o balance" or "compensate for." *Offset*, Black's Law Dictionary (11th ed. 2019). Contrary to Arizona's suggestion, PI Mot. 10, the Act's reference to States "directly or indirectly" offsetting a reduction in net tax revenue does not alter the statutory meaning. Both "directly" and "indirectly" are adverbs that cannot "alter the meaning of the word" that they modify (here, "offset"). *Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 878 (2019). It remains true that the statute restricts only the use of Rescue Plan funds to offset reductions in net tax revenue, not every form of tax reduction. If Congress had sought to prohibit *every* reduction in taxes, PI Mot. 2, it could easily have said so explicitly.

Taken together, this language simply ensures that the federal funds are not employed to finance state tax cuts that decrease net tax revenue. *See Citizens Bank of Md. v. Strumpf*, 516 U.S. 16, 18–19 (1995) (describing "offset" as balancing out a specific loss with another specific gain). But States routinely offset reductions in net tax revenue by other means. And the Act specifies that even if a State uses the new federal funds to offset a reduction in net tax revenue, the consequence is proportionate to the misuse: the State must repay only the amount of federal money it used to offset the reduction in net tax revenue. 42 U.S.C. § 802(e).

Congress has broad leeway in establishing permissible uses of federal funds. And Congress has an overriding interest in ensuring that the new Rescue Plan funds will be used for the broad categories of state expenditures it identified and not others Congress chose not to support. *See Sabri v. United States*, 541 U.S. 600, 608 (2004) ("The power to keep a watchful eye on expenditures . . . is bound up with congressional authority to spend in the first place."). This is evident from the offset provision itself, which is titled "[f]urther restriction on *use of funds*" and applies only to a State's "use [of] the funds provided under this section." 42 U.S.C. § 802(c)(2) (emphasis added).

Arizona briefly contends that the Rescue Plan's conditions on the use of funds are not *related* to the funding program. PI Mot. 12–13. But it is difficult to imagine how they could be *more* related to the funding program because they specify the uses to which a State may and may not devote the federal funds. That sort of statutory guardrail is by definition "germane[]" because it ensures that federal funds are used for the public-health and economic-recovery "federal purposes" of the spending program. *Dole*, 483 U.S. at 208. Congress acted well within its Spending Clause authority by both describing broad categories of permissible uses and proscribing certain narrow uses. The offset provision simply ensures that Rescue Plan funds "are spent according to [Congress's] view of the 'general Welfare.'" *NFIB*, 567 U.S. at 580.

Other Spending Clause legislation illustrates that the Rescue Plan and its offset provision advance a valid federal purpose: provisions that require States to maintain their existing fiscal efforts as a condition of receiving federal funds are an uncontroversial and familiar exercise of Congress's spending power. *See, e.g.*, *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 663, 673–74 (1985) (upholding a funding provision of Title I that required States to supplement state education spending); *Mayhew v. Burwell*, 772 F.3d 80, 82 (1st Cir. 2014) (upholding the Affordable Care Act's requirement that States accepting Medicaid funds maintain their state-level

Medicaid eligibility standards for children for a specified period); *S.C. Dep't of Educ. v. Duncan*, 714 F.3d 249, 252 (4th Cir. 2013) (describing provision in the Individuals with Disabilities Education Act, which generally requires the Secretary to reduce a State's grant by the same amount by which the State has failed to maintain spending for special education for children with disabilities); *Kansas v. United States*, 214 F.3d 1196, 1197 (10th Cir. 2000) (noting similar requirement in the Temporary Assistance to Needy Families program).

As these cases reflect, statutory provisions that prevent federal funds from being used to displace state efforts are both common and undoubtedly within Congress's authority. And the offset provision is even less proscriptive than those in the cases cited above: it does not mandate any particular spending or taxation level but merely prevents States from using federal funds to offset a reduction in net tax revenue. With the Rescue Plan, Congress gave States the flexibility to determine which of the broadly defined permissible uses of the new funds are most appropriate to their circumstances. *See* 42 U.S.C. § 802(c)(1). And consistent with that generous, four-year outlay of funding, Congress simply sought the assurance that States would not displace their own tax revenue sources with the federal funds that Congress had appropriated for other purposes.

