1  **MARK BRNOVICH**
   **ATTORNEY GENERAL**
2  (Firm State Bar No. 14000)
3  Joseph A. Kanefield (No. 15838)
   Brunn (Beau) W. Roysden III (No. 28698)
4  Drew C. Ensign (No. 25463)
5  Wilson Freeman (admitted pro hac vice)
   Robert J. Makar (No. 33579)
6  2005 N. Central Ave
7  Phoenix, AZ 85004-1592
   Phone: (602) 542-8958
8  Joe.Kanefield@azag.gov
   Beau.Roysden@azag.gov
9  Drew.Ensign@azag.gov
10 Wilson.Freeman@azag.gov
   Robert.Makar@azag.gov
11 *Attorneys for Plaintiff State of Arizona*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

State of Arizona,

    Plaintiff,

v.

Janet Yellen, in her official capacity as Secretary of the Treasury et al.;

    Defendants.

No. 2:21-cv-00514-DJH

**STATE'S FINAL BRIEF REGARDING PERMANENT RELIEF**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION ......................................................................................................... 1

ARGUMENT ................................................................................................................. 2

    I.       This Court Has Jurisdiction .......................................................................... 2

         A.    The Tax Mandate Inflicts Cognizable Injury-In-Fact On Arizona ............... 2

              1.    The Tax Mandate's Ambiguity Alone Establishes Standing ............. 3

              2.    The Tax Mandate Raises A "Realistic Danger" Of Enforcement ....... 4

              3.    The Tax Mandate Imposes Compliance Costs On Arizona ............... 5

         B.    Arizona's Claim Is Not Moot ...................................................................... 5

    II.      The Tax Mandate Is Unconstitutional .......................................................... 6

         A.    The Tax Mandate Is Unconstitutionally Ambiguous ................................. 7

              1.    Congress Must Present The State "Clear Notice" Of The *Conditions* ..................................................................................... 7

              2.    The IFR Cannot Cure This Constitutional Deficiency ....................... 8

         B.    Defendants Have Not Satisfied The Relatedness Requirement .................. 9

         C.    The Tax Mandate Is Unconstitutionally Coercive ...................................... 9

    III.    Declaratory Relief And A Permanent Injunction Are Appropriate Here .... 11

CONCLUSION ............................................................................................................ 11

# TABLE OF AUTHORITIES

**CASES**

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
  548 U.S. 291 (2006). ...............................................................................................7

*Babbitt v. United Farm Workers Nat. Union*
  442 U.S. 289 (1979) ................................................................................................4

*Bennett v. Kentucky Dep't of Educ.*
  470 U.S. 656 (1985) ................................................................................................8

*California v. Texas*
  141 S. Ct. 2104 (2021) .........................................................................................2, 4

*Chafin v. Chafin*
  568 U.S. 165 (2013) ................................................................................................6

*Chong v. Dist. Dir., I.N.S.*
  264 F.3d 378 (3d Cir. 2001) ....................................................................................6

*Com. of Va., Dep't of Educ. v. Riley*
  106 F.3d 559 (4th Cir. 1997) ...................................................................................9

*eBay Inc. v. MercExchange, L.L.C.*
  547 U.S. 388 (2006) ..............................................................................................11

*Lujan v. Defs. of Wildlife*
  504 U.S. 555 (1992) ............................................................................................2, 3

*Mayweathers v. Newland*
  314 F.3d 1062 (9th Cir. 2002) .............................................................................7, 8

*McCulloch v. Maryland*
  17 U.S. 316 (1819) ..................................................................................................2

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
  567 U.S. 519 (2012). ..........................................................................................4, 10

*New York v. United States*
  505 U.S. 144 (1992) ..............................................................................................10

*Ohio v. Yellen*
  No. 1:21-CV-181, 2021 WL 2712220 (S.D. Ohio July 1, 2021). ..........2, 3, 6, 7, 8, 9, 11

*Parker v. D.C.*
  478 F.3d 370 (D.C. Cir. 2007). ................................................................................2

