Andrew M. Grossman
 *Counsel of Record*
*Admitted Pro Hac Vice*
BAKER & HOSTETLER LLP
Washington Square, Suite 1100
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: 202.861.1500
Facsimile:  202.861.1783
agrossman@bakerlaw.com


Robert Alt
THE BUCKEYE INSTITUTE
88 East Broad Street, Suite 1300
Columbus, Ohio 43215
Telephone: 614.224.4422
robert@buckeyeinstitute.org

*Counsel fo*r *Amicus Curiae*
*The Buckeye Institute*

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Janet Yellen, in her official capacity as Secretary of the Treasury et al;<br><br><br>                    Defendants. | No.: 2:21-cv-514-DJH<br><br>BRIEF OF *AMICUS CURIAE*<br>THE BUCKEYE INSTITUTE<br>IN SUPPORT OF<br>THE STATE OF ARIZONA |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
WASHINGTON

## CORPORATE DISCLOSURE STATEMENT

The Buckeye Institute was founded in 1989 and is an independent research and educational institution whose mission is to advance free-market public policy in the States. It has no parent corporation, nor does any publicly held corporation own 10% or more of its stock. No counsel for any party authored this brief in whole or in part, and no one other than *amicus curiae* or its counsel made a monetary contribution to fund the brief's preparation or submission.

**INTRODUCTION**

The American Rescue Plan Act of 2021 ("ARPA"), Pub L. No. 117-2, provides State, local, territorial, and Tribal governments with $350 billion in "emergency funding" at a time of genuine nationwide emergency. But along with this funding came a vague and open-ended condition purporting to require the States to give up unprecedented autonomy over their taxing and police power. In so doing, Congress failed to carry out its obligation to legislate "unambiguously" when it seeks to impose "conditions on the States' receipt of federal funds." *Pennhurst St. Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (cleaned up). In the absence of a clear and unambiguous line defining the contours of Congress's incursion into States' sovereignty and the scope of what the States are permitted and what they are forbidden, there is no condition that could lawfully be enforced.

The fundamental vagueness of this "Tax Mandate" results in a complete capture of the levers of State policy by the federal government. It potentially freezes into stone State policy—across any field implicating economic activity—for an indeterminate period of time. Congress has never before used its Spending Clause power to attempt such a broad intrusion on States' central policymaking authority. This raises serious questions about the extent of Congress's authority *vel non* to intrude on State authority by putting a "gun to the head" of State policymakers through unduly coercive conditions on the receipt of federal funds and by effectively commandeering State taxing power to carry out federal policy.

*Amicus curiae* agrees with the State of Arizona that Congress lacks such authority, but the Court need not reach that question in this case. Whatever the extent of Congress's power in this area in the abstract, *this enactment* falls far short of the clarity required for Congress to intrude on States' traditional sovereign authorities.

When Congress exercises its power under the Spending Clause to encroach upon the States' sovereignty, any "conditions on the States' receipt of federal funds" must be imposed "unambiguously…enabl[ing] the States to exercise their choice

Baker & Hostetler llp
Attorneys at Law
Washington

knowingly, cognizant of the consequences of their participation." *Id.* Congress may only invade States' authority if it does so with perfect clarity—both so that the State may police Congress's incursion and so as to avoid miring States in uncertainty and unduly freezing the exercise of their traditional authorities. But the Tax Mandate's prohibition on the "*indirect*" use of funds to offset any source of tax revenue potentially reaches an astonishingly broad swath of State government activity, including anything that impacts revenue generation. It draws no enforceable line at all. For that reason, the Court should enjoin enforcement of the Tax Mandate.

**INTERESTS OF *AMICUS CURIAE*[1]**

*Amicus curiae* The Buckeye Institute was founded in 1989 as an independent research and educational institution—a "think tank"—to formulate and promote free-market solutions for Ohio's most pressing public policy problems. The Buckeye Institute is dedicated to upholding the balance of power between States and the federal government as prescribed by the U.S. Constitution and to creating a pro-growth economic tax system and ensuring responsible government spending. The Tax Mandate's capacious, open-ended prohibition on any State activity that could directly or indirectly offset a reduction in a State's tax revenue frustrates these efforts.

