**MARK BRNOVICH**
**ATTORNEY GENERAL**
(Firm State Bar No. 14000)

Joseph A. Kanefield (No. 15838)
Drew C. Ensign (No. 25463)
Linley Wilson (No. 027040)
Andrew Reilly (No. 029138)
Robert J. Makar (No. 33579)
2005 N. Central Ave
Phoenix, AZ 85004-1592
Phone: (602) 542-8958
Joe.Kanefield@azag.gov
Drew.Ensign@azag.gov
Linley.Wilson@azag.gov
Andrew.Reilly@azag.gov
Robert.Makar@azag.gov

*Attorneys for Plaintiff State of Arizona*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| State of Arizona, | No. 2:21-cv-00514-ROS |
| Plaintiff, | **COMBINED REPLY IN SUPPORT OF RENEWED MOTION FOR A PRELIMINARY AND PERMANENT INJUNCTION AND RESPONSE IN OPPOSITION TO MOTION TO DISMISS** |
| v. | |
| Janet Yellen, in her official capacity as Secretary of the Treasury et al.; | |
| Defendants. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 4

    I.      The State Is Likely to Prevail on the Merits of Its Claims ................................. 4

          A.   The Tax Mandate Is Unconstitutionally Ambiguous ..................................... 4

          B.   The Tax Mandate Is Unconstitutionally Coercive And Violates The Anti-Commandeering Doctrine .............................................................. 11

          C.   The Tax Mandate Is Unrelated to ARPA's Purpose ................................... 13

          D.   Defendants Agree That Treasury's Regulations Cannot Cure the Tax Mandate's Deficiencies .................................................................. 15

    II.     The State Has Met the Requirements for a Permanent Injunction .................... 15

CONCLUSION ................................................................................................................. 17

i

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*Alabama Ass'n of Realtors v. HHS,*
   141 S. Ct. 2485 (2021) ..................................................................... 16

4

*Arizona v. Yellen,*
   34 F.4th 841 (9th Cir. 2022) ........................................... 1, 3, 7, 11

5

6

*Arizona v. Yellen,*
   550 F.Supp.3d 791 (D. Ariz. 2021) ................................... 3, 12, 14

7

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
   548 U.S. 291 (2006) ............................................................ 4, 5, 6

8

9

*Ass'n of Private Sector Colleges and Universities v. Duncan,*
   681 F.3d 427 (D.C. Cir. 2012) ............................................... 9

10

*Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.,*
   467 U.S. 837 (1984) .............................................................. 9

11

12

*City of Los Angeles v. Barr,*
   929 F.3d 1163 (9th Cir. 2019) ........................................... 9, 10

13

*Ducey v. Yellen,*
   __ F.Supp.3d __, 2022 WL 2817710 (D. Ariz. July 19, 2022) ................. 8

14

15

*Kentucky v. Yellen,*
   __ F.4th __, 2022 WL 17076099 (6th Cir. Nov. 18, 2022) ........ 1, 2, 5, 7, 9, 11

16

*Kentucky v. Yellen,*
   563 F.Supp.3d 647 (E.D. Kent. 2021) .......................... 1, 2, 11, 12

17

18

*Knox v. Serv. Emps. Int'l Union, Local 1000,*
   567 U.S. 298 (2012) ................................................................ 2

19

20

*Massachusetts v. EPA,*
   549 U.S. 497 (2007) ................................................................ 2

21

*Mayweathers v. Newland,*
   314 F.3d 1062 (9th Cir. 2002) ........................................... 8, 9, 14

22

*Missouri v. Yellen,*
   39 F.4th 1063 (8th Cir. 2022) ........................................... 7, 8, 14

23

24

*New York v. United States,*
   505 U.S. 144 (1992) .............................................................. 13

25

*NFIB v. Sebelius,*
   567 U.S. 519 (2012) .............................................................. 10

26

27

*Ohio v. Yellen,*
   547 F.Supp.3d 713 (S.D. Ohio 2021) ................... 1, 2, 5, 7, 9, 10, 11, 15

28

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ................................................................ 16

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) ..................................................................................... 5

*Sateriale v. R.J. Reynolds Tobacco Co.*,
  697 F.3d 777 (9th Cir. 2012) ................................................................... 5

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ........................................................................... 5, 14

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ................................................................................... 3

*Texas Educ. Agency v. U.S. Dep't of Educ.*,
  992 F.3d 350 (5th Cir. 2021) ................................................................. 15

*Texas v. Yellen*,
  No. 2:21-CV-079-Z, 2022 WL 1063088 (D. Tex. April 8, 2022) ............ 1, 2, 11, 13, 16

*United States v. Thrasher*,
  483 F.3d 977 (9th Cir. 2007) ................................................................... 3

*United Steelworkers of America AFL-CIO-CLC v. Johnson*,
  799 F.2d 402 (8th Cir. 1986) ................................................................... 7

*Virginia Dep't of Educ. v. Riley*,
  106 F.3d 559 (4th Cir. 1997) ................................................................. 15

*West Virginia v. U.S. Department of Treasury*,
  571 F.Supp.3d 1229 (N.D. Ala. 2021) ..................................... 1, 2, 5, 6, 9, 11