## B. The Rescue Plan Provides Clear Notice of the Funding Condition.

In light of the plain text of the statute, Arizona cannot prevail on its argument that the offset provision is unconstitutionally ambiguous. PI Mot. 8–12. In *Pennhurst State School & Hospital v. Halderman*, the Supreme Court declared that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." 451 U.S. 1, 17, 24 (1981). But that is not an onerous requirement: Congress must provide only "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" certain conditions. *Id.* at 25. The idea is simply to keep Congress from "surprising

participating States with post-acceptance or retroactive conditions." *NFIB*, 567 U.S. at 584 (quoting *Pennhurst*, 451 U.S. at 25); *see City of Los Angeles v. Barr*, 929 F.3d 1163, 1174–75 (9th Cir. 2019). And when Congress makes clear that a State's acceptance of federal funds requires agreement to certain conditions, the details of those conditions can be set out in agency regulations that specify the parameters of a condition on federal grants. *Bennett*, 470 U.S. at 669–72.

Here, "a state official who is engaged in the process of deciding whether the State should accept [Rescue Plan] funds and the obligations that go with [them]" would "understand that one of the obligations of the Act" is to not use Rescue Plan funds to offset a reduction in net tax revenue resulting from changes in state law. *Arlington Cent. Sch. Dist. Bd.*, 548 U.S. at 296. That distinguishes this case from *Arlington Central*, which held that the text of the Individuals with Disabilities in Education Act (IDEA)—allowing an award of "reasonable attorneys' fees as part of the costs" to parents prevailing in IDEA suits—was insufficiently broad to place States on notice that they might need to reimburse expert fees. *Id.* at 297–99. Unlike the IDEA, the Rescue Plan plainly establishes the existence of conditions on the use of funds (§ 802(c)), requires States to certify that they will use the funds for the intended purposes and to report those uses (§ 802(d)), informs States that the potential consequence of non-compliance is the recoupment of no more than the portion of the funds used to offset a net tax revenue reduction (§ 802(e)), and permits the Secretary to implement these provisions by regulation (§ 802(f)). "Nothing more is required under *Pennhurst*, which held that Congress need provide no more than 'clear notice' to the [S]tates that funding is conditioned upon compliance with certain standards." *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005) (citing *Pennhurst*, 451 U.S. at 25); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (noting that "there was sufficient notice under *Pennhurst* where a statute made clear that some conditions were placed on the receipt of federal funds"); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).

Arizona attempts to demonstrate unconstitutional ambiguity by posing "open questions." PI Mot. 10, 12. But "Congress is not required to list every factual instance in which a [S]tate will fail to comply with a condition," which would be potentially "impossible." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *Van Wyhe v. Reisch*, 581 F.3d 639, 650 (8th Cir. 2009) ("[S]etting forth every conceivable variation in the statute is neither feasible nor required."); *see Bennett*, 470 U.S. at 666 (explaining that "every improper expenditure" need not be "specifically identified and proscribed" in the statute); *Jackson*, 544 U.S. 167 at 183 (same); *Davis*, 526 U.S. at 650 (same). Congress must simply "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Mayweathers*, 314 F.3d at 1067; *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (distinguishing statutes where it is "unclear [] whether the [S]tates incurred any obligations … by accepting federal funds"); *see Charles v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) ("[T]he existence of the conditions [must be] clear, such that States have notice that compliance with the conditions is required." (citations omitted)). The offset provision passes that bar.

Even if the bar were higher, it would make no difference. The Rescue Plan provides in direct terms that States cannot use the federal funds to offset a reduction in net tax revenue resulting from changes in state law. *See* Section II.A., *supra*. As the Supreme Court has repeatedly confirmed, more particularized questions that arise in the course of implementing the Act can be addressed by Treasury Department regulations, *see* 42 U.S.C. § 802(f), and by other guidance.