*Printz v. United States*
   521 U.S. 898 (1997) ..............................................................................................................11

*Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*
   554 U.S. 269 (2008) ................................................................................................................5

**STATUTES**

42 U.S.C. § 802(d)..........................................................................................................................5

**REGULATIONS**

*Coronavirus State and Local Fiscal Recovery Funds*
   86 Fed. Reg. 26,786 (May 17, 2021)........................................................................................1

**OTHER AUTHORITIES**

3533.1 Doctrinal Foundations
   13B Fed. Prac. & Proc. Juris. § 3533.1 (3d ed.)......................................................................6

**INTRODUCTION**

The Tax Mandate in the American Rescue Plan Act (the "ARPA" or "the Act") is among the greatest infringements on State sovereignty in American history. ARPA has coerced the States into accepting an ambiguous condition limiting their sovereign fiscal authority through 2024, effectively threatening the States with billions in claw backs if they enact policies that meet Defendants' disapproval. This centralization of authority is squarely contrary to the structure of the Constitution and should be enjoined.

The principal problem with the Tax Mandate is its ambiguity. The statutory language, which has numerous significant gaps and prohibits any "indirect[] offset[s]" of "net tax revenue," gives States little-to-no clue as to what it means. In fact, the requirement it imposes has been subject to at least three mutually exclusive readings in this litigation alone. First, the Tax Mandate could be read expansively, to prohibit any change in tax policy which reduces tax revenue against the previous year ("Manchin Interpretation"). *See* Doc. No. 11 at 5-6. Second, Defendants have suggested that the Tax Mandate has no real effect at all since, in their view, "indirectly" as an "adverb[]" "cannot alter the meaning of … word[s]." Doc. 31 at 9 ("Narrow Interpretation"). Finally, in an Interim Final Rule ("IFR") published on May 17, 2021, the Treasury Department promulgated a comprehensive reporting and monitoring scheme, purportedly to detect these indirect offsets ("Treasury's Interpretation"). *Coronavirus State and Local Fiscal Recovery Funds*, 86 Fed. Reg. 26,786 (May 17, 2021) ("IFR" or "Interim Final Rule").

When this lawsuit was filed, it was impossible for Arizona to know which of these shifting and contradictory interpretations would carry the day. Although confronted with this ambiguity, Arizona nonetheless chose to accept the enormous funds offered under the Act. Far from solving Arizona's problems, this has multiplied them. Now, the State— which has also passed substantial tax cuts in its latest budget—is facing a pall of uncertainty for the next four years, a real risk of a recoupment action, and will be forced to make tax policy essentially subject to the discretionary approval of the Secretary.

This situation is intolerable under the Constitution. The federal government's

response—rather than to defend this policy on the merits—is largely to assert that this Court lacks jurisdiction to reach them. Under Defendants' view, Arizona can either: (1) make all tax policy for four years under a Sword of Damocles, while prepared to fight the Secretary's inevitable recoupment proceedings; or (2) surrender State taxing authority—a core element of State sovereignty. *See McCulloch v. Maryland*, 17 U.S. 316, 429 (1819). Neither of these "solutions" is required—or even tenable—under Article III.

The Southern District of Ohio recently granted a permanent injunction against enforcement of the Tax Mandate against Ohio. *Ohio v. Yellen*, No. 1:21-CV-181, 2021 WL 2712220, at *2 (S.D. Ohio July 1, 2021). The *Ohio* court correctly determined both that Ohio had standing to challenge the Tax Mandate and that it was unconstitutional. *Id.* This Court should as well.

## ARGUMENT

**I.  This Court Has Jurisdiction**

Defendants have raised two main jurisdictional objections: contending that (1) Arizona lacks standing or this case is not ripe, as Arizona has not suffered any injury in fact, or alternatively that (2) this case is moot by virtue of Arizona's acceptance of ARPA funds. *See* Tr.30-32. Neither objection has merit.