**ARGUMENT**

**I.    Congress May Impose Conditions on States' Receipt of Federal Funds Only if It Does So "Unambiguously"**

The Constitution empowers Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defense and general Welfare of the United States." Art. I, § 8, cl. 1. Concomitant to this power, Congress "may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). Congress's ability to condition these funds is subject to several limitations, however—including that attempts "to condition the States' receipt

---

[1] All parties have consented to *amicus curiae*'s filing of this brief.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
WASHINGTON

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
WASHINGTON

of federal funds" must be imposed "'unambiguously, enabling the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17 (cleaned up)). This clear statement rule serves as a significant check on federal overreach and permits enforcement of the proper boundaries between State and federal power. *See* Larry J. Obhof, *Federalism, I Presume? A Look at the Enforcement of Federalism Principles Through Presumptions and Clear Statements Rules*, 2004 MICH. ST. L. REV. 123, 132 (2004).

The clear statement rule traces its modern origins to *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, where the Supreme Court considered whether certain provisions of the Developmentally Disabled Assistance and Bill of Rights Act of 1975, 89 Stat. 486, created enforceable obligations on the States. The Court held that Congress may only "impose a condition on the grant of federal moneys, [if it] do[es] so unambiguously." 451 U.S. at 17. Spending Clause legislation, it reasoned, "is very much in the nature of a contract," and the legitimacy of Congress' power to legislate" under the Clause depends on the clarity with which it acts. *Id.* This already strong clear statement rule "applies with greatest force where…a State's potential obligations under the Act are largely indeterminate." *Id.*

In *South Dakota v. Dole*, 483 U.S. 203, the Supreme Court considered a federal law withholding highway funds otherwise allocable to States "in which the purchase or public possession…of any alcoholic beverage by a person who is less than twenty-one years of age is lawful." 23 U.S.C. § 158. The Court concluded that Congress expressed the relevant condition unambiguously; indeed, "[t]he conditions upon which States receive the funds…could not be more clearly stated by Congress." 483 U.S. at 208. *See also New York v. United States*, 505 U.S. at 172 (provisions of Low-Level Radioactive Waste Policy Amendments Act of 1985, 99 Stat. 1942, unambiguously imposed conditions on certain milestones that must be hit to receive federal funds). *But see id.* at 177 (concluding that other provisions of the Act were unduly coercive and eroded State sovereignty to the point of being unconstitutional).

The clear statement rule has also been implicated in a series of cases arising under Title IX of the Education Amendments of 1972, 86 Stat. 373. *See, e.g., Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999); *Gesber v. Lago Indp't Sch. Dist.*, 524 U.S. 274 (1998), *Franklin v. Gwinett Cnty.*, 503 U.S. 60 (1992). These cases demonstrate the staying power and expansion of the clear statement rule by the Supreme Court, including a requirement that "when money damages are sought[,]" under Spending Clause legislation "that [States] be on notice that illegal conduct is occurring in a given situation." *Davis*, 526 U.S. at 672 (Kennedy, J., dissenting).

The Supreme Court similarly applied the clear statement rule in *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291 (2006), concluding that the Individuals with Disabilities Education Act (IDEA) did not permit a court to shift expert witness fees paid by a prevailing party. The Supreme Court "view[ed] the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds." *Id.* at 296. And the IDEA's bare reference to attorney's fees was deemed insufficiently clear to have provided the States with notice that they may be responsible for reimbursing expert witness fees.

The Supreme Court has relied on this clear statement rule in other contexts implicating the balance between federal and state power, as well. The Court asks whether Congress made "its intention unmistakably clear in the language of a statute" when considering whether it abrogated States' immunity from suit under the Eleventh Amendment. *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985). And the Court has concluded that the Constitution similarly requires a "'clear and manifest' statement from Congress to authorize an unprecedented intrusion into traditional state authority." *Rapanos v. United States*, 547 U.S. 715, 738 (2006) (plurality op. of Scalia, J.); *Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991).