**STATUTES**

42 U.S.C. § 2000cc-1(b)(1) ......................................................................... 8

42 U.S.C. § 802(a)(1) ............................................................................... 13

42 U.S.C. § 802(c)(2)(A) ................................................................... 5, 7, 12

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 1 ........................................................................ 4

**OTHER AUTHORITIES**

ARPA, Pub. L. No. 117-2 § 9621 .............................................................. 14

ARPA, Pub. L. No. 117-2 § 9673 .............................................................. 14

*Estimated Federal Disbursement to States*, National Conference of State Legislatures
  *available at* https://bit.ly/3i9yuBU (last visited November 21, 2022) ......................... 12

iii

# INTRODUCTION

*Every* court that has reached the merits of whether the Tax Mandate is constitutional has held it is unconstitutional.  *Every single one.*  The *only* Tax Mandate decisions that went Federal Defendants' way were based on standing grounds. But the Ninth Circuit conclusively resolved Article III standing in favor of the State of Arizona (the "State") here, and Federal Defendants did not seek review of that decision.  *See Arizona v. Yellen*, 34 F.4th 841 (9th Cir. 2022).  So all that remains here to decide is the constitutional merits. On that question, this Court should join the unanimous consensus of its sister courts.

Those courts have granted or affirmed injunctions against enforcement of the Tax Mandate for 18 states, on a combination of ambiguity or coercion grounds. *See West Virginia v. U.S. Department of Treasury*, 571 F.Supp.3d 1229, 1255 (N.D. Ala. 2021) (13-state injunction on ambiguity grounds); *Texas v. Yellen*, No. 2:21-CV-079-Z, 2022 WL 1063088, **6-7 (D. Tex. April 8, 2022) (granting injunction to Texas, Mississippi, and Louisiana on coercion grounds); *Ohio v. Yellen*, 547 F.Supp.3d 713, 741 (S.D. Ohio 2021) (granting injunction to Ohio on ambiguity grounds) *rev'd on standing grounds*, __ F.4th __, 2022 WL 17076102 (6th Cir. Nov. 18, 2022); *Kentucky v. Yellen*, 563 F.Supp.3d 647, 657-60 (E.D. Kent. 2021) (granting injunction to Tennessee and Kentucky on ambiguity grounds), *aff'd in part, Kentucky v. Yellen*, __ F.4th __, 2022 WL 17076099 (6th Cir. Nov. 18, 2022) ("*Tennessee*"). Just one week ago, the Sixth Circuit Court of Appeals unanimously affirmed the injunction as to Tennessee. *Tennessee*, 2022 WL 17076099 at *25; *see also id*. at *26 (J., Nalbandian, concurring in part and dissenting in part).[1]

---

[1] In *Tennessee*, a two-judge majority held Kentucky's (but not Tennessee's) challenge to the Tax Mandate was not justiciable under Article III due to the issuance of Treasury's regulations. 2022 WL 17076099, at *25. Circuit Judge Nalbandian concurred in part and dissented in part, stating he concurred that the Tax Mandate "violates the Spending Clause" and would have concluded that both Tennessee and Kentucky have standing "for reasons related to the federal government's intrusion on their sovereign-taking authority." *Id*. at *26 (Nalbandian, J., concurring in part and dissenting in part). Judge Nalbandian therefore would have affirmed the injunction as to Tennessee as well. *Id*. at *31. But the Ninth Circuit has already concluded Arizona has standing in this case.  *Arizona*, 34 F.4th at 853.

These courts correctly concluded that the Tax Mandate is both unconstitutionally ambiguous, *see Ohio*, 547 F.Supp.3d at 741, and *West Virginia*, 571 F.Supp.3d at 1255, and unconstitutionally coercive, *see Kentucky*, 563 F.Supp.3d at 657; *Texas*, 2022 WL 1063088 at \*6-7. The Sixth Circuit, applying the Supreme Court's Spending Clause jurisprudence, held the law is impermissibly vague, failing to provide Tennessee with "'clear notice' about the measures required to maintain compliance." *Tennessee*, 2022 WL 17076099, at \*21. In contrast, no federal court in the nation has ever held that the Tax Mandate was a constitutional exercise of Congress's Spending Clause powers. And for good reason.

The State has shown it is likewise entitled to a permanent injunction of the Tax Mandate here. *See* Doc. 78 at 10-21.[2]  Defendants did not even cite or address a single one of those district court decisions, let alone attempt to explain how *all* of them were wrong. Defendants also do not offer reason why the State should be treated any differently than its sister states, all of whom that reached the merits already obtained injunctive relief against the Tax Mandate's intrusion on state sovereignty. The State has accepted ARPA funds—a total of $4.2 billion—and has made at least $2 billion in allocations to date. Doc. 78 at 9.

---

Thus while the Sixth Circuit's analysis of Kentucky's standing is plainly wrong because, *inter alia*, only one party needs to have standing to establish Article III jurisdiction, *see, e.g.*, *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007), that error is irrelevant here as standing has already been conclusively resolved in favor of Arizona in this case.

Nor did Defendants ever raise a mootness argument here. But if Defendants were to rely on the Treasury regulations to raise such an *extremely* belated argument, such an attempt would be unavailing.