## C.    The Rescue Plan Is Not Coercive.

Arizona does not raise an independent coercion or anti-commandeering argument. The State only contends that a broad interpretation of the offset provision that "prohibit[s] any change in tax policy whatsoever that reduces tax revenue,"—which the federal government has nowhere adopted—would be "coercive" and intrude on its sovereign taxing authority. PI Mot. 12–16. But as explained above,

the State's argument rests entirely on an erroneous interpretation of the offset provision because the provision simply forbids States to "use" Rescue Plan funds to "offset" a reduction in "net tax revenue" resulting from changes in state law. *See* Section II.A., *supra*. And if Arizona does so, the only consequence under the Act would be to lower the amount of its federal grant by the amount of the offset.

Arizona's coercion argument also fundamentally misunderstands governing law. The Supreme Court has held that "Congress may attach appropriate conditions to federal taxing and spending programs to preserve its control over the use of federal funds." *NFIB*, 567 U.S. at 579; *Steward Mach. Co. v. Davis*, 301 U.S. 548, 590–91 (1937) (holding that where Congress places conditions on how federal funds are used, "[i]n such circumstances . . . inducement or persuasion does not go beyond the bounds of power"). And even when the Supreme Court has applied a coercion analysis, it has never extended to funding conditions that "safeguard [the U.S.] treasury" by "govern[ing] the use of the funds" that have been newly appropriated. *NFIB*, 567 U.S. at 578–80; *Dole*, 483 U.S. at 210; *Steward Mach. Co.*, 301 U.S. at 590–91; *New York v. United States*, 505 U.S. 144, 171 (1992) (not undertaking a "coercion" inquiry where "Congress has placed conditions—the achievement of the milestones—on the receipt of federal funds"). Where, as here, Congress merely restricts how States use newly appropriated federal funds, a coercion analysis is inapplicable. *See, e.g.*, *Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183–84 (5th Cir. 2020); *Miss. Comm'n on Env't Quality v. EPA*, 790 F.3d 138, 179 (D.C. Cir. 2015).

*NFIB's* reasoning also forecloses Arizona's argument that the offset provision is coercive or commandeering. Unlike the statute challenged here, the Affordable Care Act provision at issue in *NFIB* threatened States with the loss of their *preexisting* Medicaid funding unless they agreed to take part in the ACA's expansion of Medicaid coverage. *NFIB*, 567 U.S. at 576. In the Court's controlling opinion, the Chief Justice explained that the statute's primary constitutional flaw

was the threat to cut off all *existing* Medicaid funding if a State did not agree to the Medicaid expansion.[2] *Id.* at 579–80. As the Court summarized, "Congress is not free" to "*penalize* States that choose not to participate in that new program by taking away their *existing* Medicaid funding." *Id.* at 585 (emphases added).

By contrast, the only funds regulated by the offset provision are the funds that Congress appropriated as part of the Rescue Plan itself. *See* 42 U.S.C. § 802(a)–(c). Unlike *NFIB*, States do not suffer the "penalty" of losing *preexisting* funds for an established program if they decline to accept Rescue Plan funds with their attendant conditions. *See NFIB*, 567 U.S. at 585. Indeed, the funding condition at issue here is notably more modest than the prospective funding condition that *NFIB* indicated was permissible. *Id.* at 576, 585 (explaining that Congress could make the *entirety* of the new federal funds provided — totaling $100 billion per year — contingent on a State's adoption of that new program). A State's receipt of Rescue Plan funds is not an all-or-nothing proposition dependent on compliance with the offset provision. The Act provides that if a State were to use Rescue Plan funds to offset a reduction in net tax revenue, it could lose no more than those funds used for the offset. *See* 42 U.S.C. § 802(e)(1). And, again, there is no threat to *preexisting* funds if States decline the Rescue Plan's generous outlay of federal money.

For the same reasons, Arizona's remaining arguments fail. PI Mot. 13–16. As Arizona admits, PI Mot. 8 n.1, the inquiry under both the Spending Clause and the Tenth Amendment are the same. *New York*, 505 U.S. at 177; *NFIB*, 567 U.S. at 578–79. In cases like this one — where "a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds" — the "state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer." *NFIB*, 567 U.S. at 578; *New York*, 505 U.S. at 168. If Arizona dislikes the

---

[2] Because Chief Justice Roberts, writing for a plurality, "struck down Medicaid expansion on narrower grounds than the joint dissent, the plurality opinion is binding." *Gruver*, 959 F.3d at 183 n.5; *Miss. Comm'n on Env't Quality*, 790 F.3d at 176 & n.22; *Mayhew*, 772 F.3d at 88–89.

funding condition, it is free to decline the generous federal aid in whole or in part. Arizona's voters know where to turn if they like, or dislike, the State's choice.