**A. The Tax Mandate Inflicts Cognizable Injury-in-Fact on Arizona**

A plaintiff has standing if it can "allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *California v. Texas*, 141 S. Ct. 2104, 2113 (2021). The existence of that injury depends on "the facts *as they exist when the complaint is filed*." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992). For purposes of evaluating whether jurisdiction exists, this Court "must assume arguendo the merits of [the State's] legal claim." *Parker v. D.C.*, 478 F.3d 370, 377 (D.C. Cir. 2007).

Applying these principles, Arizona has suffered a personal and concrete injury from the unconstitutional ambiguity in the Tax Mandate in at least three ways. First, Arizona has suffered sovereign injury from bare presentment of the Tax Mandate's unconstitutional

ambiguity. Second, Arizona recently signed a budget providing for a $1.9 billion tax cut, confirming that Arizona faces a real risk of a Tax Mandate enforcement action against it.[1] Third, the Tax Mandate and its IFR directly impose irrecoverable compliance costs.

**1. The Tax Mandate's Ambiguity Alone Establishes Standing**

Although Congress has discretion under the Spending Clause to determine how federal money is spent, when it places conditions on grants to the States those conditions must be expressed "unambiguously" to enable the States to engage in "knowing and voluntary" acceptance. *See* Doc. 11 at 8-12. If Congress violates this requirement, State sovereignty is unconstitutionally encroached because States must plan and execute policy against a background of uncertainty. Most significantly, this includes the States' determination of whether to exercise their sovereign prerogative to accept or decline the federal offer. The *Ohio* court recognized this as a key injury which supported Ohio's standing, determining that the presentment of an unconstitutionally ambiguous deal is alone fully sufficient to confer Article III standing. *Ohio*, 2021 WL 2712220 at *6. This is consistent with common sense: if a State cannot even understand what an offer *means* at the time that it can make a choice to accept, that injures the State.

This injury to Arizona's sovereign interests was ongoing when Arizona's Complaint was filed. Under ARPA, Arizona had the power to accept or decline the funding immediately. Arizona's rights were thus violated when the ambiguous Tax Mandate was signed into law. Arizona's subsequent, post-Complaint acceptance cannot affect the standing injury. *See Lujan*, 504 U.S. at 569 n.4. In addition, Arizona has argued that the State was coerced into accepting the Tax Mandate. As this Court acknowledged at argument, this is a post-pandemic world, where States are being offered 40% of their budget in funding attached to a condition capable of at least three interpretations. *See* Tr.36. In this context, States that surrender any taxing authority to the Federal Government suffer

---

[1] *See*, *e.g.*, Jonathan J. Cooper, *Gov. Doug Ducey signs budget that includes major tax cut plan*, AZFamily (June 30, 2021), https://www.azfamily.com/news/politics/arizona_politics/arizona-governor-doug-ducey-signs-budget/article_fa8ff2e4-58cd-53dd-887f-6f514e56a2e4.html.

a sovereign injury at the point they "accept" the funds.

The viability of the injury at this stage is underscored by *NFIB v. Sebelius*, 567 U.S. 519 (2012). *NFIB* involved a Spending Clause challenge brought by States to a provision of the Affordable Care Act that did not go into effect until four years after the challenge was filed. *See id.* Yet *none* of the several opinions of the Supreme Court Justices even *hinted* at doubts as to whether States had standing to raise their pre-enforcement challenges. This strongly implies that standing must exist in the present context, where the unconstitutional condition is being imposed immediately.

### 2. The Tax Mandate Raises A "Realistic Danger" Of Enforcement

Injury in fact is present when a party faces a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *California*, 141 S. Ct. at 2114 (*quoting Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). Arizona easily faced—and, given its subsequent $1.9 billion tax cut, continues to face—such a danger. Requiring the State to wait to challenge an unconstitutional enforcement action is neither required by—nor appropriate under—Article III. Arizona has a significant stake in the meaning of the Tax Mandate *now*.