As a general matter, "unless Congress conveys its purposes clearly, it will not be deemed to have significantly changed the federal-state balance." *United States v.*

*Bass*, 404 U.S. 336, 349 (1971). Indeed, "[f]ederal statutes impinging upon important state interests 'cannot…be construed without regard to the implications of our dual system of government….[W]hen the Federal Government takes over…local radiations in the vast network of our national economic enterprise and thereby radically readjusts the balance of state and national authority, those charged with the duty of legislating [must be] reasonably explicit.'" *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 544 (1994) (Scalia, J.) (quoting Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 COLUM. L. REV. 527, 539–40 (1947)).

## II. The Unambiguous-Condition Requirement Is Essential To Preserving Our System of Dual Sovereignty

The clear statement rule is not formalism for formalism's sake. It is essential to policing and maintaining the boundaries between federal and State power.[2] Maintaining equilibrium in the assignment of powers is crucial to the operation of our constitutional system. The Founders created "a Union of separate state governments" and believed "that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways." *Younger v. Harris*, 401 U.S. 36, 44 (1971). This concept—"Our Federalism"— represents "a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests" should endeavor to do so "in ways that will not unduly interfere with the legitimate activities of the States." *Id*.

This "constitutionally mandated balance of power between the States and the Federal Government was adopted by the Framers to ensure the protection of our

---

[2] As Professor Thomas Merrill has noted, it prescribes a "constructive and workable role for the courts in determining the balance between stability and change in the assignment of powers between the federal government and the States." Thomas W. Merrill, *Rescuing Federalism After* Raich*: The Case for Clear Statement Rules*, 9 LEWIS & CLARK L. REV. 823, 827 (2005).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
WASHINGTON

fundamental liberties." *Atascadero*, 473 U.S. at 242 (internal quotations omitted). It serves as a powerful "check on abuses of government power"; much like the separation of powers between three, coordinate federal branches that "serve[s] to prevent the accumulation of excessive power in any one branch, a healthy balance of power between the States and the Federal Government will reduce the risk of tyranny and abuse from either front." *Gregory*, 501 U.S. at 458. In Federalist 51, James Madison referred to this concept as "double security," and if it is to be effective "there must be a proper balance between the States and the Federal Government" as "[t]hese twin powers will act as mutual restraints only if both are credible." *Id.* at 469; *see also* William H. Pryor, Jr., *Madison's Double Security: In Defense of Federalism, the Separation of Powers, and the Rehnquist Court*, 53 ALA. L. REV 1167 (2002).

Checking Congress's Spending Clause power is crucial to preserving this balance. Congress can use this power to "pursue objectives outside of 'Article I's "enumerated legislative fields"' by attaching conditions to the grant of federal funds." *Davis*, 526 U.S. at 654 (Kennedy, J., dissenting) (quoting *Dole*, 483 U.S. at 207). Therefore, "if wielded without concern for the federal balance," the Spending Clause "has the potential to obliterate distinctions between national and local spheres of interest and power by permitting the Federal Government to set policy…in areas which otherwise would lie outside its reach." *Id.* Without limits on the Spending Clause, "the reality, given the vast financial resources of the Federal Government," is that it gives "power to the Congress to tear down the barriers, to invade the states' jurisdiction, and to become a parliament of the whole people, subject to no restrictions save such are self-imposed." *Dole*, 483 U.S. at 217 (O'Connor J., dissenting) (internal quotations omitted).

To avoid those ills, the clear statement rule ensures any intrusion into State power is cabined to its precise scope. It allows States to jealousy guard their sovereignty, exercise what of it remains to the fullest extent, and police against attempted usurpations. It serves as "concrete safeguard," giving the States themselves

the power to "guard against excessive federal intrusion into state affairs and be vigilant in policing the boundaries of federal power." *Davis*, 526 U.S. at 655 (Kennedy, J., dissenting).

In a similar vein, the clear statement rule grounds policy and decision making as close to the People as possible. It helps to ensure both that State representatives make decisions reflecting the will of their constituents and that laypeople understand the requirements that Congress is imposing on their State government. This, in turn, ensures that the People "retain the ultimate decision as to whether or not the State will comply" and if they "view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant." *New York*, 505 U.S. at 168.