It is undisputed that those regulations impose compliance costs upon the State and that invalidating the Tax Mandate would eliminate those compliance costs. Because an injunction against enforcement of the Tax Mandate would thus continue to prevent harm to the State, there is no conceivable mootness issue here (which, presumably, is why Defendants have never raised it to date). *See, e.g.*, *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (A case is moot "only when it is *impossible* for a court to grant *any effectual relief whatever* to the prevailing party." (emphasis added) (cleaned up)).

[2] All citations to page numbers herein refer to the electronic ECF page numbers of the filed pleadings.

And in June 2021, the Arizona Legislature passed a massive $1.9 billion tax cut. *Id.* Consequently, the Tax Mandate poses "a realistic danger that Arizona … will be forced to repay federal funds for directly or indirectly using those funds to offset its tax cut[.]" *Arizona*, 34 F.4th at 851.

Defendants urge this Court to "reiterate" its previous reasoning in the decision Judge Humetewa issued in July 2021. Doc. 86 at 8 (relying on *Arizona v. Yellen*, 550 F.Supp.3d 791 (D. Ariz. 2021)); *see also id.* at 9, 12-13, 16 (same). But that reasoning was not only flawed; it was intertwined with a standing analysis that the Ninth Circuit reversed. In reversing the July 2021 decision, the Ninth Circuit concluded that the State has standing and directed this Court to "make a ruling on the merits in the first instance" on the State's Spending Clause and Tenth Amendment claims. *Arizona*, 34 F.4th at 853.

Defendants' suggestion thus fails at the outset as it violates the Ninth Circuit's mandate, which directed this Court to decide the "merits *in the first instance*"—not reiterate what it putatively had already decided. *See*, *e.g.*, *United States v. Thrasher*, 483 F.3d 977, 981 (9th Cir. 2007) ("The rule of mandate doctrine … provides … [that] the [district court] is bound by the decree as the law of the case, and must carry it into execution according to the mandate. That court cannot vary it, or examine it for any other purpose than execution; or give any other or further relief; or review it, even for apparent error, upon any matter decided on appeal.") (cleaned up). Indeed, this Court lacks jurisdiction to accept Defendants' suggestion, as the doctrine is jurisdictional in nature. *Id.*

Rule-of-mandate-doctrine aside, the putative merits reasoning that Defendants urge this Court to "reiterate" comes from a decision that *expressly* disclaimed reaching the merits, explaining it was dismissing for "lack of subject matter jurisdiction"—thereby necessarily making *any* consideration of the merits beyond this Court's power and improper. 550 F.Supp.3d at 799. *See*, *e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("'Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.'" (citation omitted)).

Moreover, whatever purported merits reasoning this Court may have engaged in, it was necessarily intertwined with its jurisdictional analysis—and thus equally caught up in the Ninth Circuit's unanimous reversal of this Court. Moreover, that phantom reasoning squarely contradicts both the reasoning *and holding* of *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006)—which would have been an affirmance, rather than a reversal, if Defendants' existence-only rationale were correct. Defendants, however, make almost no effort to reconcile their existence-only reasoning with that decision. But what then could they say?

Because the State succeeds on the merits of any one of its claims, Defendants' motion to dismiss must be denied. The Court should grant the State's Renewed Motion, hold the Tax Mandate is unconstitutional and enjoin its enforcement, and allow the State to exercise its full sovereign-taxing authority.

## ARGUMENT

## I.     The State Is Likely to Prevail on the Merits of Its Claims

The Tax Mandate exceeds Congress's authority under the Spending Clause in Article I, section 8 of the Constitution and unconstitutionally infringes on the State's sovereignty under the Tenth Amendment. *See* Doc. 78 at 10-21. Defendants' arguments do not show otherwise.

### A.     The Tax Mandate Is Unconstitutionally Ambiguous

The U.S. Constitution empowers Congress to "lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds," but as Defendants acknowledge (Doc. 86 at 11), Congress must condition the States' receipt of federal funds "unambiguously … enabl[ing] the States to exercise their choice [whether to accept federal funds] knowingly, cognizant of the consequences of their participation." *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987) (citation omitted). "It is undisputed that ARPA was enacted pursuant to the Spending Clause." *Tennessee*, 2022 WL 17076099 at *17.

4

Defendants maintain that the mere existence of "a condition" suffices to comply with the unambiguity requirement under the Supreme Court's leading Spending Clause cases, *Pennhurst* and *Arlington Central*. Doc. 86 at 11-15 (discussing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), and *Arlington Cent. Sch. Dist. Bd. of Educ. V. Murphy*, 548 U.S. 291, 296 (2006)). Other courts have rightly rejected this argument. As one court aptly put it, "merely because *Pennhurst* stands for the proposition that Congress must clearly state its intent to impose a condition does not mean that Congress need not also *define* the condition sufficiently so that States can know how to comply with it." *West Virginia*, 571 F.Supp.3d at 1252. Indeed, *Pennhurst* states that Congress must speak "so clearly that … the State [can] make an informed choice." 451 U.S. at 25. The State cannot voluntarily or meaningfully assent to ambiguous conditions. Just as vague contractual provisions are unenforceable, *see Sateriale v. R.J. Reynolds Tobacco Co.*, 697 F.3d 777, 789 (9th Cir. 2012), so too are vague conditions in Spending Clause legislation.