### III. THE BALANCE OF HARMS AND THE PUBLIC INTEREST PRECLUDE A PRELIMINARY INJUNCTION.

1. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 555 U.S. at 24. Arizona is not entitled to this "extraordinary remedy" because it cannot demonstrate that it is "likely to suffer irreparable harm in the absence of preliminary relief." *Id.* at 20. Arizona's burden to show irreparable harm is higher than for standing. *See, e.g., Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Even if Arizona were able to establish standing, it fails to establish irreparable harm. The State cites no plan to reduce net tax revenue or use Rescue Plan funds to offset that reduction. Accordingly, Arizona's alleged harms are "too attenuated and conjectural" to warrant the relief it seeks. *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 675 (9th Cir. 1988).

Importantly, irreparable harm means "harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). Even if Arizona were to accept the conditioned funding and nonetheless use those funds to offset a reduction in net tax revenue (potentially facing recoupment), the State would have an "adequate legal remedy" in any recoupment proceeding. *Id.* Instead, Arizona seeks to preliminarily declare the offset provision's meaning and preempt any recoupment, PI Mot. 17, but that potential recoupment action is where the State should make its arguments. With such action nowhere in sight, Arizona's challenge is premature.

Despite all this, Arizona argues, in a solitary paragraph, that the offset provision could inflict irreparable injury *if* interpreted broadly by interfering with the State's "sovereignty." *Id.* As discussed above, however, there is no intrusion on state sovereign interests or essential functions here. *See* Sections I.–II., *supra*. The two cases Arizona cites that involved allegedly depriving a state of its ability

to pursue its sovereign functions therefore involved harms "for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal.*, 757 F.3d at 1068; *see* PI Mot. 17 (citing cases). Here, Arizona is concerned that it might someday need to repay money it receives under the Act. Such future injury would categorically fail to qualify as irreparable because it can be cured by the restoration of any improperly recouped funds if any "harm" ever materializes. *See Ariz. Dream Act Coal.*, 757 F.3d at 1068. Indeed, courts have routinely characterized the potential loss of money as a quintessential example of harm that is not irreparable. *See, e.g.*, *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

**2.** Arizona is on no firmer ground in urging that an injunction against enforcement of the offset provision "will not harm anyone" because "[f]ederal grants can still be paid." PI Mot. 17. In other words, Arizona asserts that an intrusion on its own alleged sovereign interests would constitute irreparable harm, but that enjoining an Act of Congress would not irreparably harm Defendants.

The Supreme Court takes a different view. "The presumption of constitutionality which attaches to every Act of Congress is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships." *Walters v. Nat'l Ass'n of Radiation Survivors*, 468 U.S. 1323, 1324 (1984) (Rehnquist, J., in chambers). "Any time a [government] is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Thus, an injunction would irreparably harm the United States and undermine the public interest.

## CONCLUSION

The Court should deny Arizona's preliminary-injunction motion. If the Court were to enjoin any aspect of the Rescue Plan, the injunction should be limited to Arizona. *See Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018); *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

DATED: April 30, 2021                    Respectfully submitted,

                                         BRIAN M. BOYNTON
                                         Acting Assistant Attorney General

                                         BRIAN D. NETTER
                                         Deputy Assistant Attorney General

                                         ALEXANDER K. HAAS
                                         Director, Federal Programs Branch

                                         BRIGHAM J. BOWEN
                                         Assistant Director, Federal Programs Branch

                                         */s/ Stephen Ehrlich*
                                         MICHAEL P. CLENDENEN
                                         STEPHEN EHRLICH
                                         CHARLES E.T. ROBERTS
                                         Trial Attorneys
                                         Civil Division, Federal Programs Branch
                                         U.S. Department of Justice
                                         1100 L Street, NW
                                         Washington, DC 20005
                                         Phone: (202) 305-9803
                                         Email: stephen.ehrlich@usdoj.gov

                                         *Counsel for Defendants*