The Tax Mandate is so impossible to understand as to be unconstitutionally ambiguous. Nor have Defendants disavowed bringing recoupment actions against the State. On the contrary, Treasury has recently promulgated an IFR with a complex scheme for monitoring subsequent developments for unlawful indirect offsets. This is just like *Babbitt*: there, the statute also had never been applied, and the State had not disavowed the intent to enforce the statute. *Babbitt*, 442 U.S. at 302. As the Court explained, standing existed there because "Appellees [we]re thus not without some reason in fearing prosecution." *Id.* So too here.

Arizona's decision to certify that it did not intend to violate the ARPA does not undermine this conclusion. First, as Arizona has alleged, the Tax Mandate's sweep is so broad and uncertain, Arizona could reasonably certify under its own reasonable reading of the language. Further, even under Treasury's regulations, the Tax Mandate extends to

4

inadvertent decreases in tax revenue and contemplates Treasury effectively reviewing past conduct for indirect offsets. *See*, *e.g.*, IFR, https://www.federalregister.gov/d/2021-10283/p-398. Given the size and scope of Arizona's tax cuts and the breadth of the Tax Mandate's unconstitutionally ambiguous language, it defies reason to insist that Arizona's certification is sufficient to protect it from prosecution.

### 3. The Tax Mandate Imposes Compliance Costs On Arizona

Apart from the threat of enforcement and the injury to Arizona's sovereignty, Arizona has standing to challenge the Tax Mandate because it directly imposes compliance costs on the State. Defendants' response points to a section of the ARPA, which requires States to make a "detailed accounting" of "all modifications to the State's … tax revenue sources." *See* Tr.43-44 (citing 42 U.S.C. § 802(d)). That contention is specious because Section 802(d) is far less broad than the Tax Mandate/IFR. Among other things, the Tax Mandate, as implemented in the IFR, requires the States to break out and "identify any sources of funds that have been used to permissibly offset" tax changes. *See* IFR, https://www.federalregister.gov/d/2021-10283/p-393 (requiring the States to "identify and calculate the total value of changes that could pay for revenue reduction due to covered changes and sum these items" and describing the procedures for doing so). Nothing in Section 802(d) requires States to do so. Identifying revenue reduction sources and tracing offsets is not even arguably within the ambit of "the uses of [ARPA] funds" or "modifications to the State's … tax revenue sources." 42 U.S.C. § 802(d).

Nor is the size of the marginal compliance costs relevant to the standing inquiry: Injury that is "personal" and "concrete" suffices regardless of size. *See Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008) (upholding jurisdiction, noting that injury of "perhaps only a dollar or two" would even be sufficient).

### B. Arizona's Claim Is Not Moot

Given this Court's Rule 65(a)(2) consolidation, this Court can issue a declaratory judgment and also enjoin the Secretary from enforcing the Tax Mandate against Arizona. Accordingly, this case is clearly not moot. A case is only moot when it is *impossible* to

grant any effectual relief whatsoever. *See Chafin v. Chafin*, 568 U.S. 165, 172 (2013). Furthermore, the burden of demonstrating mootness falls on the party claiming it. *See* § 3533.1 Doctrinal Foundations, 13B Fed. Prac. & Proc. Juris. § 3533.1 (3d ed.) (citing cases). Defendants have conceded that the IFR has no implication on mootness and have only briefly argued that the State's acceptance of the funding "moots [Arizona's] injury." Tr.31-32. Not so.

As the *Ohio* court explained, even if this Court considers Arizona's uncertainty on whether to accept ARPA funding the "primary" injury and fears that no injunction can cure it, the existence of any "secondary or collateral injuries" suffices to defeat mootness. *Ohio*, 2021 WL 2712220, at *7 (citation omitted). A variety of secondary injuries exist, all of which would can be cured by this Court, thereby ensuring that Arizona retains a concrete stake in this lawsuit. For example, any of the injuries described above constitute such secondary injuries, as *Ohio* recognized. *Id.* But *any* change in policy that Arizona experiences as a result of the unconstitutional ambiguity would also suffice as an interest—"however small"—to defeat mootness. And any uncertainty the State experiences in policymaking as a result of the unconstitutionality would also suffice—for example, in planning tax policy, or in determining how to use spending cuts to offset tax cuts, or in how to spend ARPA funds.