### III.  The Tax Mandate Is Unprecedented in Its Ambiguity and Violation of the Principles of Federalism

The exceedingly vague, potentially limitless Tax Mandate falls far short of satisfying the clear statement rule. Congress has failed to properly mark its incursion into state sovereignty with clear lines and boundaries, instead enacting a provision that reaches potentially any policy a State might enact that has some direct or indirect impact on economic activity and therefore tax revenues. The Constitution requires far greater clarity, so that States may police the boundaries of federal intrusions and are not chilled in the exercise of retained sovereign power. *See Davis*, 526 U.S. at 655 (Kennedy, J., dissenting).

Determining whether Congress has delimited its incursion into a State's power with sufficient clarity is not merely a matter "of routine statutory construction." *Id.* at 657 (Kennedy, J., dissenting). The inquiry is not simply whether a State could understand what the words meant. Instead "[i]f Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute," *Atascadero*, 473 U.S. at 242, in a manner both "unequivocal and textual," *Dellmuth v. Muth*, 491 U.S. 223, 230 (1989). Put simply, Congress must draw a clear line demarking the

Baker & Hostetler LLP
Attorneys at Law
Washington

permissible from the impermissible. If Congress fails to clearly cabin its intrusion on State autonomy in this way, Congress is not legislating under the Spending Clause legitimately and those vague provisions are facially invalid. *Pennhurst*, 451 U.S. at 17.

Contrast the Tax Mandate with two provisions that the Supreme Court concluded were sufficiently unambiguous to pass constitutional muster: the highway funding provision in *Dole*, 483 U.S. 203, and the rebates in *New York*, 505 U.S. 144. In *Dole*, the bargain was clear: If a State wants extra highway funds, its minimum drinking age must be 21-years old. That is a model of clarity. 483 U.S. at 208. The same is true of the condition at issue in *New York*: to receive a payment out of the Secretary of Energy's escrow account, a State must satisfy certain federal benchmarks in its handling of low-level radioactive waste. 505 U.S. at 172. In both cases, the Congress provided an unmistakably clear line cabining its abrogation of State authority. There could be no doubt as to what states were required to do—and what they were otherwise free to do.

The Tax Mandate, in contrast, draws no line at all. It potentially intrudes on every area of state policymaking, limited only by the preferences of a federal official, the Secretary of the Treasury. Every exercise of a State's police power regulates human conduct, which in turn affects economic activity and taxation. After all, "taxation, in reality, is life."[3] Lowering the speed limit may save lives, but it is also likely to reduce gas-tax collections and taxable commerce. Every policy may, depending on how things play out, "reduce[] any tax" and thereby run afoul of the Tax Mandate if funds received under ARPA are used to "indirectly" offset the loss. A State has no way to predict with any certainty whether the Mandate permits any given exercise of its police power. The Mandate, in turn, provides no standard at all by which to judge a State's compliance with the rules; its scope is not "plain to anyone reading the Act." *Gregory*, 501 U.S. at 467. It is in situations like the Tax Mandate, where "a States' potential

---

[3] Jeffrey. M. Birnbaum & Alan S. Murray, *Showdown at Gucci Gulch* 289 (1987) (quoting Sheldon Cohen).

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
WASHINGTON

obligations under the Act are largely indeterminate," that the clear statement rule "applies with greatest force," *Pennhurst*, 451 U.S. at 24.

This defect is just as apparent in the narrower field of State tax policy. The Tax Mandate could touch upon every facet of State taxation in ways that Congress never considered or specified. It very well could disable broad swaths of state policymaking on taxation for an uncertain period of time, as its language could be interpreted to freeze everything from tax rates to pet registration fees. Through its prohibition of "administrative reinterpretation[s,]" it may even require states to perpetuate error by leaving in place misinterpretations of its tax code—if issuing corrections would result in a net tax revenue reduction.