Here, the Tax Mandate, "even when read in context, fails to put the state on 'clear notice' of its obligations." *Ohio*, 547 F.Supp.3d at 731 (citing *Arlington Central*, 548 U.S. at 296). The Tax Mandate prohibits the State from using ARPA funds "to either directly or indirectly offset a reduction in the net tax revenue of such State…" 42 U.S.C. § 802(c)(2)(A). States can only guess, but do not know by the statute's text, "what it means to 'directly or indirectly' offset tax cuts with ARPA funds." *West Virginia*, 571 F.Supp.3d at 1250; *see also Tennessee*, 2022 WL 17076099, at *17 (reasoning the Tax Mandate's "text does not clearly explain what it means to 'indirectly offset' revenue-reducing tax cuts with ARPA funds").

Defendants' existence-only premise also squarely violates the Supreme Court's decision in *Arlington Central*. There, the Court addressed whether a condition was sufficiently clear to require the States to pay experts fees to prevailing parties. 548 U.S. at 295. The existence of *a* condition was indisputable (and undisputed). If the Defendants' argument were correct, the Supreme Court should have stopped there and affirmed. It didn't.

Instead, the Supreme Court held that condition was insufficiently clear as a constitutional matter to mandate that the States pay expert fees, thus making plain that the Constitution demands clarity in what the conditions *are*, not merely that they *exist*. If Defendants' existence-only argument below were correct, *Arlington* would necessarily have been an affirmance rather than the reversal it was. *Id.* Nor have Defendants—in the innumerable briefs filed in this Court and the Ninth Circuit—*ever* explained how their reasoning is not completely incompatible with the *holding* in *Arlington Central*.

Defendants nonetheless argue they "have already explained both direct and indirect offsets," and offer examples of certain actions they believe would constitute a "direct" or "indirect" offset of a reduction in net tax revenue. Doc. 86 at 16-17. Defendants propose that an "indirect" use of ARPA funds to "offset a net-tax-revenue reduction" would occur if the State used ARPA funds "to replace $2 billion in planned state expenditures on COVID-19 testing and then use the $2 billion it had originally budgeted for that purpose to offset a $2 billion reduction in state income tax." Doc. 86 at 17. This example illustrates the State's point—that money is fungible and that there are no clear limits (if any) to the Secretary's discretion of deciding when ARPA funds are "indirectly" used to be deemed non-compliant with the Tax Mandate. *See* Doc. 78 at 13; *West Virginia*, 571 F.Supp.3d at 1250 (reasoning that "any ARPA funds the [s]tates receive could be viewed as indirectly offsetting any reduction in net tax revenue from a change in state law or policy" because "[a]fter all, a decrease in one part of a State's revenue is necessarily offset somehow to achieve a balanced budget"). As the Sixth Circuit observed, "Treasury's own Rule acknowledges that the money-is-fungible interpretation is at least a *plausible* concern" with the Tax Mandate" and "[t]he plausibility of this interpretation was the very reason that Treasury had to shed so much ink attempting to disavow it with the Rule." *Tennessee*, 2022 WL 17076099 at *18 (discussing 87 Fed. Reg. 4,338, 4,424 (Jan. 27, 2022)).

Moreover, the Tax Mandate provides no baseline against which to measure revenue reductions. *See Ohio*, 547 F.Supp.3d at 732 (emphasizing "the statutory language itself

6

provides no mechanism for determining whether a State's net tax revenues are 'reduced' or not"). The Tax Mandate's language—"a reduction in the net tax revenue … resulting from" a tax cut "is similarly indeterminate." *Tennessee*, 2022 WL 17076099 at \*19 (quoting 42 U.S.C. § 802(c)(2)(A)). The statute does not specify "which fiscal year's revenue" would be used to decide whether a reduction occurred. This omission is even more glaring because in "the provision just above [the Tax Mandate]—§ 802(c)(1)(C)—which establishes one of the permissible uses of ARPA funds," Congress specified a baseline as "the most recent full fiscal year of the State." *Tennessee*, 2022 WL 17076099 at \*19. The Tax Mandate also does not explain "how states must assess whether a reduction in tax revenue '*result[ed]* from a change" in state tax policy." *Id.* (quoting 42 U.S.C. § 802(c)(2)(A)). And the Tax Mandate fails to specify if it "prohibits a reduction in *expected* tax revenues, which a state would be able to control *ex ante*, or whether it prohibits a reduction in *actual* tax revenues, which a state could potentially determine only *ex post*." *Id.* "Yet the difference matters." *Id.* Nor could Treasury's regulation cure the violation. *See infra* § I(D).