Because an injunction against the enforcement of the Tax Mandate and a declaration as to its unconstitutionality would remedy these harms, this case is not moot.

**II.    The Tax Mandate Is Unconstitutional**

There are four main reasons why the Tax Mandate—which was hastily added to the ARPA, as its drafting reflects—is unconstitutional. First, the Tax Mandate is unconstitutionally ambiguous, and fails to allow States to "knowingly and voluntarily" accept the amorphous conditions it imposes. *See* Doc. No. 11 at 8-12. Second, the Tax Mandate violates the requirement that conditions on spending be related to the "purpose of the federal spending." *See id.* at 12-13. Third, the Tax Mandate induces the States to sell the "essence of their statehood." *See id.* at 13-14. Finally, the Tax Mandate is coercive—

offering the States a "deal" with many-possible interpretations, at a time of serious economic hardship. *See id.* at 14-16.

The State renews all of these arguments. A few points bear emphasis: (1) the statute remains unconstitutionally ambiguous; (2) the condition imposed is unrelated to the purpose of the spending; and (3) the Tax Mandate is unconstitutionally coercive.

## A. The Tax Mandate Is Unconstitutionally Ambiguous

Defendants have always recognized—out of court—that the language of the Tax Mandate, at the very least, raises "a host of thorny questions." See Makar Decl. Ex. Y (testimony of Secretary Yellen). If a State cannot understand and therefore cannot knowingly accept a spending condition—even if a State ultimately "accepts" the funds—the statute violates the Constitution. In this respect, the State is in good company: Secretary Yellen—by her own admission—*also* finds the Tax Mandate to be hopelessly ambiguous, raising a "host of thorny questions" that no *un*ambiguous statute would.

Defendants' response to the State's argument is twofold. First, Defendants have argued the Spending Clause does not require Congress to present clear conditions, and only requires that the existence of conditions be clear. Tr.36 (citing *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002)). Second, Defendants have argued that the IFR can clarify any unconstitutionality. *See, e.g.*, Tr.35.

### 1. Congress Must Present the State "Clear Notice" of the *Conditions*

The Supreme Court in *Arlington Central* could not be clearer: "when Congress attaches conditions…, the conditions must be set out unambiguously." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The Court emphasized that this analysis is analogous to contract, and the question must be viewed "from the perspective of the state official" who must be able to "clearly understand" "the obligations" imposed. *Id.* The *Ohio* court agreed: "it is not sufficient that the State receives funds merely knowing that some kind of strings are attached … Congress must also tell States what those conditions are." *Ohio*, 2021 WL 2712220, at *12.

*Mayweather* (which predated *Arlington*) is not to the contrary. *Mayweather* stands

for the far-more limited proposition that, as the *Ohio* Court recognized, "exactitude is not necessary." *Id. Accord Mayweather*, 314 F.3d at 1067 ("Congress is not required to list every factual instance in which a state will fail to comply with a condition.")

But the Tax Mandate's language provides *no meaningful guidance* as to what is prohibited, uses an incredibly expansive framing, and has several critical gaps, which the *Ohio* court ably explains in detail. 2021 WL 2712220 at *12-*15. By contrast, the condition in *Mayweather* had decades of case law behind it and was well understood by practitioners. To illustrate the ambiguity of the Tax Mandate, at oral argument, Defendants tried to explain the difference between a "direct offset" and an "indirect offset," explaining that the former would involve receiving $2 billion and then "appl[ying] the money to a tax cut" whereas the latter would involve receiving $2 billion, then cutting $2 billion of the State's spending and using "that" money for a tax cut. Tr.35. But the *Ohio* court effectively demolished that artifice, explaining that it "amounts to two slightly different ways of saying the same thing." 2021 WL 2712220, at *14. Money is fungible, as the Secretary acknowledged. Doc. 11 at 2. Moreover, Defendants previously argued that "indirectly" has no meaning at all. *Supra* at 1. Defendants' own admissions, indecision, and shifting positions provide powerful evidence of the Tax Mandate's ambiguity.