Consider, for example, the question of whether a State would run afoul of the Tax Mandate if it issued an order prohibiting property-tax assessors from making their rounds during the pandemic. Such a decision would likely reduce or delay tax revenue by pushing out revised valuations used to calculate property taxes. Would this violate the Tax Mandate? On the face of the statute the answer to this questions is: "Maybe?" That is insufficient when State sovereignty is in the balance.

Or suppose another wave of COVID-19 cases leads a governor to prohibit indoor dining in her State. These restaurant closures would almost certainly lead to a reduction in restaurant sales in the State and, as a result, a reduction in sales-tax revenue received by the State, as well as perhaps income-tax revenue and other revenues. Undoubtedly the Governor's order is a "change in law, regulation, or administrative interpretation" and it would appear to "otherwise" "reduce any tax." But would it run afoul of the Tax Mandate? Again, there is no way to know, short of asking the Secretary of the Treasury for her view on the matter.

Consider a State program providing an array of benefits for those who qualify under state law as disabled. If a State provides, among other things, a tax credit to disabled residents, is it then barred under the Tax Mandate from revising its regulatory definition of disability to include, say, partial blindness or "long COVID" syndrome?

The effect of such a change would be to reduce tax revenue, and so the possibility cannot be dismissed even as the question cannot be answered definitively. In this way, the Tax Mandate may well prohibit a State from revising any part of its laws that "directly or indirectly" affect tax revenues. And there are, as noted, precious few areas of the law that lack consequences for tax collections.

The havoc inherent in the standardless Tax Mandate is not merely hypothetical. Last week, Arizona enacted S.B. 1752 , which conforms Arizona's tax code to federal tax code by, *inter alia*, exempting the first $10,000 in unemployment aid and forgiven Paycheck Protection Program loans from state income tax.[4] But it is unclear whether the State of Arizona will be penalized for conforming state law to federal policy. Is S.B. 1752 a piece of legislation that reduces any tax by providing for a reduction in a rate, a rebate, a deduction, a credit or otherwise? Quite possibly. Might the Secretary of the Treasury exercise her discretion to determine that this reduction in taxes does not violate ARPA? And, if so, why is the Secretary permitted to substitute her discretion for the State's police power?

Whether S.B.1752 or any other policy that the State enacts violates the Tax Mandate only will knowable to the State *post hoc.* There is no way for the State to know what the Tax Mandate permits it to do based upon the language in the Act. Whatever power Congress may have to condition States' receipt of federal funds, it cannot arrogate to the federal government potentially the whole of States' taxing and police powers through a fundamentally vague restriction.

## CONCLUSION

The Court should enjoin enforcement of the Tax Mandate.

---

[4] *See* News Release, Office of Arizona Governor Doug Ducey, Governor Ducey Signs Bipartisan, Unanimous Legislation Conforming Arizona's Tax Code (Apr. 14, 2021). *Available at* https://azgovernor.gov/governor/news/2021/04/governor-ducey-signs-bipartisan-unanimous-legislation-conforming-arizonas-tax.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
WASHINGTON

1

Dated:  October 24, 2022

Respectfully submitted,

2

3

By:    _/s/ Andrew M. Grossman_

4

5

Robert Alt

Andrew M. Grossman

THE BUCKEYE INSTITUTE

6

*Counsel of Record*

88 East Broad Street, Suite 1300

BAKER & HOSTETLER LLP

Columbus, Ohio 43215

7

Washington Square, Suite 1100

Telephone:  614.224.4422

1050 Connecticut Avenue, N.W.

robert@buckeyeinstitute.org

8

Washington, D.C. 20036

Telephone: 202.861.1500

9

Facsimile:  202.861.1783

agrossman@bakerlaw.com

10

11

*Counsel fo*r *Amicus Curiae*

12

*The Buckeye Institute*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
WASHINGTON

1

**CERTIFICATE OF SERVICE**

2   I hereby certify that on October 24, 2022, I caused the foregoing brief to be filed

3 with the Court electronically using the CM/ECF system, which will send a

4 notification to all counsel of record.

5

6 Dated: October 24, 2022       */s/ Andrew M. Grossman*

                   Andrew M. Grossman

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
WASHINGTON