Defendants also rely on the Eighth Circuit's decision in *Missouri v. Yellen*, 39 F.4th 1063 (8th Cir. 2022), in attempting to explain what the Tax Mandate means. Doc. 86 at 16. The Court should not look to *Missouri* for several reasons. First, the Eighth Circuit's decision addressed *only* whether Missouri had standing, and concluded—contrary to the Ninth Circuit's holding that the State has standing here, *see Arizona*, 34 F.4th at 853—that Missouri lacked standing. *See* 39 F.4th at 1070-71 & n.5. Thus, the Eighth Circuit's commentary about what the Tax Mandate *might* mean is unpersuasive dicta at best. *See United Steelworkers of America AFL-CIO-CLC v. Johnson*, 799 F.2d 402, 404 (8th Cir. 1986) (where a case was decided based on plaintiff's lack of standing, the court's views about the plaintiff's constitutional claims "remain dicta"). Second, the Eighth Circuit appears to have relied on Treasury's Interim and Final Rules, reasoning that those regulations "set forth clearly how Treasury will determine whether a recipient of ARPA

7

funds has violated" the Tax Mandate. *Missouri,* 39 F. 4th at 1071, 1068 n.4. But as Defendants admit here, Treasury's rules cannot cure an unconstitutional statute. *See* Doc. 86 at 14 & *infra* § I(D).[3] Third, *Missouri* erroneously suggests that the Tax Mandate merely prevents states from "us[ing] ARPA funds as part of [the states'] balancing process" to balance a budget. 39 F.4th at 1071, 1070 n.6. The Tax Mandate does not say that, and as explained above, the prohibition's scope reaches much farther than simply prohibiting states from *directly* offsetting reductions in revenue with ARPA funds. For all of these reasons, the Court should not make the same missteps of the Eighth Circuit.

Defendants also misplace reliance on *Mayweathers* and *Ducey*. Doc. 86 at 13-16 (discussing *Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002), and *Ducey v. Yellen*, __ F.Supp.3d __, 2022 WL 2817710 (D. Ariz. July 19, 2022)). The *Ducey* decision (now pending in the Ninth Circuit) has no relevance here because it interpreted a completely different provision of ARPA. *See* Doc. 78 at 14-15 & n.6.

*Mayweathers* likewise does not support Defendants. That case involved a facial challenge to the constitutionality of the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* (2000) ("RLUIPA"), on various grounds. 314 F.3d at 1065. RLUIPA states that it applies to any "program or activity that receives Federal financial assistance" and requires that governments not impose a substantial burden on the religious exercise of prisoners unless the government can demonstrate that the burden both serves a compelling government interest and is the least restrictive means of advancing that interest. *Id*. at 1067 (quoting 42 U.S.C. § 2000cc-1(b)(1)). Plaintiffs challenged this aspect of RLUIPA as ambiguous under *Dole* and *Pennhurst*. The Ninth Circuit disagreed, explaining that "[t]he fact that the least restrictive means standard is perhaps unpredictable because it has resulted in different determinations in different courts does not weaken the express conditional language." *Id*. at 1067. The Tax Mandate, by contrast, does not set

---

[3] Defendants made the same concession in *West Virginia*, 571 F.Supp.3d at 1254, and in *Tennessee*, 2022 WL 17076099 at *21.

forth an "unpredictable" standard to apply; it presents "an 'impossible to understand' standard." *Ohio*, 547 F.Supp.3d at 731; *see also West Virginia*, 571 F.Supp.3d at 1253 (distinguishing RLUIPA, which imposes a legal standard that "every lawyer is familiar with," from the Tax Mandate, which provides "no way for States to comply with the ARPA by looking to the text of the provision itself"). Even in *Mayweathers*, the Ninth Circuit reiterated that "any conditions on federal grants *must be unambiguous*, clearly communicating to states the consequences of their participation in the federally funded scheme." 314 F.3d at 1066 (emphasis added). Thus, *Mayweathers* is distinguishable and further supports a conclusion that the Tax Mandate fails the unambiguity requirement. And even if it were otherwise, it putative existence-only holding has necessarily been overruled by *Arlington Central*, which post-dates *Mayweathers* and whose holding is entirely incompatible with it.

Defendants also suggest that if the Tax Mandate is unconstitutionally vague, that conclusion would jeopardize "numerous other funding regimes (like Medicaid and education statutes) … even though courts have deferred to regulations implementing such statutes for decades." Doc. 86 at 17-18. Not so. Again, by Defendants' own admission, "agency regulations have no bearing on the Spending Clause analysis," *id.* at 14, and the State agrees, *infra*, § I(D). Consequently, Defendants' cited cases involving *Chevron*[4] deference (including *Ass'n of Private Sector Colleges and Universities v. Duncan*, 681 F.3d 427 (D.C. Cir. 2012), and *City of Los Angeles v. Barr*, 929 F.3d 1163 (9th Cir. 2019), *see* Doc. 86 at 17-18), are inapplicable to the State's Spending Clause challenge to the Tax Mandate. *See Tennessee*, 2022 WL 17076099 at \*22 (explaining that whether *Chevron* deference applies in other contexts "has little relevance" to the Tax Mandate because when Congress imposes conditions to control taxation, "a core aspect of state sovereignty," Congress "must do so in clear and unmistakable terms").

---

[4] *Chevron U.S.A. Inc. v. Nat. Res. Defense Council, Inc.*, 467 U.S. 837 (1984).