The ambiguity in the Tax Mandate goes well beyond a failure to lay out exhaustive factual applications, and cannot be knowingly and voluntarily accepted.

### 2. The IFR Cannot Cure This Constitutional Deficiency

The IFR cannot cure these deficiencies. Defendants suggest that *Bennett v. Kentucky Dep't of Educ.*, 470 U.S. 656, 666 (1985) states otherwise, but this ignores that, in *Bennett*, the Court relied on the fact that "the requisite clarity" was provided by the statute itself. *Id.* And Defendants have ignored the Fourth Circuit's en banc decision in *Riley*, which stated: "It is axiomatic that statutory ambiguity defeats altogether a claim by the Federal Government that Congress has unambiguously conditioned the States' receipt of federal monies" notwithstanding any subsequent regulation. *Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc) (adopting opinion of Luttig, J., dissenting below). The

*Ohio* court did not see the need to reach this issue, instead correctly concluding that ordinary interpretive principles precluded the use of a regulation to cure ambiguous statutory language. *Ohio*, 2021 WL 2712220, at *19.

The ultimate takeaway from the IFR, however, is that, even in a rulemaking where Defendants are filling the statutes' innumerable gaps, they were unable to articulate coherent guidelines on what violates the Tax Mandate. The IFR, rather than clarifying the meaning of the Tax Mandate, simply parrots the statute in several places, or adds new, similarly, vague language. As a result, the IFR merely perpetuates and demonstrates the Tax Mandate's ambiguity.

### B. Defendants Have Not Satisfied The Relatedness Requirement

Spending Clause conditions must be related to the purpose of the spending. Although this is generally a "low-threshold" test, *see Mayweathers*, 314 F.3d at 1067, there must still be "some relationship" between the condition imposed and "the purpose of the federal spending." *Id.* Here, there is no relationship at all—Congress expressly adopted numerous tax cuts in the ARPA, and permits municipalities (but not the States) to cut taxes, implicitly recognizing the importance of tax cuts to macroeconomic recovery. *See* Doc. No. 11, Makar Dec. Exs. G, Z. Further, the Tax Mandate bars tax cuts as far down the road as 2024—well beyond the limits of even "some relationship."

Defendants have only made a token response (Doc. 31 at 10), asserting that because the Tax Mandate only limits "uses to which a State may and may not devote federal funds," the relatedness requirement is not applicable. But the "indirect offset" language reaches far broader than that and effectively establishes a "Tax cuts for me, but not for thee" that is both utterly irrational and completely undefended. And if that is the Tax Mandate's true reach—as the IFR asserts—Defendants have offered no constitutional defense of it. That concession alone requires judgment for the State.

### C. The Tax Mandate Is Unconstitutionally Coercive

The ARPA provides Arizona with $4.9 billion in a time of unparalleled economic challenges. As explained previously, this is nearly 10% of Arizona's projected FY2022

budget. *See* Makar Decl. Ex. T. In *NFIB*, the Court addressed Medicaid spending which "account[ed] for over 20 percent of the average State's total budget, with federal funds covering 50 to 83 percent of those costs." 567 U.S. at 581. These funds are similar in their scale, and this is apart from the fact that the pandemic created unique economic pressures, making this money especially important.[2] In the context of an ambiguous condition, this is coercive: States can treat the Tax Mandate as a black box. They can sign on for the enormous money and certify compliance because they do not know what it means. But as the IFR makes clear, this does not mean the Tax Mandate lacks teeth—only that States have no choice but to hope that it does not bite them.