9

In *City of Los Angeles*, for example, the Ninth Circuit addressed "an allocation of grant funds through a competitive grant process" and reasoned that "the applicable Spending Clause principles do not readily apply" to that type of program. 929 F.3d at 1175. The Ninth Circuit analyzed the agency-drawn conditions on grants to states and localities "under the principles of *Dole* and *NFIB*" only because "Congress delegated the task of specifying these conditions to DOJ." *Id*. at 1175 n.6. Unlike *City of Los Angeles*, however, Congress has not made any delegation here (and Defendants do not argue otherwise). Doc. 78 at 14; *see also Ohio*, 547 F.Supp.3d at 738 (even assuming Congress can "delegate to an agency the power to create the requisite clarity" required by the Spending Clause, "it did not do so" in the Tax Mandate). The Tax Mandate "must sink or swim on its own." *Ohio*, 547 F.Supp.3d at 739.

Finally, the fact that Defendants "are aware of no case," beyond ARPA, "holding that a statutory funding condition is 'unconstitutionally ambiguous' on its face" (Doc. 86 at 18) does Defendants little good. The Tax Mandate's "directly or indirectly offset" language is completely unprecedented, both in its phrasing and the extent to which it infringes upon State sovereignty.

The Tax Mandate is not immunized from constitutional scrutiny simply because Congress has never done something so audacious and dubious before, and the State need not point to another similar law that has been struck down as an unconstitutional exercise of Congress's authority to prevail here. Indeed, "sometimes the most telling indication of a severe constitutional problem is the lack of historical precedent for Congress's action." *NFIB v. Sebelius*, 567 U.S. 519, 550 (2012) (cleaned up). That Congress has never attempted anything remotely similar supports the State and not Defendants here. Moreover, as discussed above, several courts have already held that the Tax Mandate "is the type of federal invasion of state sovereignty that Spending Clause jurisprudence" cannot tolerate. *See Ohio*, 547 F.Supp.3d at 734; *West Virginia*, 571 F.Supp.3d at 1254; *see also Tennessee*, 2022 WL 17076099 at *22.

10

### B.    The Tax Mandate Is Unconstitutionally Coercive And Violates The Anti-Commandeering Doctrine

Setting aside the ambiguity and vagueness defect, the Tax Mandate also coerces and commandeers the State in violation of the Constitution. *See Kentucky*, 563 F.Supp.3d at 657 ("[T]he coercion presented in the ARPA is exactly the kind of intrusion on state sovereignty that the Constitution prohibits");[5] *Texas*, 2022 WL 1063088 at *5 ("The Court finds the threat to Plaintiffs' budgets here is 'economic dragooning' that exerts 'undue influence' rather than 'relatively mild encouragement'") (citation omitted); *see also* Doc. 78 at 16-20.

After citing several paragraphs of the State's complaint, Defendants argue that the State's coercion claim "is absent" from the complaint and insist the State has alleged coercion only if the Tax Mandate "prohibits the States from cutting taxes in essentially any manner." Doc. 86 at 19. In Defendants' view, "a tax cut, on its own, does not fall within the [Tax Mandate]'s ambit." Doc. 86 at 19 (quoting *Arizona*, 34 F.4th at 856 (R. Nelson, J., concurring), and *Missouri*, 39 F.4th at 1070 n.6). But that mistaken interpretation of the Tax Mandate is unavailing for the reasons described above. *Supra*, § I(A). In any event, the State has always alleged that the Tax Mandate is coercive or commandeering—irrespective of how the claim is characterized. *See* Doc. 78 at 10 & n.4. This claim is plainly raised in Count II of the State's Complaint. Doc. 1 at 14-16.[6]

As discussed in the State's Renewed Motion, Congress's offer of billions of dollars in ARPA funds in exchange for acceptance of the Tax Mandate comes at a time when states need money the most. Doc. 78 at 16-20. "[T]he pandemic has many state and local

---

[5] Although the Sixth Circuit reversed "the district court's conclusion that Kentucky's claim is justiciable and vacate[d] the injunction to the extent that it bars enforcement of the [Tax Mandate] against Kentucky," the Sixth Circuit did not disturb the district court's holding that the Tax Mandate is coercive in violation of the Spending Clause. *See Tennessee*, 2022 WL 17076099 at **2, 25.

[6] When Defendants opposed the State's initial motion for a preliminary injunction in April 2021, Defendants did not argue that the State's coercion claim had not been pled in the Complaint. *See* Doc. 31 at 17-25.

governments treading water." *Kentucky*, 563 F.Supp.3d at 657. Millions of dollars in ARPA funds (in some states, as in Arizona, billions) have been distributed to all 50 states. *See Estimated Federal Disbursement to States*, National Conference of State Legislatures.[7] ARPA funds amount to <u>roughly 30%</u> of the State's general fund budget. *Id*. at 17; *see also Arizona*, 34 F.4th at 845. "The numbers speak for themselves." *Kentucky*, 563 F.Supp.3d at 657. The July 2021 decision grossly minimized the Tax Mandate's inducement by stating that "[t]he downside to declining the ARPA funds is just that—Arizona would not have received ARPA funds." *Arizona*, 550 F.Supp.3d at 799. But given the billions of dollars at stake, which came at a time of severe economic hardship, the State had no real option but to take the ARPA funds, along with the uncertain conditions with them. *See* Doc. 78 at 17-18 (discussing analogy of ARPA funds available under the Tax Mandate to Medicaid spending at issue in *NFIB v. Sebelius*, which accounted for over 20 percent of the average state's total budget). Defendants argue that the Tax Mandate is "a modest restriction on an otherwise generous outlay of federal funds." Doc. 86 at 19. But the Tax Mandate's prohibition is far from modest; states cannot "directly" or "indirectly" offset tax cuts with ARPA funds. 42 U.S.C. § 802(c)(2)(A). Indeed, if the shoe were on the other foot, there is every reason to believe Congress would regard such restrictions on its sovereign taxing powers as expansive and egregious.