Defendants argue that, because *NFIB* involved the withdrawal of existing funding, and the Tax Mandate involves only new funding, it cannot be coercive. *See*, *e.g.*, Tr.43-44. This misunderstands *NFIB*; nothing in *NFIB*'s reasoning is limited to preexisting funding. Rather, the fact that preexisting Medicaid funding was at stake was important because that illustrated the *amount* of funds which the States stood to lose. *NFIB*, 567 U.S. at 581. The crucial question is whether the money at stake is a "relatively mild encouragement" or a "gun to the head." *Id.* If it is the latter, then the State is not really "accepting" a condition as a sovereign; rather, its sovereign powers are being unconstitutionally commandeered. *Id.* at 577.

Accordingly, the Tax Mandate is unconstitutionally coercive, amounting to a commandeering of the State taxing power. It should be enjoined.

---

[2] While it is true that the Tax Mandate, if violated, will only cause the State to lose a proportional share of the funds received, this does not undermine the State's coercion argument. First, given the Tax Mandate's ambiguity, there is no way for the State to sure how much it is putting at stake with a particular tax cut; this is an insidious and coercive structure by itself. And given scope of the tax cuts Arizona actually enacted—almost $2 billion—there is still is an enormous sum of money at stake. Second, the harm here is that the State's policymaking apparatus is being commandeered, which happens as long as the State is coerced to enter the program. Even if the State never cut taxes and wholly complied with the Mandate, if it did so because of coercion, this would still violate the values inherent in dual sovereignty. *See New York v. United States*, 505 U.S. 144, 162 (1992) ("[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions.").

### III. Declaratory Relief And A Permanent Injunction Are Appropriate Here

Because this Court has consolidated this action, the only remaining question is whether declaratory relief and a permanent injunction are warranted. All of the requirements for such relief are met here. As to the former, there is no apparent reason (and Defendants have offered none), why this Court should not declare the Tax Mandate to be unconstitutional since it is so. *See* 28 U.S.C. § 2201(a). This Court should similarly issue a permanent injunction, for which all the applicable requirements are met.[3]

As explained above regarding standing, Arizona is suffering several injuries resulting from the Tax Mandate, including injuries to its sovereignty, its policymaking apparatus, and in the form of compliance costs. These injuries plainly cannot be remedied by money damages. *See Ohio*, 2021 WL 2712220, at*21.

With respect to the balance of hardships, as the *Ohio* court recognized, "the Secretary has no judicially cognizable interest in enforcing a provision (like the Tax Mandate) that is unconstitutionally ambiguous. *Id.* Under such an injunction, the Secretary would still be free to enforce the other aspects of ARPA—including the limitations on how ARPA funds are spent, and thus would suffer no cognizable harm. *Id.*

Finally, as to the public interest, the Supreme Court has repeatedly explained that the limits on Congress's spending clause power, and federalism limitations generally, serve to protect our system of "dual sovereigns." This system protects important values, such as political accountability, and encourages individual liberty. *See, e.g.*, *Printz v. United States*, 521 U.S. 898, 921 (1997). *See also Ohio*, 2021 WL 2712220 at *21.

### CONCLUSION

This Court should enjoin the operation of the Tax Mandate against Arizona as unconstitutional and declare it as beyond Congress's power under the Spending Clause.

---

[3] Under *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006), an injunction is appropriate where a party can show that: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

|   |   |
|---|---|
| 1 | **MARK BRNOVICH** |
| 2 | **ATTORNEY GENERAL** |
| 3 | By <u>s/ Drew C. Ensign</u> |
| 4 | Joseph A. Kanefield (No. 15838) |
| 5 | Brunn W. Roysden III (No. 28698) |
|   | Drew C. Ensign (No. 25463) |
| 6 | Wilson Freeman (admitted pro hac vice) |
| 7 | Robert J. Makar (No. 33579) |
|   | *Assistant Attorneys General* |
| 8 | *Attorneys for Plaintiff Arizona* |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |
| 26 | |
| 27 | |
| 28 | |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of July, 2021, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

                         s/ Drew C. Ensign
                         Drew C. Ensign

                         *Attorney for Plaintiff State of Arizona*