Defendants further argue that "ARPA is more modest than the prospective funding condition" deemed permissible in *NFIB* because the State would only have to repay ARPA funds that it "uses as an improper offset." Doc. 86 at 21. But this is hardly any consolation, given that money is fungible and it is impossible for the State to anticipate what amount might eventually be subject to recoupment. Moreover, the State's coercion claim is evaluated at the time the State chose "whether to surrender [its] sovereignty or forgo billions of dollars in federal funds." *Texas*, 2022 WL 1063088, at *5 (rejecting notion that threat of recoupment is necessary to decide whether Tax Mandate is coercive).

---

[7] *Available at:* https://bit.ly/3i9yuBU (last visited November 21, 2022).

Although Congress did not expressly demand that the states adopt Congress's preferred tax policy, that much is both implicit in, and inescapably flows from, the Tax Mandate's sweeping text. The Spending Clause and Tenth Amendment do not allow Congress to "order states to forgo a sovereign power by an explicit command or a conditional offer a State cannot refuse." *Texas*, 2022 WL 1063088, at *4. Because the Tax Mandate "unduly influences a State's power to set its own tax policies," *id*. at *5, it should be enjoined on this basis.

### C.      The Tax Mandate Is Unrelated to ARPA's Purpose

As discussed in the State's renewed motion, the Tax Mandate is also invalid because it violates *Dole*'s relatedness requirement. Doc. 78 at 20-21. *See New York v. United States*, 505 U.S. 144, 167 (1992) ("some relationship" must exist between the condition imposed and "the purpose of the federal spending"). The Tax Mandate fails this test because prohibiting states from making any tax reductions—no matter the justification or causal relationship to ARPA funds—possibly years *after* the impact of the pandemic has dissipated, does not bear any relationship to ARPA's stated purpose of mitigating the fiscal effects of COVID-19. *See* 42 U.S.C. § 802(a)(1). The Tax Mandate further impedes ARPA's purpose because it allows States to spend state funds for purposes other than pandemic relief, yet punishes States for providing tax relief to its citizens impacted by the pandemic.

Moreover, the Tax Mandate is not only lacking a rational relationship to the purpose of the State aid—it affirmatively violates the Act's express (and actual) purposes. Notably, the Act expends a truly enormous amount of money as stimulus through tax cuts and direct payments to taxpayers: approximately $593 billion in all. *See* Doc. 11-2, Exs. G, Z. Congress thus made its own determination through the Act that substantial tax relief (as well as spending) was appropriate to stimulate the U.S. economy. Barring the States from engaging in any form of stimulus through tax relief is shown as irrational by Congress's own actions. In essence, Congress's message to the States is "Tax cuts for me, but not for thee." But this flagrant hypocrisy does not satisfy the relatedness requirement.

13

Similarly, Congress's decision to apply the Tax Mandate only to the States and not local governments, underscores the lack of any rational relationship between ARPA's purposes and the Tax Mandate. Either macroeconomic stimulus through tax relief serves ARPA's purposes or it does not. But Congress's decision to hamstring States—but not local governments or itself—in enacting such stimulus has no legitimate connection to ARPA's purposes.

Citing paragraphs 65 and 66 of the State's Complaint, Defendants argue that the State did not plead this claim in its Complaint. Doc. 86 at 23.[8] Defendants are mistaken. In Count II, the State alleged that "the Tax Mandate is unrelated to the asserted federal interest in the national program advanced in [ARPA]" and cited *Dole*, 483 U.S. at 208. Doc. 1 at 15. As with the State's coercion claim, Defendants appear to argue that the State's relatedness claim can only survive if the Tax Mandate is broadly construed "under the problematic interpretation," which would prevent states from cutting taxes in essentially any manner.  Doc. 86 at 23 (citing *Arizona*, 550 F.Supp.3d at 795, and *Missouri*, 39 F.4th at 856 (R. Nelson, J., concurring)). As discussed above, however, the Tax Mandate's ambiguous and expansive text does not lend itself to any plausible narrow interpretation. *Supra*, § I(A). The Tax Mandate does not "bear some relationship to the purpose" of ARPA, *see Mayweathers*, 314 F.3d at 1067, because it flatly contradicts Congress's explicit endorsement of *federal* tax cuts as a tool for economic recovery from the pandemic. ARPA, Pub. L. No. 117-2, § 9621 (expanding earned income tax credit); § 9673 (exempting revitalization funds).

---

[8] When Defendants opposed the State's initial motion for a preliminary injunction in April 2021, Defendants did not argue that the State's relatedness claim had not been pled in the Complaint. *See* Doc. 31 at 19. And for good reason: it plainly was. That Defendants are scraping ever deeper into the bottom of the barrel reveals the weaknesses of their remaining arguments here.

### D.     Defendants Agree That Treasury's Regulations Cannot Cure the Tax Mandate's Deficiencies

Finally, Defendants concede that neither Treasury's Interim Final Rule nor Final Rule implementing ARPA's conditions could cure an unconstitutional statute. Doc. 86 at 9-10 (discussing final rule), 14 & n.3 (arguing "agency regulations have no bearing on the Spending Clause analysis" and this Court need not "look to the regulation"). Concession aside, the Spending Clause and Supreme Court precedent demand that Congress supply the requisite clarity in statutory language itself; a regulation cannot backfill the necessary clarity. *See Virginia Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc); *Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361-62 (5th Cir. 2021).

Thus, this Court should not rely on Treasury's regulations when resolving the merits of the State's constitutional claims. *See* Doc. 78 at 13-15, 20.

## II.    The State Has Met the Requirements for a Permanent Injunction

Defendants argue the State cannot meet the other injunction factors, but they make only cursory arguments contesting the irreparable-harm factor. Doc. 86 at 24. The State pointed out that the harm caused by the Tax Mandate "manifests in several forms," including the constraint on the State's taxing power, thus interfering with the State's sovereignty. Doc. 78 at 21-22. Defendants do not address that harm at all.

Instead, Defendants suggest the State "will have an 'adequate remedy' if recoupment proceedings ever materialize." Doc. 86 at 24 (citation omitted). That "wait-and-see approach" offers no solace and does not remedy the alleged harm at all. *Ohio*, 547 F.Supp.3d at 726. "[I]t is not merely the recoupment that harms" the State because "if the Tax Mandate is ambiguous as to a broad range of potential tax changes, then that ambiguity will have consequences of its own." *Id*. Arizona's Legislature "may be disinclined to consider *any* rate reduction, as to *any* state tax, because the Secretary could interpret that reduction as triggering a right to recoupment." *Id*. Defendants' attempt to minimize the harm to the State's sovereignty, "especially when coupled with the billions of dollars that are at risk based on that ambiguity," is unpersuasive. *Id*.

15

1       At the end of the day, if Congress has exceeded its authority under the Spending

2   Clause in a manner that putatively binds the States, that is sovereign injury. And

3   Defendants do not explain how sovereign injury could possibly be anything other than

4   irreparable harm: money damages could not remedy it, and they are not available here due

5   to Defendants' own sovereign immunity.

6       Defendants further argue that an injunction harms the federal government when its

7   laws are enjoined. Doc. 86 at 24. That argument fails, of course, when the law at issue is

8   unconstitutional. *See Otto v. City of Boca Raton*, 981 F.3d 854, 870 (11th Cir. 2020)

9   ("[N]either the government nor the public has any legitimate interest in enforcing an

10   unconstitutional ordinance."); *see also Texas*, 2022 WL 1063088 at *7 (emphasizing

11   Defendants "have no judicially cognizable interest in enforcing a provision—such as

12   Section 802(c)(2)(A)—that is coercive and commandeers [states], and Defendants remain

13   able to enforce the other ARPA provisions"). Ultimately, "our system does not permit

14   agencies to act unlawfully even in pursuit of desirable ends." *Alabama Ass'n of Realtors v.*

15   *HHS*, 141 S. Ct. 2485, 2490 (2021). The Treasury Department has no legitimate interest in

16   enforcing an unconstitutional law, and does not suffer a scintilla of cognizable harm from

17   an injunction against such enforcement.

18       Indeed, Defendants' argument is not merely wrong, but outright offensive to our

19   federal constitutional system. Defendants' position that an *unconstitutional* law—and one

20   that violates the sovereign of States under our constitutional system of dual sovereigns—

21   should be permitted to remain in effect *even though it is outright unconstitutional* is, quite

22   frankly, beyond the pale. Is it *really* Defendants' position that unconstitutional laws should

23   generally remain in place because enjoining them would harm the federal government's

24   putative "interest" in enforcing unconstitutional statutes?

25       Because the State has satisfied all of the requirements for injunctive relief, this

26   Court should issue a permanent injunction.

27       …

28

16

1

**CONCLUSION**

2      The Court should grant the State's Renewed Motion and deny Defendants' motion

3  to dismiss.

4      RESPECTFULLY SUBMITTED this 25th day of November, 2022.

5

6                                   **MARK BRNOVICH**
                                    **ATTORNEY GENERAL**

7

8  By
                                        Joseph A. Kanefield (No. 15838)
9                                       Drew C. Ensign (No. 25463)
                                        Linley Wilson (No. 027040)
10                                      Andrew Reilly (No. 029138)
                                        Robert J. Makar (No. 33579)
11                                          *Assistant Attorneys General*

12                                  *Attorneys for Plaintiff Arizona*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

**CERTIFICATE OF SERVICE**

I hereby certify that on this 25th day of November, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Arizona using the CM/ECF filing system. Counsel for all parties are registered CM/ECF users and will be served by the CM/ECF system pursuant to the notice of electronic filing.

 s/Linley Wilson
*Attorney for the State of Arizona*